1  Payam Shahian (State Bar Number 228406)
   **STRATEGIC LEGAL PRACTICES, APC**
2  email: pshahian@slpattorney.com
3  1875 Century Park East, Suite 700
   Los Angeles, California 90067
4  Telephone: (310) 277-1040
   Facsimile:  (310) 943-3838
5
6  [Additional attorneys on the signature page]

7  Attorneys for Plaintiffs DAVID J. KEEGAN, LUIS GARCIA, ERIC ELLIS,
   CHARLES WRIGHT, BETTY KOLSTAD, CAROL HINKLE, AND
8  JONATHAN ZDEB

9

10            **UNITED STATES DISTRICT COURT**

11    **CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION**

12
   DAVID J. KEEGAN, LUIS GARCIA,      | Case Number: 2:10-cv-09508-MMM -
13 ERIC ELLIS, CHARLES WRIGHT,        |                AJW
   BETTY KOLSTAD, CAROL HINKLE,       |
14 AND JONATHAN ZDEB individually,    | **FIRST AMENDED COMPLAINT**
15 and on behalf of a class of similarly | **FOR:**
   situated individuals,              |
16                                    | **(1) Violations of California**
17          Plaintiffs,               | **Consumer Legal Remedies Act; (2)**
                                      | **Violations of Unfair Business**
18       v.                           | **Practices Act; (3) Breach of Implied**
                                      | **Warranty pursuant to Song-Beverly**
19 AMERICAN HONDA MOTOR CO.,          | **Consumer Warranty Act; (4) Breach**
   INC., HONDA NORTH AMERICA,         | **of Written Warranty under the**
20 INC., AND HONDA MOTOR              | **Magnuson-Moss Warranty Act, 15**
   COMPANY, LTD.,                     | **U.S.C. § 2301** *et seq.***; (5) Breach of**
21                                    | **Express Warranty under Cal. Com.**
22          Defendants.               | **Code § 2313; (6) Violations of**
                                      | **Various States' Express Warranty**
23                                    | **Statutes; (7) Violations of Various**
24                                    | **States' Implied Warranty Statutes;**
                                      | **and (8) Violations of Various States'**
25                                    | **Consumer Protection Statutes**
26
27                                    | **JURY TRIAL DEMANDED**
28
   ─────────────────────────────
   **Case No.:** 2:10-cv-09508-MMM-AJW

   ─────────────────────────────
                **FIRST AMENDED COMPLAINT**

# **INTRODUCTION**

1.      Plaintiffs David J. Keegan, Luis Garcia, Eric Ellis, Charles Wright, Betty Kolstad, Carol Hinkle, and Jonathan Zdeb ("Plaintiffs") bring this action individually and on behalf of all similarly situated persons ("Class Members") who purchased or leased certain defective Honda Civic vehicles that were designed, manufactured, distributed, marketed, sold, and leased by Defendants American Honda Motor Co., Inc. ("Honda U.S.A."), Honda North America, Inc. ("Honda North America"), and Honda Motor Company, Ltd. ("Honda Japan") (collectively "Honda" or "Defendants").

2.      Defendants designed, manufactured, distributed, marketed, sold, and leased model year 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicles ("Class Vehicles") to Plaintiffs and Class Members.

3.      Beginning in 2006, if not before, Defendants knew or should have known that the Class Vehicles contain one or more design and/or manufacturing defects in their rear upper control arms that cause the tires of the Class Vehicles to wear out unevenly and prematurely.   Although this defect manifests itself during the warranty period and therefore, is covered by Honda's warranty, Honda failed, until recently (*i.e.*, January 2008), to repair and replace the Suspension Defect and the damaged tires under warranty.[1]

4.      The defect at issue affects the alignment/geometry of the Class Vehicles' rear suspension.  As a result of this defect, the Class Vehicles are or become misaligned, and as a result, the rear tires wear unevenly and prematurely, causing the occupants to experience an extremely rough ride, as well as

---

[1] Honda provides owners and lessees of Class Vehicles with a New Vehicle Limited Warranty.  The New Vehicle Warranty states that Honda will repair or replace, free of charge, any part that is defective in material or workmanship under normal use for 3 years or 36,000 miles, whichever comes first, or in some cases, a one-year, 12,000-mile warranty for certified used cars, or in other cases, a 60-day warranty for certified pre-owned cars.

exceptionally loud and disruptive noise, while driving the Class Vehicles ("the Suspension Defect").

5.     The Class Vehicles present a safety hazard and are unreasonably dangerous to consumers.  Tires are one of the most important mechanical components for vehicle control and safe driving.  This is because a driver has only three ways to control a car: braking, accelerating, or steering.  Each of these is dependent upon rolling friction with the ground beneath the wheels, and the only contact the vehicle has is through its tires.[2]

6.     The Class Vehicles present a safety hazard and are unreasonably dangerous to consumers because uneven and premature tire wear can have serious consequences on handling, steering, stability, and braking of the Class Vehicles while in operation.  For example, as a result of the Suspension Defect, the Class Vehicles' tread wear becomes uneven and can cause catastrophic tire failure.  This is because more pressure is being applied to one side of the tire then the other.  This results in excessive tire heat due to uneven vehicle weight distribution, which can cause uneven tire wear and other problems.  When this occurs, the Suspension Defect can suddenly and unexpectedly cause tire failure while the vehicle is in operation, thereby contributing to car accidents, which can cause personal injury or death.[3]

_____

[2] *See e.g.*, http://www.oregon.gov/OSP/PATROL/safety_tip_tire_safety.shtml.

[3] The Class Vehicles are also unsafe because the Suspension Defect results in the tires equipped on the Class Vehicles not complying with the Federal motor Vehicle Safety Standards ("FMVSS").  FMVSS 571.109 establishes the tire dimensions and laboratory test requirements for passenger vehicle tires.  Section S4.2.1(d) requires tires to incorporate a tread wear indicator that will provide a visual indication that the tire has worn to a tread depth of 1/16 inch.  Because the tires equipped on Class Vehicles experience uneven wear along the width of the tire, a tire wear indicator will not accurately reflect the depth of the remaining tire tread along the entire width of the tire.

7.     In addition to these safety hazards, the cost to repair the Suspension Defect and the damage that it causes (*i.e.*, the cost of replacement tires) can be exorbitant because consumers will be required to pay hundreds, if not thousands, of dollars both to repair the Suspension Defect and to prematurely replace the damaged tires.  Indeed, as a result of the Suspension Defect, the tires must frequently be replaced prematurely, in many cases after less than 20,000 miles.  In properly functioning vehicles without the Suspension Defect, the expected tread wear of the original factory tires installed in the Class Vehicles is approximately 75,000 miles or more.

8.     Plaintiffs are informed and believe and based thereon allege that Defendants knew or should have known that the Class Vehicles are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation.  Nevertheless, Defendants have actively concealed and failed to disclose this defect from Plaintiffs and the Class Members at the time of purchase or lease and thereafter.

9.     Plaintiffs are also informed and believe and based thereon allege that as the number of consumer complaints about the Suspension Defect increased, in January 2008, Defendants, through Honda U.S.A., issued a technical service bulletin ("TSB") to only their dealers[4] acknowledging and admitting to the existence of the Suspension Defect.  In this TSB, Defendants implemented cheaper, albeit temporary, fixes: namely, installing a new "rear upper control arm kit," replacing "the flange bolts and the worn tires," and "a four-wheel alignment to the new specification listed in REPAIR PROCEDURE."  (These are referred to herein as the "Suspension Modification.")  Plaintiffs allege that the 2008 TSB is equally applicable to all the Class Vehicles, including those vehicles that Defendants omitted from the 2008 TSB.

---

[4] The notice was not disseminated to all owners and lessees of the Class Vehicles.

10.    The control arm maintains control over the tires and the alignment by controlling the upward and downward motion and the pitch for the alignment. Upon information and belief, the original rear upper control arms installed on the Class Vehicles were too short and caused misalignment. As a result, Honda released this bulletin to replace the rear upper control arms with longer upper control arms illustrated here:



11.    Plaintiffs are informed and believe and based thereon allege that Honda's Suspension Modification is only a temporary fix and will not fix the underlying problem. It only marginally increases the amount of time before consumers again experience the Suspension Defect, the need for costly repairs, as well as the associated safety hazards.

12.    Plaintiffs are also informed and believe and based thereon allege that Defendants are aware that the Suspension Modification does not fix the defect. Rather, Defendants have implemented this temporary fix to prolong the amount of time that will elapse before the Suspension Defect manifests itself, thus helping ensure that the Suspension Defect occurs outside of the warranty period so that Defendants can easily and unfairly shift financial responsibility for the Suspension Defect to Class Members.

13.     While Honda's 2008 TSB appears to be directed to only those vehicles that are covered under warranty, Plaintiffs are informed and believe and thereon allege that the 2008 TSB is strictly limited to the most persistent customers and only those who visit Honda's dealers and complain loudly enough about the Suspension Defect and the premature tire wear that it causes.

14.     In other words, while Honda's dealers check consumers' tires during regular maintenance and inform them about the need to pay hundreds of dollars to replace their prematurely and unevenly worn tires, they fail to advise consumers about the cause of the premature tire wear and Honda's clandestine TSB that according to Honda can allegedly fix the problem.

15.     In fact, instead of providing consumers with the Suspension Modification under Honda's warranty, Honda and Honda's dealers, who are its agents for vehicles repairs, have routinely, wrongfully, and unfairly attributed consumers' premature tire to their driving habits, road conditions, and improper maintenance, despite the fact that Defendants have known since 2006 that the premature tire wear is due to the Suspension Defect alleged herein and despite the fact that since 2008, they have had a fix that according to Honda can fix the problem.

16.     Plaintiffs are informed and believe and based thereon allege that despite notice of the defect from numerous consumer complaints and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the defect, have not offered their customers a suitable repair or replacement free of charge, and have not offered to reimburse the Class Vehicles' owners and leaseholders the costs they incurred relating to diagnosing and repairing the Suspension Defect and the related damage that it causes.

17.     Honda knew and concealed the Suspension Defect that is contained in every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiffs and Class Members both at the time of

FIRST AMENDED COMPLAINT

sale and repair and thereafter. Had Plaintiffs and the Class Members known about these defects at the time of sale or lease, Plaintiffs and the Class Members would not have purchased the Class Vehicles or would have paid less for them. As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

18.     Additionally, as a result of the Suspension Defect contained in the Class Vehicles, Plaintiffs and the Class Members have been harmed and have suffered actual damages in that the Class Vehicles and their tires are experiencing premature and uneven tire wear and/or are substantially certain to experience premature and uneven tire wear before their expected useful life has run.

## PARTIES

### PLAINTIFF DAVID J. KEEGAN:

19.     Plaintiff David J. Keegan is a California citizen who lives in Dublin, California. Mr. Keegan purchased a new 2007 Honda Civic from Dublin Honda, in Dublin, California, on or about April 2007. Mr. Keegan purchased this vehicle primarily for his personal, family, or household purposes. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Honda, and bears the Vehicle Identification No. 1HGFA16857L069772.

20.     Following his purchase of his vehicle, with less than 25,000 miles on the vehicle's tires, Plaintiff noticed that his rear tires were wearing unevenly and prematurely and subsequently paid to replace all four tires for approximately $397.65. Plaintiff then began to experience the same type of uneven and premature tire wear with less than 20,000 miles on his second set of tires and subsequently paid several hundred dollars to replace all four of his second set of tires. With less than 25,000 miles on his third set of tires, Plaintiff again began

1   to experience the same type of uneven and premature tire wear and as a result

2   paid several hundred dollars more to replace all four of his third set of tires.

3        21.   Prior to replacing his second set of tires, Plaintiff complained to

4   Honda about the Suspension Defect. Honda refused to pay or reimburse Plaintiff

5   for the costs associated with replacing the prematurely and unevenly worn tires

6   on Plaintiff's vehicle—even though the premature and uneven tire wear

7   experienced by Plaintiff was attributable to the defect contained in the Class

8   Vehicles.

9   **PLAINTIFF LUIS GARCIA:**

10        22.   Plaintiff Luis Garcia is a citizen of New York. He purchased a new

11   2007 Honda Civic EX on or about March 17, 2007.

12        23.   In or about February 2008, with approximately 12,000 miles on the

13   odometer, Mr. Garcia noticed that the original factory installed tires on his

14   vehicle were experiencing premature wear. As a result, on February 15, 2008,

15   Plaintiff ordered four new tires from The Tire Rack at a cost of $476.78.

16        24.   On February 21, 2008, with approximately 13,018 miles on the

17   odometer, Plaintiff visited Honda's agent for vehicle repairs, Honda Morehead

18   Auto Sales, Inc. ("Morehead Honda"), to install the newly purchased tires at a

19   cost of over $100. During this visit, while the dealer noted that the "tires coming

20   off were feathered," it failed to disclose the Suspension Defect to Mr. Garcia and

21   Honda's Suspension Modification that could allegedly fix it.

22        25.   On April 24, 2008, with approximately 15,662 miles on the

23   vehicle's odometer, Mr. Garcia visited Morehead Honda to "[mount and balance]

24   summer tires in car remove snow[ tires] and mark tech replaced snow tires with

25   tires in car[, mount and balance]." During this visit, the dealer again failed to

26   disclose the Suspension Defect to Mr. Garcia and Honda's Suspension

27   Modification that could allegedly fix it.

28

26.    On May 6, 2008, with approximately 16,050 miles on the vehicle's odometer, Mr. Garcia took the subject vehicle to Morehead Honda complaining that since having taken out his snow tires, he "hears a noise when drivin[g]." The dealer verified Mr. Garcia's concern and replaced the vehicle's "right rear control arm." The dealer, however, refused to cover the entire cost of Mr. Garcia's tires, which were prematurely worn as the result of the Suspension Defect, under its express warranty. The dealer also failed to inform Mr. Garcia that the Suspension Modification that it performed on Mr. Garcia's vehicle was only a temporary repair. During this vist, Mr. Garcia also removed the winter tires and put the OEM tires back on the vehicle.

27.    Mr. Garcia, immediately noticed vibrations and a load roaring sound coming from the tires. In response, on May 14, 2008, Mr. Garcia purchased four new tires from The Tire Rack at a cost of approximately $340. On May 17, 2008, with approximately 16,382 miles on the odometer, Mr. Garcia took the vehicle to Advanced Auto of New Windsor, Inc. to install his four new tires at a cost of approximately $122.19.

28.    On August 22, 2008, with approximately 19,095 miles on the vehicle's odometer, Mr. Garcia began to experience noises and vibrations from his tires again. Mr. Garcia visited Morehead Honda to rotate and balance all four tires and paid out of pocket for this repair.

29.    On November 25, 2008, with approximately 23,855 miles on the odometer, Mr. Garcia was still experiencing vibrations and noise from his tires. Mr. Garcia visited Advanced Auto of New Windsor, Inc. to place winter tires on his vehicle and for a "four wheel alignment" and paid $223.83 out of pocket for this adjustment.

30.    On April 7, 2009, with approximately 28,700 miles on the vehicle's odometer, Mr. Garcia visited Advanced Auto of New Windsor, Inc. to take off

1   the winter tires and to balance all four tires and paid approximately $121.11 for
2   this adjustment.

3         31.    On September 22, 2009, with approximately 33,582 miles on the
4   odometer, Mr. Garcia visited Morehead Honda to rotate and balance all four
5   tires.

6         32.    On November 10, 2009, with approximately 35,431 miles on the
7   vehicle's odometer, Mr. Garcia visited Advanced Auto of New Windsor, Inc. to
8   put winter tires on his vehicle and balance all four tires and paid out of pocket
9   for this adjustment.

10         33.    On December 1, 2009, with approximately 34,800 miles on the
11   vehicle's odometer, Mr. Garcia visited Morehead Honda complaining that the
12   vehicle continues to suffer from premature tire wear. The dealer checked the
13   suspension and noted that it "found no problems." The dealer also checked the
14   vehicle's alignment and found it to be "in good condition." During this visit, the
15   Honda dealer failed to advise Plaintiff that his premature tire wear concerns were
16   as a result of the Suspension Defect alleged herein and that the new control arm
17   that Honda installed on Mr. Garcia's vehicle during the previous visit was only a
18   temporary repair. The Honda dealer also failed to disclose to Mr. Garcia that as
19   a result of the suspension defect he would continue to experience premature tire
20   wear problems (as long as he owned the subject vehicle) regardless of how often
21   he balanced the tires and adjusted their alignment.

22         34.    On March 29, 2010, with approximately 40,303 miles on the subject
23   vehicle's odometer, Mr. Garcia visited Morehead Honda to rotate and balance all
24   four tires.

25         35.    At some point thereafter, plaintiff removed the winter tires and
26   replaced them with summer tires. Immediately, plaintiff noticed vibrations and a
27   roaring sound coming from the tires. Having experienced this before, plaintiff
28   knew his tires needed to be replaced and purchased 4 new tires from Tire Rack.

36.     On June 24, 2010, with approximately 45,169 miles on the vehicle's odometer, Mr. Garcia visited Morehead Honda complaining that "loud roaring noise [comes] from rear tires."  In response, the dealer installed 4 newly purchased "customer supplied tires."  The service advisor also advised that Mr. Garcia should return in another 1,000 miles to see whether there was premature tire wear.

37.     On July 29, 2010, with approximately 47,565 miles on the vehicle's odometer, Mr. Garcia visited Morehead Honda requesting that the dealer check his tires for wear and alignment.  The dealer checked the tires and found all tire wear were normal.

38.     On December 15, 2010, with approximately 55,358 miles on the vehicle's odometer, Mr. Garcia took the vehicle too Advanced Auto of New Windsor, Inc. to place winter tires on the vehicle.  These winter tires were tires provided by his brother because the first set of winter tires wore prematurely. Mr. Garcia paid approximately $40 for this adjustment.

39.     On or about April 14, 2011, with 61,841 miles on the odometer, Mr. Garcia took his vehicle to Advanced Auto of New Windsor, Inc. to replace the winter tires with summer tires.

**PLAINTIFF ERIC ELLIS:**

40.     Plaintiff Eric Ellis resides in Adrian, Oregon.  On July 6, 2007, Mr. Ellis purchased a new 2007 Honda Civic LX from Tom Scott Honda in Nampa, Idaho.  Mr. Ellis purchased the car with an extended warranty of 84 months / 100,000 miles.

41.     Mr. Ellis first began experiencing problems with his suspension on or about March 20, 2008 at 14,343 miles.  Specifically, Mr. Ellis' car was making a loud rumbling noise.  Between that time and Mr. Ellis' most recent visit to Tom Scott Honda on May 21, 2011, Mr. Ellis continuously experienced a rumbling noise, rotated his tires several times, and purchased six new tires.

42.   On May 21, 2011 and at approximately 80,450 miles, Mr. Ellis visited Tom Scott Honda to complain about the rapid and uneven tire wear he had experienced with his Honda Civic since 2007.   Service advisor Roel Morales informed Mr. Ellis that he needed to purchase control arms, purchase four new tires, and pay for an alignment.   Importantly, Mr. Morales conceded that that the tires had experienced rapid and uneven tire wear.   At this time, two of the tires had been driven approximately 14,000 miles, and the other two approximately 30,000 miles.   Mr. Morales was unable to explain why Mr. Ellis was experiencing rapid and uneven tire wear on his current Honda Civic, but not on the previous three Hondas owned by Mr. Ellis.   Tom Scott Honda refused to pay for the new control arms, alignment and tires.

43.   At that point Mr. Ellis showed Mr. Morales TSB 08-001 which explicitly covers Mr. Ellis' car.   In response, Mr. Morales stated that the TSB was more limited than its terms.   Frustrated, Mr. Ellis left without purchasing the four new tires, alignment repair, and control arms for which Honda refused to pay.

**PLAINTIFF CHARLES WRIGHT:**

44.   Plaintiff Charles Wright is a citizen of and resides in Missoula, Montana.   He purchased a Honda Civic Hybrid on March 3, 2006, from University Motors in Missoula, Montana.   On April 14, 2006, and at 3,007 miles, Charles Wright took his car to University Motors for a new-car check-up and routine maintenance.   At that time, University Motors did not disclose any defect with his car.

45.   On August 31, 2006 and at 10,946 miles, Charles Wright took his car to University Motors for routine maintenance.   At that time, University Motors did not disclose any defect with his car.

46.   Immediately thereafter, on September 19, 2006, and at 15,927 miles, Charles Wright visited University Motors to complain about the rapid tire wear. He spoke to service advisor Barbara Sowers, who said that the stock tires on the

1    car were not as good as replacement tires available in the marketplace. Honda
2    did not offer to compensate Charles Wright for the rapid tire wear and did not
3    disclose any defect with his car.

4         47.    On October 14, 2006, and at 19,770 miles, the tires on Charles
5    Wright's car were completely bald. He purchased four new tires from Les
6    Schwab Tires, which were guaranteed to last 100,000 miles.

7         48.    On November 1, 2006, and at 20,027 miles, Charles Wright took his
8    car to University Motors for a safety check-up and routine maintenance. No
9    defect was disclosed.

10        49.    On December 29, 2006, and at 23,804 miles, Charles Wright took
11   his car to University Motors for routine maintenance. No defect was disclosed.

12        50.    On February 23, 2007, and at 27,656 miles, Charles Wright took his
13   car to University Motors for routine maintenance. No defect was disclosed.

14        51.    On April 13, 2007, and at 30,554 miles, Charles Wright took his car
15   to University Motors for routine maintenance. No defect was disclosed.

16        52.    On July 12, 2007, and at 35,784 miles, Charles Wright took his car
17   to University Motors for routine maintenance. No defect was disclosed.

18        53.    On October 23, 2007, and at 44,073 miles, Charles Wright took his
19   car to University Motors for routine maintenance. No defect was disclosed.

20        54.    On or about November 11, 2007, and at approximately 45,024
21   miles, while Charles Wright was driving his car at 55 MPH on Interstate 15, the
22   left rear tire suffered a blowout. He visited Les Schwab Tires and purchased one
23   new tire, guaranteed to last 80,000 miles.

24        55.    On March 17, 2008, and at 54,665 miles, Charles Wright took his
25   car to University Motors for routine maintenance. No defect was disclosed.

26        56.    On May 30, 2008, and at 55,150 miles, Charles Wright was
27   extremely frustrated when the three tires purchased on October 14, 2006, which
28   were supposed to last 100,000 miles, were completely bald. He visited Les

1  Schwab Tires and purchased three new tires, which were guaranteed to last

2  80,000 miles.

3      57.    On March 3, 2011, and at 83,826 miles, Charles Wright visited

4  University Motors again for routine maintenance.  At that time, University

5  Motors disclosed that he needed to replace a defect in the car and specifically

6  referenced the control arms.  University Motors did not offer to pay for the

7  control arms and did not offer to reimburse him for prior expenses associated

8  with the tires.  Instead, University Motors told him that he not only needed two

9  new rear tires, but that he needed new control arms.  This was the first time

10  University Motors disclosed the defect in Charles Wright's car.

11     58.    On March 13, 2011, and at 83,887 miles, Charles Wright visited Les

12  Schwab Tires and was told that he needed only one new rear tire, which he

13  purchased, and which was guaranteed to last 70,000 miles.

14     59.    When Charles Wright purchased his car in March 2006, he received

15  a new vehicle 3-year/36,000-mile limited warranty and a powertrain 5-

16  year/60,000-mile limited warranty.

17  **PLAINTIFF BETTY KOLSTAD:**

18     60.    Plaintiff Betty Kolstad is a citizen of and resides in Big Ben,

19  California.  On October 15, 2009, Betty Kolstad purchased a 2006 Honda Civic

20  from Auto West Honda in Roseville, California with a certified pre-owned car

21  warranty for 60 days.  Prior to the expiration of the 60-day warranty, Betty

22  Kolstad approached Auto West Honda, complaining about the drivability of the

23  car.  At that time, a service manager named Michelle had a service technician (a

24  stocky young man about 5'8") drive the car to test the drivability and told Betty

25  Kolstad that the car was fine.  Even though the service technician was well aware

26  of the multiple defects in the car, including those associated with the suspension

27  and Suspension Defect, he refused to implement the Suspension Modification at

28  the dealer's expense.

1       61.    Several months later and on March 26, 2010, Betty Kolstad's car

2  began grinding and squealing. She brought the car in for a meeting with service

3  manager Jeff Cullivan. Service manager Jeff Cullivan told Betty Kolstad that she

4  needed new tires. At the time of this visit, Betty Kolstad complained, but Auto

5  West Honda did not replace the tires, did not repair the Suspension Defect.

6  Interestingly, at that time, service technician Jeff Cullivan admitted that it was **not**

7  normal for the car's tires to need to be replaced so quickly. Betty Kolstad was

8  never able to visit Jeff Cullivan again.

9       62.    Several months later, and on September 8, 2010, Betty Kolstad's car

10  began experiencing the same grinding and shaking. Again, the dealer refused to

11  provide her with the Suspension Modification and reimbursement for tires.

12       63.    Several months later, Betty Kolstad's car began shaking and grinding

13  again. At that time, Auto West Honda and, in particular, service technician Chris

14  McCay, told Betty Kolstad that she needed four new tires and rotors. He informed

15  her that the rotors may be warped, but they could not analyze the rotors until the

16  tires were replaced. Upset at the rapid rate at which her car was deteriorating, she

17  refused and left to explore her options.

18       64.    Several months later and on February 11, 2011, Betty Kolstad's car

19  began experiencing the same problems. She took her car into Auto West Honda

20  and, in particular, visited with service technician Chris McCay. She purchased

21  four new tires and alignment for approximately $500.

22       65.    At that time, Auto West Honda refused to provide Betty Kolstad with

23  the Suspension Modification or reimbursement for her tires. Ultimately, Betty

24  Kolstad left the dealership completely frustrated at the rate at which her car was

25  deteriorating. She was likewise upset that the dealer refused to provide her new

26  brakes and resurfaced rotors at the dealer's expense. Her car continues to suffer

27  from these same annoying symptoms—symptoms that had been present since

28  prior to the expiration of her 60 day warranty.

66.   On March 1, 2011, Betty Kolstad again visited Auto West Honda. She spoke with technician Chris McCay. Chris McCay refused to compensate Betty Kolstad for prior work related to the tires and Suspension Defect. Chris McCay refused to provide Betty Kolstad the Suspension Modification that, according to Honda, was a defective part well-known to Honda prior to the day Honda sold Betty Kolstad her car.

67.   Finally, upon information and belief, Betty Kolstad believes that the car's defects manifested themselves (by causing premature and uneven tire wear, as well as premature brake and rotor wear) prior to the expiration of the original 3-year/36,000-mile warranty provided to the original purchaser. Betty Kolstad's requests to obtain the prior work history on the car have been refused by Auto West Honda.

## PLAINTIFF CAROL HINKLE:

68.   Plaintiff Carol Hinkle is a citizen of and resides in Salisbury, North Carolina. On April 2008, Carol Hinkle purchased a Honda Civic LX at Salisbury Honda in North Carolina with a Lifetime Warranty. On August 11, 2008 and at 12,007 miles, her husband, Rick Hinkle, visited Flow Honda in Winston Salem, North Carolina to have the rapid tire wear on the car inspected. At that time, Tony Stovall told Rick Hinkle that the stock tires that came with the car were "no good." Mr. Stovall informed Rick Hinkle that he needed new tires and Honda refused to pay for them. At that time, Flow Honda did not disclose any defect with the car.

69.   On January 3, 2009, Rick Hinkle visited Wagner Tires. The car had 18,902 miles on it and Rick Hinkle purchased four very expensive, high-quality tires to prevent any subsequent, rapid and uneven tire wear.

70.   Then, on February 9, 2009, the car began vibrating and the tires wore out. Rick Hinkle took the car to Piedmont Tire and had the tires balanced.

71.     Subsequently, on July 15, 2009, and at 45,005 miles, Rick Hinkle took the car to Stokes Tires and purchased four expensive tires.

72.     Thereafter, on August 26, 2009, and at 49,923 miles, Rick Hinkle took the car to Stokes Tires complaining about vibration.

73.     On November 13, 2009, and at 56,886 miles, Rick Hinkle noticed the tires had worn out again.  He took the car to Parish Tire and purchased four new expensive tires.

74.     On September 14, 2010, and at 74,880 miles, Rick Hinkle returned to Parish Tire again to buy two new tires and have them measured.

75.     On January 18, 2011, and at 78,114 miles, Rick Hinkle visited Parish Tire again because the tires were completely bald.  He purchased two new tires.

76.     On January 22, 2010, Mr. Hinkle visit Parish Tire again for a routine rotation and check-up.

77.     On July 19, 2010, and at 73,202 miles, the car began vibrating again. Mr. Hinkle took the car to Parish Tire and purchased two new tires.  At that time, Parish Tire informed Mr. Hinkle of the defect associated with Honda Civics and showed him literature to that effect.  Parish Tire informed Mr. Hinkle that he did not have the "C" control arm required by Honda's literature.

78.     On July 22, 2010, Mr. Hinkle visited Kenny G at Salisbury Honda because the tires had worn out again.  At that time, Salisbury Honda informed Mr. Hinkle that he indeed had the "C" control arms and that his car "checked out."

79.     On September 14, 2010, and at 74,880 miles, Mr. Hinkle returned to Parish Tire because the tires had worn out again.  On this visit, he purchased two new tires.

80.     Subsequently, on January 18, 2011, and at 78,174 miles, Mr. Hinkle approached Parish Tire to have the tires rotated.

81.     Finally, on March 8, 2011, the Hinkles visited with the service manager at Salisbury Honda.  They spoke to Scott Gavett and complained about

the rapid and uneven tire wear.  At that time, Salisbury Honda informed the Hinkles that Honda would not reimburse the Hinkles for their prior expenses and frustration.  Salisbury Honda informed the Hinkles that the car needed four new tires.  Salisbury Honda offered to pay for two of the four new tires.

**PLAINTIFF JONATHAN ZDEB:**

82.   Plaintiff Jonathan Zdeb resides in West Palm Beach, Florida.  He purchased a new 2007 Honda Civic SI, from Holman Honda in Fort Lauderdale, Florida in or about January 2007.

83.   On August 11, 2008, with approximately 27,716 miles on the vehicle's odometer, Mr. Zdeb visited Honda's authorized dealer Braman Honda. Braman Honda inspected Mr. Zdeb's vehicle and aligned all four tires but never disclosed to him the Suspension Defect and Honda's Suspension Modification that could allegedly fix it.

84.   On August 21, 2008, with approximately 28,116 miles on his odometer, Mr. Zdeb visited Braman Honda and again was not told about the Suspension Defect and Honda's Suspension Modification that could allegedly fix it.

85.   On September 30, 2008, with less than 30,000 miles on the vehicle's odometer, Mr. Zdeb noticed that his tires were severely cupped and worn unevenly.  Mr. Zdeb went to Costco Tore Center, and the lead tire technician was surprised by the condition of his tires given the mileage and confirmed that his tires were cupped and needed to be replaced.  Mr. Zdeb replaced all four tires at Costco Tire Center for approximately $502.02.

86.   On July 8, 2009, with approximately 41,000 miles on the vehicle's odometer, Mr. Zdeb suffered a tire blow-out while driving.  Mr. Zdeb took the vehicle to Costco Tire Center and paid $135.55 for a single tire replacement to replace the tire.

87.     On February 10, 2010, with approximately 53,757 miles on the vehicle's odometer, Mr. Zdeb took the subject vehicle to Braman Honda for service and was told that "his tires are in poor condition." During this visit, Braman Honda never told Mr. Zdeb about the Suspension Defect and Honda's Suspension Modification that could allegedly fix it.

88.     In early 2010, with less than 55,000 miles on the vehicle's odometer, Mr. Zdeb began to notice that his tires were again wearing unevenly and prematurely. On April 8, 2010 with approximately 56,000 miles on the odometer, Mr. Zdeb took the vehicle to Costco Tire Center, whose technicians again confirmed that his rear tires had worn out prematurely, were severely cupped, and needed to be replaced. Mr. Zdeb replaced two rear tires for approximately $323.61.

89.     Given the premature and uneven tire wear that he had been experiencing, Mr. Zdeb began to conduct research to determine why the problem was occurring. Mr. Zdeb research revealed that the premature and uneven tire wear that he was experiencing may have been caused by the vehicle's defective rear upper control arms.

90.     On November 18, 2010, with approximately 66,841 miles on the vehicle's odometer, Mr. Zdeb visited Braman Honda complaining that his tires were wearing out unevenly and that there was a vibration that could be felt in the rear. Mr. Zdeb also asked the Honda dealer to check and see whether the upper control arm of his vehicle might be defective. The dealer inspected Mr. Zdeb's vehicle and was unable to duplicate Mr. Zdeb's complaints. The dealer also refused to perform Honda's Suspension Modification on Mr. Zdeb's vehicle despite the fact that Honda knew of the Suspension Defect and the new control arm that can allegedly fix it. The dealer refused to perform the Suspension Modification because they advised that his car (a Civic SI) was not included in the 2008 TSB. Interestingly, the dealer could not explain why Honda Civic SI

1  vehicles were not included in the TSB since they utilized the same rear upper

2  control arms as the other Civic models.

3      91.    Unhappy with Honda's inability to resolve his premature tire wear

4  concerns, on or about November 19, 2010, Mr. Zdeb paid approximately $299.00

5  to purchase aftermarket modified rear control arms and an additional $120.34 to

6  install it.

7      92.    On November 23, 2010, with approximately 66,998 miles on the

8  vehicle's odometer, Mr. Zdeb again replaced all four tires as result of premature

9  wear for approximately $653.90.

10     93.    At all times, Mr. Zdeb, like all Class Members, had driven his vehicle

11  in a foreseeable manner and in the manner in which it was intended to be used.

12  **Defendants**:

13     94.    Defendants Honda Japan, Honda U.S.A., and Honda North America,

14  are automobile design, manufacturing, distribution, and/or servicing corporations

15  doing business in all 50 states.  Defendants design, manufacture, distribute,

16  market, service, repair, sell and lease passenger vehicles, including the Class

17  Vehicles, nationwide.

18     95.    Honda Japan, 1-1, 2-chome, Minami-Aoyama, Minato-ku, Tokyo

19  107-8556, Japan, is an automobile design, manufacturing, sale, leasing,

20  distribution, and servicing corporation organized under the laws of Japan.

21  Honda Motor Company, Ltd. is the parent and owns 100% of American Honda

22  Motor Co., Inc. and Honda North America, Inc.  Honda Motor Company, Ltd.

23  designed and manufactured the Class Vehicles.

24     96.    Honda U.S.A. has its principal place of business at 1919 Torrance

25  Boulevard, Torrance, California 90501-2746.  Honda U.S.A. is the United States

26  distributor and warrantor of the Class Vehicles.

27

28

1    97.    Honda North America has its principal place of business at 700 Van

2   Ness Avenue, Torrance, California 90501-1486 and according to its website is

3   responsible for "Coordination of Honda operations in North America."

4                                    **JURISDICTION**

5    98.    This is a class action.

6    99.    This Court has jurisdiction over this action under the Class Action

7   Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class

8   members exceed the sum value of $5,000,000, exclusive of interests and costs.

9   This Court has jurisdiction over Honda because it maintains its principal

10  headquarters in California, is registered to conduct business in California, has

11  sufficient minimum contacts in California, or otherwise intentionally avails itself

12  of the markets within California, through promotion, sale, marketing, and

13  distribution of its vehicles in California, to render the exercise of jurisdiction by

14  this Court proper and necessary. Moreover, Honda's wrongful conduct (as

15  described herein) emanates from California.

16                                       **VENUE**

17   100.   Venue is proper in this District under 28 U.S.C. § 1391 because at

18  least one Defendant resides in this District and a substantial part of the events or

19  omissions giving rise to Plaintiffs' claims occurred in this District.  Plaintiffs'

20  counsel's Declaration, as required under California Civil Code section 1780(d),

21  which reflects that at least one Defendant resides in this district and that a

22  substantial part of the events or omissions giving rise to the claims alleged herein

23  occurred, or a substantial part of property that is the subject of this action, is

24  situated in Los Angeles County, California, is attached as Exhibit 1 to Plaintiff's

25  Original Complaint filed with this Court.

26                                 **APPLICABLE LAW**

27   101.   With the exception of Plaintiffs' implied warranty cause of action,

28  California State law applies to all claims brought on behalf of all Nationwide

Case No. 2:10-cv-09508-MMM-AJW              Page 20

1  Class Members.  If, however, the Court decides that California State law only
2  applies to California Class Members, then the Court should apply the state law of
3  the various Statewide Sub-Classes (defined below with reference to ¶ 124).

4
5  **FACTUAL ALLEGATIONS**

6  102.   For years, Honda has designed, manufactured, distributed, sold, and
7  leased the Class Vehicles.  Upon information and belief, it has sold, directly or
8  indirectly through dealers and other retail outlets, tens of thousands of Class
9  Vehicles in California and nationwide.

10  103.   The Class Vehicles and the rear suspension of the Class Vehicles are
11  defective, including but not limited to defects contained in the rear control arm
12  of the Class Vehicles.

13  104.   The defect at issue affects the alignment/geometry of the rear
14  suspension of the Class Vehicles.  As a result of this defect, the Class Vehicles
15  are, or become (among other things) misaligned and, as a result, the rear tires
16  wear unevenly and prematurely, causing the occupants to experience an
17  extremely rough ride, as well as exceptionally loud and disruptive noise, while
18  driving the Class Vehicles.

19  105.   Plaintiffs are informed and believe and based thereon allege that
20  Honda acquired its knowledge of the Suspension Defect through sources not
21  available to Class Members, including but not limited to pre-release testing data,
22  early consumer complaints about the Suspension Defect to Honda and its dealers
23  (who are its agents for vehicle repairs), testing conducted in response to those
24  complaints, aggregate data from Honda's dealers, and from other internal
25  sources.

26  106.   Honda had and has a duty to disclose the Suspension Defect and the
27  associated repair costs to Class Vehicles' owners, among other reasons, because
28  the defect poses an unreasonable safety hazard; because Honda had and has

exclusive knowledge or access to material facts about the Class Vehicles and their rear suspension that was and is not known or reasonably discoverable by Plaintiffs and Class Members; and because Honda has actively concealed the Suspension Defect from its customers.

107. Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced the Suspension Defect. Complaints filed by consumers with the NHTSA and posted on the Internet demonstrate that the defect is widespread and dangerous. The complaints also indicate Honda's awareness of the defect and how potentially dangerous the defective condition is (note that spelling and grammar mistakes remain as found in the original):

- NHTSA Complaint: 2006 HONDA CIVIC. CAR WAS MAKING LOUD NOISE, BUT I COULDN'T TELL WHERE IT WAS COMING FROM (EXCEPT SOMEWHERE UNDERNEATH) KIND OF A GRINDING NOISE. I PURCHASED NEW TIRES ABOUT 12 MONTHS AGO, BECAUSE THE TRIES FROM THE FACTORY WEREN'T GOOD IN THE SNOW (OR SO I THOUGHT). I TOOK IT TO THE DEALER AND THEY SAID I'D NEED REAR CONTROL ARMS AND NEW TIRES, BECAUSE THE TIRES WERE VERY WORN. IT'S A 2006 CIVIC AND ABOUT 10,000 MILES ON THOSE TIRES. THE WHOLE THING IS GOING TO COST ME ALSMOST $1,000.00 BUT THE GUY AT THE DEALER SAID "WELL, YOU GET A $50.00 REBATE FOR THE TIRES" OH BOY!! IT ISN'T UNDER WARRANTY ANYMORE EITHER OF COURSE. I WILL BE CONTACTING HONDA USA TO TALK TO THEM. BUT HAVE SEEN FROM THIS WEBSITE THAT IT WON'T DO ANY GOOD, BUT I STILL HAVE TO TRY. I AM DISGUSTED WITH THIS AS I BOUGHT A HONDA BECAUSE THEY HAVE SUCH GLOWING RELIABILITY AND SAFETY REPORTS. I HAD ONE ACCIDENT (REAR ENDED), NOT WITH THIS CAR ALSO NOT MY FAULT AND I DO NOT WANT TO HAVE ANOTHER!! I WILL BE KEEPING THE PARTS AND THE TIRES WHEN I GET IT DONE.

- NHTSA Complaint: 2006 HONDA CIVIC. THE CONTACT OWNS A 2006 HONDA CIVIC LX. WHILE DRVING 60 MPH

THE VEHICLE STARTED TO SHAKING IN THE REAR.  HE
PULLED OVER TO THE SHOULDER OF THE ROAD AND
NOTICED THAT THE PASSENGER SIDE REAR TIRE WAS
DAMAGED.  THE VEHICLE WAS TOWED TO A TIRE
COMPANY.  THE TIRE WAS REPLACED AND ALIGNED.
ELEVEN MONTHS LATER, THE IDENTICAL. FAILURE
OCCURRED ON THE REAR TIRE.  THE TIRE WAS REPLACED
AND THE VEHICLE WAS ALIGNED.  HE STATED THAT THE
FAILURE HAPPEN AGAIN ELEVEN MONTHS LATER AND HE
TOOK THE VEHICLE TO THE DEALER.  THE DEALER
ADVISED HIM THAT THRE REAR UPPER CONTROL ARM
NEEDED REPLACING.  THE VEHICLE HAS NOT BEEN
REPAIRED.  THE FAILURE MILEAGE APPROXIMATELY 8,000
AND T THE CURRENT MILEAGE WAS 75,000.

- NHTSA Complaint: 2006 HONDA CIVIC.  THE CONTACT
  OWNS A 2006 HONDA CIVIC.  THE CONTACT STATED THE
  REAR UPPER CONTROL ARMS ARE CAUSING THE TIRES TO
  CUP AND WEARS RAPIDLY AT 15,000.  THIS IS A KNOWN
  DESIGN FLAW THAT THE MANUFACTURER HAS
  RECOGNIZED IN THE TSB (NHTSA # 10024657).  THE
  CONTACT CALLED THE MANUFACTURER REGARDING THE
  CONTROL ARMS AND STATED THEY REFUSE TO HANDLE
  THE COST OF THE REPAIRS.  THE CONTACT STATED THIS
  IS A MAJOR SAFETY ISSUE THAT THE MANUFACTURER IS
  IGNORING.  THE FAILURE MILEAGE WAS 67,000.

- NHTSA Complaint: 2006 HONDA CIVIC.  I'VE HAD A
  PROBLEM WITH THE REAR TIRES WEARING OUT QUICKLY
  AND VIBRATIONS WHEN TRAVELING ABOVE 50 MPH.
  YESTERDAY THE RIGHT REAR TIRE SEPERATED AND
  STATED SMOKING.  I CHANGED THE TIRE AND TOOK THE
  CAR IN AND THE OTHER REAR TIRE HAD VEY UNUSUAL
  WEAR TO THE BELT ON THE INNER PART.  THE SAME
  PLACE THE OTHER TIRE SEPERATED.  IN LOOKING THIS UP
  ON THE INTERNET IT SEEMS TO BE A COMMON PROBLEM
  WITH THE HONDA CIVICS AND THRE REAR ALIGNMENT
  BEING DEFECTIVE.  THIS SHOULD BE INVESTIGATED
  BEFORE SOMEONE, IF NOT ALREADY, IS KILLED BY SUCH
  PROBLEM.

1
2
3
4
5
6
7
8
9
10
11

- NHTSA Complaint: 2006 HONDA CIVIC. 2006 HONDA CIVIC EX 4 DOOR SEDAN. PROBLEM WITH THE REAR UPPER CONTROL ARMS. I WAS DRIVING THE CAR, AND NOTICED SUDDENLY THAT THE TIRES START MAKING HORRIBLE NOISES. ALMOST SOUNDING AS IF I HAD A FLAT TIRE. THE EFFECT ON DRIVING WAS VERY BAD CONTROL AND STEERING WAS EFFECTED, I CHECKED THE TIRES, BUT DIDN'T NOTICE ANYTHING SPECFIC EXCEPT FOR WEAR ISSUES. TAKING IT IN TO HONDA, THEY SADI THAT "NO ONE COULD FIX THE PROBLEM EXCEPT FOR HONDA". THEY SAID THAT A "NEW, UPDATED PART" HAD BEEN RELEASED A YEAR AND A HALF AGO (WHEN MY CAR WAS STILL UNDER WARRANTY) THERE WAS A TECHNICAL SERVICE BULLETIN ISSUED, SO THE PROBLEM WAS WELL KNOWN. THEY STILL HAVE NOT ISSUED A RECALL. THIS IS A SERIOUS DANGER TO DRIVER SAFETY. *TR.

12
13
14
15
16
17
18

- NHTSA Complaint: 2006 HONDA CIVIC. REAR CONTROL ARMS (CAMBER ARMS) CAUSE SEVERE INNER TIRE WEAR. 85,000 MILE TIRES LAST APPROXIMATELY 30,000 MILES BEFORE INSIDE OF TIRES WEAR AND CUP. HONDA ISSUED A TSB 08-011 WHICH ADDRESSES THE PROBLEM, BUT HONDA REFUSED TO FIX AS A WARRANTY CLIAM UNTIL RECENTLY 3/10/10 AND THEN ONLY COVERED 25% COST OF REPAIR REAR CONTROL ARMS WERE REPLACED AND ALIGNMENT COMPLETED 3/13/10. *TR.

19
20
21
22
23
24

- NHTSA Complaint: 2006 HONDA CIVIC. REAR SUSPENSION, PREMATURE TIRE WEAR 2006 CIVIC SI. TURNED DOWN AT DEALER EVEN WITH WARRANTY IN HAND AT ABOUT 30,000 MILES FOR REPAIR OR REPLACEMENT OF REAR CONTROL ARMS/PARTS WITHOUT PAYING OUT OF POCKET. STATES NOT COVERED HAVE HAD THE PROBLEM SINCE AND 4 WHEEL ALIGNMENT IS NOT THE REMEDY. NOTICE BAD CUPPING TO INNER REAR TIRES AND HARSH VIBRATIONS AND NOISE. *TR.

25
26
27
28

- NHTSA Complaint: 2006 HONDA CIVIC. 2006 HONDA CIVIC EX 2 DOOR. HONDA HAS A SERVICE BULLETIN FOR A BAD REAR UPPER CONTROL ARM OVER TIME TO THIS DEFECT INNER TIRE WEAR IS EXCESSIVE. THIS CAN LEAD TO TIRE BLOW OUT. HONDA IS ONLY REPLACING THE PART WHEN

ASKED.  DUE TO THIS DEFECT I HAVE THROUGH TWO
SETS OF TIRES, A BRAKE JOB AND NOW NEED A NEW
WHEEL BEARING.  HONDA IS ONLY WILLING TO REPLACE
THE CONTROL ARMS.  THEY ARE CHARGING FOR
ALIGNMENT, WHEEL BEARING AND TIRES.  THIS REALLY
SEEMS LIKE SOMETHING THAT SHOULD BE A RECALL.
TIRES ONLY LASTING 10,000 MILES BEFORE BECOMING
DANGEROUS IS NOT GOOD.  *TR.

- Internet Posting: The contact owns a 2006 honda civic. The contact
  stated the rear upper control arms are causing the tires to cup and
  wears rapidly at 15,000. This is a known design flaw that the
  manufacturer has recognized in the TSB (NHTSA #10024687). The
  contact called the manufacturer regarding the control arms and the
  stated they refuse to handle the cost of the repairs. The contact stated
  this is a major safety issue that the manufacturer is ignoring. The
  failure mileage was 67,000.

- Internet Posting: First set of tires repeatedly became cupped and
  caused high road noise. Rear end bounced and swayed. Repeated tire
  rotations and spin balancing of all four wheels failed to rectify. I
  replaced ties at 33,800. Second set of tire because cupped, rear end
  unstable. Tite rotation made problem worse. Replaced rear shocks.
  No effect; continued unstable and rear end swayed. When on rough
  pavement. Second set of tires cupped and noisy by 33,000 miles.
  Went to honda dealer asked for complete analysis. They said front
  end and suspension are sound. I was told that we have "outdated"
  upper control arms on the rear wheels that are "famous in honda
  garages for eating tires." service manager said these parts must be
  replaced before alignment is possible.  He said there has never been a
  recall issued.  I called american honda.  They informed me they did
  want to discuss the issue and that they would offer a small amount
  toward my replacing the parts. They will not stand behind this part
  even though it was a known manufacturing defect which was
  subsequently replaced on newer models.  I consider the car unsafe
  due to rear end instability.

- Internet Posting: I own a 2006 honda civic. The rear tires are cupping
  (others call it see-saw pattern). There is technical service bulletin for
  the lower control arm, dated february, 2008 that exactly describes the
  problem. The vehicle had three sets of new tires since it was

purchased. First I thought it was a tire problem and I kept changing the tires, only to discover after the car was out of Warranty, that it was a manufacturing defect. I contacted the manufacturer, and I spoke to my caldarella from american honda motor who refused to offer any assistance, stating that it was my fault that "I did not give them the opportunity to fix the car." The service bulletin was not communicated to me, I found out through my research, but in the meantime the Warranty expired.

- Internet Posting: 2006 honda civic - rear control arms (camber arms) cause severe inner tire wear. 85000 mile tires last approx. 30000 miles before inside of tires wear and cup. Honda issued a TSB 08-001 which addresses the problem, but honda refused to fix as a Warranty claim until recently 3/10/10 and then only covered 25% cost of repair. Rear control arms were replaced and alignment completed 3/13/10.

- Internet Posting: I have noticed that there is noise during driving which appear to be from the tires and it can be annoying at points. I read about the service bulletin about the upper control arms and my car has the problems that occur to having a bad control arm. The inner portion of my tires are wearing out faster than the other parts of the tires. Honda and the dealership I go to won't cover the replacement of the control arms because I am out of Warranty. I didn't know about the control arm issue until recently. I have bought another set of tires because the first set started to make the steering wheel vibrate during speeds above 60 mph. Honda should make this a recall or cover all the costs of replacing these parts even if the car is out of Warranty. The car owner shouldn't have to pay for fixing this issue.

- Internet Posting: 2006 honda civic ex defective upper rear control arm which honda poorly designed so that it is too short from what I understand. Had to replace the control arm at a cost of approx. $700 prior to a 5,000 mile trip because tires were cupping and wearing poorly and handling was impacted especially in inclement weather.

- Internet Posting: Defective rear upper control arms which cause excessive tire wear. Only a service bulletin was issued from honda. The bad part is when the service bulletin was issued in july 2008 my vehicle was under Warranty. There's trust issues with my dealer (phil

**FIRST AMENDED COMPLAINT**

bachman honda) which I feel should have been looking out for me
their customer and made me aware of this but that didn't happen so I
am paying $700 instead of honda. When I contacted honda the
representative chris tried to point the problem to me for not replacing
my tires with the same brand that come on it from the factory. How
crazy this proves honda is a company of placing the blame on others
instead of taking ownership / fixing the bad control arms they
installed. I read the complaints and see that basically every brand of
tire has been damaged due to this. This should be reclassified as a
recall and everyone paid back for there repairs and prorated tire cost -
in my case honda owes me $220 for the control arm repair and $150
prorated tires. This must be the honda's new mind set never take
ownership.  It also may have to do with having 3 recalls already.

- Internet Posting: I purchased a 2006 honda civic new from dealer
  with 100k mile Warranty. They will not fix this issue. The suspension
  is faulty, causing the rear two tires to wear out on the inside of the
  tread within 15k miles. I've spent money for 4 sets of tires so far, and
  they won't fix it. They acknowledge that it's their problem, but there
  is no solution. I cannot understand how a company can produce a
  vehicle they know can't be aligned to not eat up tires.

- Internet Posting: 2006 honda civic rear control arms. Honda has
  issued a tsb08-001. Yet they will not honor the repair of what should
  be considered a defective part that was deemed to be too short and
  can cause rapid and uneven tire wear.

- Internet Posting: I own a honda civic lx 2006. The current mileage as
  of 06/18/2009 is ~40k miles. We started noticing a lot of noise from
  our rear tires while driving at speeds even as low as 30 mph. We also
  noticed significant vibration on the steering wheel while driving at
  speeds greater than 60 mph. The problem became worse every day.
  We took our car to the dealership (round rock honda), described the
  issue in detail and requested them to look at the issue. They noticed
  extreme uneven tire wear on the rear tires. They have given me
  written notice that I need to replace the rear control arm and the rear
  tires. I further found out from web complaints that this is a well know
  frequently occurring issue on honda civic 2006 model cars. There is a
  service bulletin 08-001 (NHTSA campaign id number: 10024687) on
  this issue. The dealer (round rock honda) is refusing to replace the
  rear control arm of the car claiming that they do not have a recall

notice and I am out of Warranty (called them on 06/18/2009). I have now replaced my tires to avoid driving in unsafe condition. I understand this is a temp. Solution and this issue can come back at any time. I am more worried to know that some of the other customers have this issue occur even at low mileages (10k miles). I kindly request you to consider this as a serious issue - putting the driver, passengers and other vehicles on the road at extreme risk. I also request you to demand honda to release a recall notice to make this car safer to drive.

- Internet Posting: I'm an owner of a honda civic ex '06, which was purchased brand new in 2006. After getting a flat tire (rear right side), my car was taken in to another dealer (not honda) and had all 4 tires replaced. The car had 39k miles on it. At the time, it was suggested that the car should be taken into honda to be inspected for uneven tire wear. I searched the internet and found out that other people had experienced the same problem with that model/year of car and there was even a service bulletin about it. After the inspection, honda stated that yes indeed, the uneven tire wear was due to a known problem with the rear upper control arms and that it must be replaced in order to correct the problem. Honda wouldn't pay for it at the time since my Warranty had already expired. I just want to write this notification because they should not be selling cars that has a potential safety hazard (especially when driving in rain or snow).

- Internet Posting: I have a 2006 honda civic. I have had to replace the rear tires on it 4 times since april of 2007. I contacted honda today, december 2, 2008 after finding a bulletin that they posted about the problem, but because my vehicle is now out of Warranty they refuse to reimburse me or pay to get this fixed. It states in the bulletin that the rear upper control arm is too short and that it causes uneven and rapid rear tire wear, as well as vibration at highway speeds. This is a hazard for me driving the vehicle as it is, but I do not have the money to keep replacing tires, nor do I have the money to get it fixed on my own. If they had sent me some type of notice or something I would have gotten this fixed while my vehicle was still under Warranty. Things like this should be fixed by the manufacturer, or dealership for no charge because they are a hazard to us as drivers, and expensive to fix.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Internet Posting: On the days leading up to the incident, heard a roaring in my tires. On wed. Aug 20th. I heard a loud pop coming from the rear of my car. Drove into work, left work and rear passenger tire was tilted inward. Had to get tow truck take it to dealership. On 8/22, clerk at dealership stated that the rear upper control arm had broke. She said they looked at it and believed it was a "leaky shock", I knew that wasn't the case. They then said it was result of an accident my car was involved in 2 years ago!!!. I contacted Insurance company and they immediately said that accident couldn't have caused that major damage. Insurance adjuster told dealership same thing. I was told that it was not a defect. From my documentation and research, there's numerous complaints about the rear upper control arms on the 06 & 07 honda civics. I was told that my extended Warranty would not be honored and I had to pay for what I know is a defect at the manufacturer. I've complained to honda hq with no action being taken thus far. I'm frazzled!! I can't believe they won't own up to this defect!! I need help with this!! I can't afford to pay for the repairs. Please respond asap!! they are still saying it's related to "an accident" (non-existent).

- Internet Posting: Cupping of rear tires caused by rear control arm premature wear. Parts not covered by a recall, car out of Warranty, cost to replace faulty control arm, $453.00, cost to replace ruined tires, $200.00. Due to the fact that this part is not on a recall at this time, no action has been taken, the faulty part is still on my car. The replacement part is on back order because of high demand for replacement on other cars like mine.

- Internet Posting: We took our 2006 honda civic in for service and we were told the tires needed to be rotated. When we left and got to highway speed the steering wheel shook violently and we didn't know what was going on. We kept the speed down and made it to another honda dealer. We were told this was normal and it would correct itself in about 500 or 600 miles. We left there and went to a tire shop where they took off the front tires (that were rotated from the back) and noticed they both had flat spots on them that were worn down to the cords. We rotated the tires back to get us by. The next day we replaced all 4 tires. The new tires were fine but when we had the brakes replaced we noticed the flat spots had come back with less than 16,000 miles on the tires. We took our honda in for an oil change and asked about the tires and if they could look at it, the

dealer told us about service bulletin 08-001. Service bulletin 08-001 is to correct the tire wear issue by replacing the upper controller arms on the rear suspension. We left the car, and soon got a call from the dealer telling us they could not perform the service because our car was out of Warranty (even though it will wear the tires out). Fortunately there was a honda representative there that day that approved the repair. We still had to pay for the alignment, even though it clearly states in the service bulletin that the alignment is included and even though we bought the extended Warranty at the time of purchase. We also got no compensation for tires even though there is a table for prorating the tires in the service bulletin. We had to replace the back tires again because of the flat spots. These were not down to the cords, but there was no tread left on the flat spots. I don't want my wife and young daughter to be stranded on the road or worse because of an engineering flaw by honda.

108.   Although Honda was aware of the widespread nature of the Suspension Defect in the Class Vehicles, and that it caused premature and uneven tire wear in the Class Vehicles, Honda took no steps to notify customers of the defect or to provide any relief until January 2008—approximately two years after most of the Class Vehicles had been placed in the marketplace.  At that late stage, and after most of the Class Vehicles had already been sold or leased and many Class Members had already replaced prematurely and unevenly worn tires without adequate reimbursement, Honda issued a TSB only to its dealers where it began to cover certain costs associated with temporary correction of the Suspension Defect (*i.e.*, replacing the rear control arm) and, on a *pro rata* basis, began providing certain  limited (albeit facially inadequate) reimbursements for prematurely worn tires as follows:

> American Honda will pay a prorated amount, as shown in the chart below, for replacement of *tires* due to uneven or rapid rear tire wear, based on the vehicle's mileage[5].

_____

[5] Honda released a similar TSB in 2009 where, in part, agreed to reimburse consumers based on the "tires mileage" as long as "Customers who had tires

| Tread Depth / Miles | 0/32" | 1/32" | 2/32" | 3/32" | 4/32" | 5/32" | 6/32" or more |
|---|---|---|---|---|---|---|---|
| 0-3,500 | 100% | 100% | 100% | 75% | 50% | 50% | 0% |
| 3,501-6,500 | 100% | 100% | 100% | 75% | 50% | 50% | 0% |
| 6,501-9,500 | 100% | 100% | 100% | 75% | 50% | 25% | 0% |
| 9,501-12,500 | 75% | 75% | 75% | 50% | 50% | 0% | 0% |
| 12,501-15,500 | 75% | 75% | 75% | 50% | 25% | 0% | 0% |
| 15,501-18,750 | 50% | 50% | 50% | 50% | 25% | 0% | 0% |
| 18,751-21,750 | 25% | 25% | 25% | 0% | 0% | 0% | 0% |
| 21,751-25,000 | 25% | 25% | 25% | 0% | 0% | 0% | 0% |
| over 25,000 | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

Abnormal Wear (% Covered by Honda)
Normal Wear (No Coverage by Honda)

109.   Honda's 2008 TSB, with respect to premature and uneven tire wear on the Class Vehicles, applied to all the Class Vehicles.

110.   Customers have reported the Suspension Defect in the Class Vehicles to Honda directly and through its dealers.  Defendants are fully aware of the Suspension Defect contained in the Class Vehicles.  Nevertheless, Defendants have actively concealed the existence and nature of the defect from Plaintiffs and the Class Members at the time of purchase or repair and thereafter. Specifically, Defendants:

      a.      failed to disclose, at and after the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Suspension Defect and, among others, the premature tire replacement repair costs that should have been covered under warranty;

      b.      failed to disclose at the time of purchase or repair that the Class Vehicles and their rear suspension were not in good

previously replaced due to wear, and whose vehicle is eligible for rear upper control replacement . . . ."

1    working order, were defective, and were not fit for their

2    intended purpose; and

3    c.    failed to disclose and/or actively concealed the fact that the

4          Class Vehicles and their rear suspension were defective,

5          despite the fact that Defendants learned of such defects as

6          early as 2006, if not before.

7    d.    failed to disclose and/or actively concealed the fact that as a

8          result of the suspension defect consumers would continue to

9          experience premature tire wear problems (as long as they

10         owned the subject vehicles) regardless of how often they

11         balanced their tires and adjusted their alignment.

12    111.   Defendants have caused Plaintiffs and Class Members to expend

13   money at their dealerships or other third-party repair facilities and/or take other

14   remedial measures related to the Suspension Defect contained in the Class

15   Vehicles.

16    112.   Defendants have not recalled the Class Vehicles to repair the

17   Suspension Defect, have not offered to its customers a suitable repair or

18   replacement of parts related to the Suspension Defect free of charge, and have

19   not under warranty nor offered to reimburse Class Vehicle owners and

20   leaseholders who incurred costs relating to repairs related to the Suspension

21   Defect.

22    113.   Class Members have not received the value for which they

23   bargained when they purchased or leased the Class Vehicles.

24    114.   As a result of the Suspension Defect, the value of the Class Vehicles

25   has diminished, including without limitation the resale value of the Class

26   Vehicles.

27    115.   Reasonable consumers, like Plaintiffs, expect and assume that a

28   vehicle's rear suspension is not defective and will not cause the tires to wear

1   unevenly and prematurely.  Plaintiffs and Class Members further expect and

2   assume that Honda will not sell or lease vehicles with known safety defects, such

3   as the Suspension Defect, and will disclose any such defect to its consumers

4   when they learn of the defect and offer to repair it under warranty.  They do not

5   expect Honda would fail to disclose the Suspension Defect to them, to

6   continually deny the defect, or to attribute the Suspension Defect to normal wear

7   and tear of the tires, Class Members' driving habits, and Class Members' failure

8   to properly maintain and rotate their tires, among other factors—all to avoid

9   millions of dollars in liability and warranty coverage.

10      116.   Class Members also do not expect Honda to charge them hundreds,

11   and in many instances thousands, of dollars to replace all or part of their rear

12   suspensions with defective parts that are only temporary fixes that will only

13   delay manifestation of the problem.

14      117.   Class Members also do not expect Honda to charge them hundreds,

15   and in many instances thousands, of dollars to replace tires for premature wear,

16   when the cause of the premature wear was due to a defect contained in the Class

17   Vehicles and one that should have been covered under the vehicle's express

18   warranty.

19      118.   Specifically, Honda has caused Class Members to expend money at

20   its dealerships to repair or replace the Class Vehicles' rear suspension, despite

21   Honda's knowledge of the Suspension Defect.  Moreover, where Honda replaced

22   the Class Vehicles' defective rear suspension at its dealerships, Defendants

23   utilized equally defective parts such that the defect was not corrected even

24   though Defendants informed consumers that the defect was corrected.

## TOLLING OF THE STATUTE OF LIMITATIONS

26      119.   Because the defects in the design or manufacturer of the Class

27   Vehicles and their rear suspension cannot be detected until the defect manifests

28   itself, Plaintiffs and the Class Members were not reasonably able to discover the

1    problem until after purchasing or leasing the Class Vehicles, despite their

2    exercise of due diligence.

3         120.   Plaintiffs and the Class Members had no realistic ability to discern

4    that the Class Vehicles and their suspension are defective until they experienced

5    the uneven and premature tire wear.  In addition, despite their due diligence,

6    Plaintiffs and the Class Members could not reasonably have been expected to

7    learn or discover that they were deceived and that material information

8    concerning the Class Vehicles and their rear suspension was concealed from

9    them.  Therefore, the discovery rule is applicable to the claims asserted by

10   Plaintiffs and the Class Members.

11        121.   In addition, even after Class Members contacted Honda and/or its

12   authorized agents for vehicle repairs in California concerning the defective

13   nature of the Class Vehicles, Plaintiffs and Class Members were routinely told

14   by Honda and/or through its authorized agents for vehicle repairs that the Class

15   Vehicles are not defective and that their uneven and premature tire wear was

16   attributable to causes other than the defects in the Class Vehicles such as, for

17   example, high or low tire pressure, failure to maintain or rotate tires, or poor

18   driving behavior.

19        122.   Any applicable statute of limitation has therefore been tolled by

20   Honda's knowledge, active concealment, and denial of the facts alleged herein.

21   Honda is further estopped from relying on any statute of limitation because of its

22   concealment of the defective nature of the Class Vehicles and their rear

23   suspension.

24                        **CLASS ACTION ALLEGATIONS**

25        123.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

26   and all others similarly situated as members of the proposed Plaintiffs Class

27   pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and/or (b)(2).  This

28   action satisfies the numerosity, commonality, typicality, adequacy, predominance,

Case No. 2:10-cv-09508-MMM-AJW              Page 34

1    and superiority requirements of those provisions.

2        124.   The Class and Sub-Classes are defined as:

3            Class: All purchasers and lessees of any 2006 through 2007
             Honda Civic and 2006 through 2008 Honda Civic Hybrid
4            vehicles who reside in the United States.

5        In the alternative, if the Court finds that California law should not be

6    uniformly applied to the claims of the proposed Class[6], Plaintiffs propose the

7    following Sub-Classes (collectively, the "Statewide Sub-Classes" or the "Sub-

8    Classes"):

9            California Sub-Class:     All Class Members who purchased
10           or leased their vehicles in California.  The proposed
             California Sub-Class representatives are Plaintiffs David J.
11           Keegan and Betty Kolstad.

12           New York Sub-Class:     All Class Members who purchased
             or leased their vehicles in New York. The proposed New
13           York Sub-Class representative is Luis Garcia.

14
             Florida Sub-Class:     All Class Members who purchased
15           or leased their vehicles in Florida.  The proposed Florida Sub-
             Class representative is Jonathan Zdeb.
16
             North Carolina Sub-Class: All Class Members who purchased
17           or leased their vehicles in North Carolina.  The proposed
             North Carolina Sub-Class representative is Carol Hinkle.
18
19           Montana Sub-Class:     All Class Members who purchased
             or leased their vehicles in Montana.  The proposed Montana
20           Sub-Class representative is Charles Wright.

21           Idaho Sub-Class:  All Class Members who purchased or
22           leased their vehicles in Idaho.  The proposed Idaho Sub-Class
             representative is Eric Ellis.
23
         125.   Excluded from the Class and Sub-Classes are: (1) Defendant, any
24
25   entity or division in which Defendants have a controlling interest, and its legal

26        [6] Plaintiffs are not proposing to apply California law to the nationwide
     class only in connection with their breach of implied warranty cause of action.
27   As set forth below, Plaintiffs are proposing only sub-classes for their implied
     warranty cause of action.
28

representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

126.  Numerosity: Although the exact number of Class Members or Sub-Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles of various states.

127.  Typicality: The claims of representative Plaintiffs are typical of the claims of the Class or Sub-Classes in that the representative Plaintiffs, like all Class Members, purchased and leased Class Vehicles designed, manufactured, and distributed by Honda in which the rear suspension was defective.  The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective suspension and its related parts.  Further, the factual bases of Honda's misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and negligent misconduct resulting in injury to all Class Members.

128.  Commonality: There are numerous questions of law and fact common to Plaintiffs and the Class or the Sub-Classes that predominate over any question affecting only individual Class or Sub-Class Members.  These common legal and factual issues include the following:

1  a. whether Class Vehicles suffer from the Suspension Defect;

2  b. whether the Suspension Defect constitutes an unreasonable

3    safety risk;

4  c. whether Defendants know about the Suspension Defect and, if

5    so, how long Defendants have known of the defect;

6  d. whether the defective nature of the Class Vehicles and their

7    rear suspension constitutes a material fact;

8  e. whether Defendants have a duty to disclose the defective

9    nature of the Class Vehicles and their rear suspension to

10    Plaintiffs and Class Members;

11  f. whether Plaintiffs and the Class Members are entitled to

12    equitable relief, including but not limited to a preliminary

13    and/or permanent injunction;

14  g. whether Defendants knew or reasonably should have known

15    of the Suspension Defect contained in the Class Vehicles

16    before they sold or leased them to Class Members;

17  h. whether Honda U.S.A. breached the Class Vehicles' express

18    warranty;

19  i. whether Defendants breached the implied warranty of

20    merchantability under California law, New York law,

21    Montana law, North Carolina law, Florida law, or Idaho law.

22  j. whether Defendants violated express warranty statutes under

23    California law, New York law, Montana law, North Carolina

24    law, Florida law, or Idaho law; and

25  k. whether Defendants violated consumer protection statutes

26    under California law, New York law, Montana law, North

27    Carolina law, Florida law, or Idaho law.

28

129.  <u>Adequate Representation</u>:  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

130.  <u>Predominance and Superiority</u>: Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION

(Violation of California's Consumer Legal Remedies Act,

California Civil Code § 1750 *et seq.*)

131.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

132.  Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against all Defendants.

133.  Each Defendant is a "person" as defined by California Civil Code § 1761(c).

134.   Plaintiffs and Class Members are "consumers" within the meaning of California Civil Code § 1761(d).

135.   By failing to disclose and concealing the defective nature of the Class Vehicles and their rear suspension from Plaintiffs and prospective Class Members, Defendants violated California Civil Code § 1770(a), as they represented that their Class Vehicles and their rear suspension had characteristics and benefits that they do not have, and represented that their Class Vehicles and their rear suspension were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

136.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

137.   Defendants knew that their Class Vehicles and their rear suspension suffered from an inherent defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

138.   Defendants were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles' and their rear suspension and/or the associated repair costs because:

a.    Defendants were in a superior position to know the true state of facts about the safety defects contained in the Class Vehicles and their rear suspension;

b.    Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their rear suspension have a dangerous safety defect until they experienced the uneven and premature tire wear; and

c.    Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn about or discover the safety defect.

139.   By failing to disclose the Suspension Defect, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

140.   The facts concealed or not disclosed by Defendants to Plaintiffs and the Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.  Had Plaintiffs and other Class Members known that the Class Vehicles and their rear suspension were defective, they would not have purchased the Class Vehicles or would have paid less for them.

141.   Plaintiffs and Class Members are reasonable consumers who do not expect that with proper maintenance their tires would wear unevenly and prematurely.  That is the reasonable and objective consumer expectation for tires.

142.   As a result of Defendants' misconduct, Plaintiffs and Class Members have been harmed and have suffered actual damages in that the Class Vehicles and their rear suspension are defective and are continuously causing their tires to wear unevenly and prematurely.

1    143.   As a direct and proximate result of Defendants' unfair or deceptive

2    acts or practices, Plaintiffs and Class Members have suffered and will continue

3    to suffer actual damages.

4    144.   Plaintiffs and the Class are entitled to equitable relief.

5    145.   Plaintiffs have provided Defendants with notice of their alleged

6    violations of the CLRA pursuant to California Civil Code § 1782(a).  Defendants

7    failed to provide appropriate relief for their violations of the CLRA, therefore,

8    Plaintiffs are now amending their Complaint to seek monetary, compensatory,

9    and punitive damages, in addition to injunctive and equitable relief.

10                        **SECOND CAUSE OF ACTION**

11    (Violation of California Business & Professions Code § 17200 *et seq.*)

12    146.   Plaintiffs hereby incorporate by reference the allegations contained

13    in the preceding paragraphs of this Complaint.

14    147.   Plaintiffs bring this cause of action on behalf of themselves and on

15    behalf of the Class against all Defendants.

16    148.   California Business & Professions Code § 17200 prohibits acts of

17    "unfair competition," including any "unlawful, unfair or fraudulent business act

18    or practice" and "unfair, deceptive, untrue or misleading advertising."

19    149.   Defendants knew their Class Vehicles and their Suspension Defect

20    suffered from an inherent defect, were defectively designed or manufactured,

21    would fail prematurely, and were not suitable for their intended use.

22    150.   In failing to disclose the Suspension Defect, Defendants have

23    knowingly and intentionally concealed material facts and breached their duty not

24    to do so.

25    151.   Defendants were under a duty to Plaintiffs and the Class Members

26    to disclose the defective nature of the Class Vehicles and their defective

27    suspension:

28

    a.    Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles and their suspension;

    b.    Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their rear suspension; and

    c.    Defendants actively concealed the defective nature of the Class Vehicles and their rear suspension from Plaintiffs and Class Members.

152.  The facts concealed or not disclosed by Defendants to Plaintiffs and the Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase Defendants' Class Vehicles, or to pay less for them.  Had Plaintiffs and other Class Members known that the Class Vehicles' suffered from the Suspension Defect described herein, they would not have purchased the Class Vehicles or would have paid less for them.

153.  Defendants continued to conceal the defective nature of the Class Vehicles and their rear suspension even after Class Members began to report problems.  Indeed, Defendants continue to cover up and conceal the true nature of the problem, while secretly replacing the control arm of the Class Vehicle to ensure that the defect will manifest itself outside of the warranty period.

154.  By its conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

155.  Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, and were capable of deceiving a substantial portion of the purchasing public.

1    156.   As a direct and proximate result of Defendants' unfair and deceptive

2    practices, Plaintiffs and Class Members have suffered and will continue to suffer

3    actual damages.

4    157.   Defendants have been unjustly enriched and should be required to

5    make restitution to Plaintiffs and the Class Members pursuant to §§ 17203 and

6    17204 of the Business & Professions Code.

7                            **THIRD CAUSE OF ACTION**

8    (Breach of Implied Warranty pursuant to Song-Beverly Consumer Warranty Act,

9                     California Civil Code §§ 1792 and 1791.1 *et seq.*)

10   158.   Plaintiffs hereby incorporate by reference the allegations contained

11   in the preceding paragraphs of this Complaint.

12   159.   Plaintiffs bring this cause of action against all Defendants on behalf

13   of themselves and on behalf of the California Sub-Class.

14   160.   Defendants were at all relevant times the manufacturer, distributor,

15   warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to

16   know of the specific use for which the Class Vehicles were purchased.

17   161.   Defendants provided Plaintiffs and Class Members with an implied

18   warranty that the Class Vehicles and any parts thereof are merchantable and fit

19   for the ordinary purposes for which they were sold.  However, the Class Vehicles

20   are not fit for their ordinary purpose of providing reasonably reliable and safe

21   transportation because, *inter alia*, the Class Vehicles suffer from a Suspension

22   Defect that can put the lives of its occupants and other drivers who share the road

23   with them at risk.

24   162.   Defendants impliedly warranted that the Class Vehicles were of

25   merchantable quality and fit for such use.  This implied warranty included,

26   among other things: (i) a warranty that the Class Vehicles and their suspension

27   were manufactured, supplied, distributed, and/or sold by Defendants were safe

28   and reliable for providing transportation; and (ii) a warranty that the Class

1  Vehicles and their suspension would be fit for their intended use while the Class

2  Vehicles were being operated.

3      163.   Contrary to the applicable implied warranties, the Class Vehicles

4  and their suspension at the time of sale and thereafter were not fit for their

5  ordinary and intended purpose of providing Plaintiffs and the Class Members

6  with reliable, durable, and safe transportation.  Instead, the Class Vehicles are

7  defective, including but not limited to the defective design and manufacture of

8  their suspension.

9      164.   Defendants' actions, as complained of herein, breached the implied

10  warranty that the Class Vehicles were of merchantable quality and fit for such

11  use in violation of  California Civil Code §§ 1792 and 1791.1.

12                    **FOURTH CAUSE OF ACTION**

13            (Breach of Written Warranty under the Magnuson-Moss

14                 Warranty Act, 15 U.S.C. § 2301 *et seq.*)

15      165.   Plaintiffs hereby incorporate by reference the allegations contained in

16  the preceding paragraphs of this Complaint.

17      166.   Plaintiffs bring this action on behalf of themselves and on behalf of

18  the Class against Honda U.S.A. only.

19      167.   Plaintiffs and the other Class Members are "consumers" within the

20  meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

21      168.   Honda U.S.A. is a "supplier" and "warrantor" within the meaning of

22  15 U.S.C. §§ 2301(4)-(5).

23      169.   The Class Vehicles are "consumer products" within the meaning of

24  15 U.S.C. § 2301(1).

25      170.   Honda U.S.A.'s express warranty is a "written warranty" within the

26  meaning of 15 U.S.C. § 2301(6).

27      171.   Honda U.S.A. breached the express warranty by:

28

a.   Extending a 3-year/36,000-mile New Vehicle Limited Warranty, and a 1-year/12,000-mile warranty, and in some cases, its extended warranty such as its 60-day warranty for pre-owned cars, with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b.   Selling and leasing Class Vehicles with control arms that were defective in material and workmanship, requiring repair or replacement within the warranty period;

c.   Refusing to honor the express warranty by repairing or replacing, free of charge, the suspension and the control arm or any of their component parts and instead, charging for repair and replacement parts; and

d.   Refusing to honor the express warranty by replacing tires that were damages as a result of the Suspension Defect alleged herein.

172.   Honda U.S.A.'s breach of the express warranty deprived the Plaintiffs and the other Class Members of the benefits of their bargains.

173.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

174.   Honda U.S.A. has been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other Class Members brought their vehicles in for diagnoses and repair of the Suspension Defect.

175.   As a direct and proximate result of Honda U.S.A's breach of written warranty, Plaintiffs and Class Members sustained damages and other losses in an

amount to be determined at trial. Honda U.S.A.'s conduct damaged Plaintiffs and Class Members who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## FIFTH CAUSE OF ACTION

(Breach of Express Warranty under Cal. Comm. Code § 2313)

176.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

177.   Plaintiffs bring this action on behalf of themselves and on behalf of the Class against Honda U.S.A. only.

178.   Honda U.S.A. provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became part of the basis of the bargain. Accordingly, Honda U.S.A.'s express warranty is an express warranty under California law.

179.   The control arm and its component parts, including the tires, were manufactured and/or installed and/or distributed by Honda U.S.A. in the Class Vehicles and are covered by the express warranty.

180.   Honda U.S.A. breached the express warranty by:

   a.   Extending a warranty to owners or lessees of the Class Vehicles, thereby warranting to repair or replace any defect in material or workmanship at no cost to the owner or lessee;

   b.   Selling and leasing Class Vehicles with control arms that were defective in material and workmanship, requiring repair or replacement within the warranty period; and

   c.   Refusing to honor the express warranty by repairing or replacing, free of charge, the control arms or any of its component parts affected by the Suspension Defect, including the tires, and instead charging for repair and replacement parts.

181.   Plaintiffs (or the prior owners of their Class Vehicles) notified Honda U.S.A. of the breach within a reasonable time, and/or were not required to do so because affording Honda a reasonable opportunity to cure its breach of written warranty would have been futile.  Honda U.S.A. was also on notice of the Suspension Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the control arm or a component thereof, and through its own maintenance records.

182.   As a direct and proximate cause of Honda U.S.A's. breach, Plaintiffs and the other Class Members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, *i.e.*, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.  Additionally, Plaintiffs and the other Class Members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

183.   Plaintiffs and the other Class Members are entitled to legal and equitable relief against Honda U.S.A., including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## SIXTH CAUSE OF ACTION

(Violations of Various States' Express Warranty Statutes)

184.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

185.   Plaintiffs bring this action on behalf of themselves and on behalf of the Statewide Sub-Classes against Honda U.S.A. only, under the express warranty statutes of the states in which they purchased the Class Vehicles.

186.   Honda U.S.A. provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became part of the

1   basis of the bargain. Accordingly, Honda U.S.A.'s express warranty is an express

2   warranty under state law express warranty statutes referred to herein.

3        187.  The control arm and its component parts, including the tires, were

4   manufactured and/or installed and/or distributed by Honda U.S.A. in the Class

5   Vehicles and are covered by the express warranty.

6        188.  Honda U.S.A. breached the express warranty by:

7           d.    Extending a warranty to owners or lessees of the Class

8                  Vehicles, thereby warranting to repair or replace any defect in

9                  material or workmanship at no cost to the owner or lessee;

10          e.    Selling and leasing Class Vehicles with control arms that were

11                 defective in material and workmanship, requiring repair or

12                 replacement within the warranty period; and

13          f.     Refusing to honor the express warranty by repairing or

14                 replacing, free of charge, the control arms or any of its

15                 component parts affected by the Suspension Defect, including

16                 the tires, and instead charging for repair and replacement parts.

17       189.  Plaintiffs (or the prior owners of their Class Vehicles) notified Honda

18  U.S.A. of the breach within a reasonable time, and/or were not required to do so

19  because affording Honda a reasonable opportunity to cure its breach of written

20  warranty would have been futile. Honda U.S.A. was also on notice of the

21  Suspension Defect from the complaints and service requests it received from Class

22  Members, from repairs and/or replacements of the control arm or a component

23  thereof, and through its own maintenance records.

24       190.  As a direct and proximate cause of Honda U.S.A's. breach, Plaintiffs

25  and the other Class Members have suffered damages and continue to suffer

26  damages, including economic damages at the point of sale or lease, *i.e.*, the

27  difference between the value of the vehicle as promised and the value of the

28  vehicle as delivered. Additionally, Plaintiffs and the other Class Members either

1   have incurred or will incur economic damages at the point of repair in the form of

2   the cost of repair.

3      191.   Plaintiffs and the other Sub-Class Members are entitled to legal and

4   equitable relief against Honda U.S.A., including damages, consequential damages,

5   specific performance, rescission, attorneys' fees, costs of suit, and other relief as

6   appropriate.

7      192.   The California Sub-Class: Honda U.S.A.'s practices, as alleged, were

8   and are in violation of California Commercial Code § 2313.

9      193.   The Montana Sub-Class: Honda U.S.A.'s practices, as alleged, were

10  and are in violation of Mont. Code Ann. 30-2-313.

11     194.   The North Carolina Sub-Class: Honda U.S.A.'s practices, as alleged,

12  were and are in violation of N.C. Gen. Stat. Ann. § 25-2-313.

13     195.   The Florida Sub-Class: Honda U.S.A.'s practices, as alleged, were

14  and are in violation of Fla. Stat. Ann. § 672.313.

15     196.   The New York Sub-Class: Honda U.S.A.'s practices, as alleged, were

16  and are in violation of N.Y. U.C.C. Law §§ 2-313.

17     197.   The Idaho Sub-Class: Honda U.S.A.'s practices, as alleged, were and

18  are in violation of Id. Stat. §§ 28-2-313.

19                    **SEVENTH CAUSE OF ACTION**

20  (Violations of Various States' Implied Warranty Statutes other than California)

21     198.   Plaintiffs hereby incorporate by reference the allegations contained in

22  the preceding paragraphs of this Complaint.

23     199.   Plaintiffs bring this action on behalf of themselves and on behalf of

24  the Statewide Sub-Classes against all Defendants, under the implied warranty

25  statutes of the states in which they purchased the Class Vehicles.

26     200.   Defendants were at all relevant times the manufacturer, distributor,

27  warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to

28  know of the specific use for which the Class Vehicles were purchased.

201.   Defendants provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffer from a Suspension Defect that can put the lives of its occupants and other drivers who share the road with them at risk.

202.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their suspension were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their suspension would be fit for their intended use while the Class Vehicles were being operated.

203.   Contrary to the applicable implied warranties, the Class Vehicles and their suspension at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including but not limited to the defective design and manufacture of their suspension.

204.   The Montana Sub-Class: Defendants' practices, as alleged, were and are in violation of Mont. Code Ann. 30-2-314.

205.   The North Carolina Sub-Class: Defendants' practices, as alleged, were and are in violation of N.C. Gen. Stat. Ann. §§ 25-2-314.

206.   The Florida Sub-Class: Defendants' practices, as alleged, were and are in violation of Fla. Stat. Ann. §§ 672.314.

207.   The New York Sub-Class: Defendants' practices, as alleged, were and are in violation of N.Y. U.C.C. Law §§ 2-314.

FIRST AMENDED COMPLAINT

208.   The Idaho Sub-Class: Defendants' practices, as alleged, were and are in violation of Id. Stat. §§ 28-2-314.

## EIGHTH CAUSE OF ACTION

(Violations of Various States' Consumer Protection Statutes)

209.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

210.   Plaintiffs bring this action on behalf of themselves and on behalf of the Statewide Sub-Classes against all Defendants under the consumer protection statutes of the states in which they purchased the Class Vehicles.

211.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

212.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of all Class Members.

213.   Plaintiffs and Class members are consumers who bought or leased the Class Vehicles for personal, family, or household purposes.

214.   The Class Vehicles and their parts and replacement parts are goods or merchandise, and Plaintiffs' purchases and leases of the Class Vehicles constitute transactions.  Defendants' sale, leasing, and/or repair of Class Vehicles through its authorized dealers occur in the regular course of Defendants' business.

215.   By failing to disclose and concealing the defective nature of the Class Vehicles and their rear suspension from Plaintiffs and prospective Class Members, Defendants have engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as they represented that their Class Vehicles and their rear suspension had characteristics and benefits that they do not have, and represented that their Class Vehicles and their rear suspension were of a particular standard, quality, or grade when they were of another.

1    216.   Defendants' unfair and deceptive acts or practices occurred

2    repeatedly in Defendants' trade or business, were capable of deceiving a

3    substantial portion of the purchasing public, and imposed a serious safety risk on

4    the public.

5    217.   Defendants knew that their Class Vehicles and their rear suspension

6    suffered from an inherent defect, were defectively designed or manufactured,

7    would fail prematurely, and were not suitable for their intended use.

8    218.   Defendants were under a duty to Plaintiffs and the Class Members

9    to disclose the defective nature of the Class Vehicles' and their rear suspension

10   and/or the associated repair costs because:

11           a.      Defendants were in a superior position to know the true state

12                   of facts about the safety defects contained in the Class

13                   Vehicles and their rear suspension;

14           b.      Plaintiffs and the Class Members could not reasonably have

15                   been expected to learn or discover that their rear suspension

16                   have a dangerous safety defect until they experienced the

17                   uneven and premature tire wear; and

18           c.      Defendants knew that Plaintiffs and the Class Members could

19                   not reasonably have been expected to learn about or discover

20                   the safety defect.

21   219.   By failing to disclose the Suspension Defect, Defendants have

22   knowingly and intentionally concealed material facts and breached their duty not

23   to do so.

24   220.   The facts concealed or not disclosed by Defendants to Plaintiffs and

25   the Class Members are material because a reasonable consumer would have

26   considered them to be important in deciding whether or not to purchase the Class

27   Vehicles, or to pay less for them.  Had Plaintiffs and other Class Members

28

known that the Class Vehicles and their rear suspension were defective, they would not have purchased the Class Vehicles or would have paid less for them.

221. Plaintiffs and Class Members are reasonable consumers who do not expect that with proper maintenance their tires would wear unevenly and prematurely. That is the reasonable and objective consumer expectation for tires.

222. As a result of Defendants' misconduct, Plaintiffs and Class Members have been harmed and have suffered actual damages in that the Class Vehicles and their rear suspension are defective and are continuously causing their tires to wear unevenly and prematurely.

223. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer actual damages.

224. Plaintiffs and the other Class Members are entitled to legal and equitable relief against Honda U.S.A., including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

225. The California Sub-Class: Honda U.S.A.'s practices, as alleged, were and are in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*

226. The Montana Sub-Class: Honda U.S.A.'s practices, as alleged, were and are in violation of Mont. Code §§ 30-14-101 *et seq.*

227. The North Carolina Sub-Class: Honda U.S.A.'s practices, as alleged, were and are in violation of N.C. Gen. Stat. §§ 75-1.1 *et seq.*

228. The Florida Sub-Class: Honda U.S.A.'s practices, as alleged, were and are in violation of Fla. Stat. §§ 501.201 *et seq.*

1    229.   The New York Sub-Class: Honda U.S.A.'s practices, as alleged, were

2    and are in violation of New York's Consumer Protection from Deceptive Acts and

3    Practices statute, N.Y. Gen. Bus. Law §§ 349 *et seq.*

4    230.   The Idaho Sub-Class: Honda U.S.A.'s practices, as alleged, were and

5    are in violation of Idaho Code §§ 48-601 *et seq.*

6                              **RELIEF REQUESTED**

7    231.   Plaintiffs, on behalf of themselves, and all others similarly situated,

8    requests the Court to enter judgment against Defendants, and accordingly,

9    request the following:

10            a.    An order certifying the proposed Class and Sub-Classes,

11                  designating Plaintiffs as named representative of the Class,

12                  and designating the undersigned as Class Counsel;

13            b.    A declaration that Defendants are financially responsible for

14                  notifying all Class Members about the defective nature of the

15                  Class Vehicles and their defective suspension;

16            c.    An order enjoining Defendants from further deceptive

17                  distribution, sales, and lease practices with respect to their

18                  Class Vehicles, and to remove and replace Plaintiffs and Class

19                  Members' rear suspension with a suitable alternative product;

20            d.    Any and all remedies provided pursuant to the Song-Beverly

21                  Act, including California Civil Code section 1794;

22            e.    An award to Plaintiffs and the Class of compensatory,

23                  exemplary, and statutory damages, including interest, in an

24                  amount to be proven at trial;

25            f.    A declaration that Defendants must disgorge, for the benefit

26                  of the Class, all or part of the ill-gotten profits they received

27                  from the sale or lease of their Class Vehicles, or make full

28                  restitution to Plaintiffs and Class Members;

g.    An award of attorneys' fees and costs, as allowed by law;

h.    An award of attorneys fees and costs pursuant to California Code of Civil Procedure § 1021.5;

i.    An award of pre-judgment and post-judgment interest, as provided by law;

j.    Leave to amend the Complaint to conform to the evidence produced at trial; and

k.    Such other relief as may be appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

232.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: May 23, 2011         **STRATEGIC LEGAL PRACTICES, APC**

By:    Payam Shahian
         Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robert L. Starr (State Bar No. 183052)
**THE LAW OFFICE OF ROBERT L.
STARR**
email:  starresq@hotmail.com
23277 Ventura Boulevard
Woodland Hills, California 91364-1002
Telephone:  (818) 225-9040
Facsimile:   (818) 225-9042


Matthew R. Mendelsohn (awaiting *pro hac
vice*)
email:  mmendelsohn@mskf.net
David A. Mazie (awaiting pro hac vice)
email:  dmazie@mskf.net
**MAZIE SLATER KATZ & FREEMAN,
LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone:   (973) 228-9898
Facsimile:    (973) 228-0303


Michael A. Caddell (State Bar No. 249469)
mac@caddellchapman.com
Cynthia B. Chapman (State Bar No.
164471)
cbc@caddellchapman.com
Brian M. Keller (*pro hac vice* forthcoming)
bmk@caddellchapman.com
**CADDELL & CHAPMAN**
1331 Lamar, Suite 1070
Houston, TX 77010-3027
Telephone:  (713) 751-0400
Facsimile:  (713) 751-0906