1
2
3
4
5
6                        UNITED STATES DISTRICT COURT

7                        CENTRAL DISTRICT OF CALIFORNIA

8
9
10   DAVID J. KEEGAN; LUIS GARCIA,          )   CASE NO. CV 10-09508 MMM (AJWx)
     BETTY KOLSTAD; CAROL HINKLE;           )
11   ERIC ELLIS; CHARLES WRIGHT;            )
     JONATHAN ZDEB;  individually and       )   CLASS ACTION
12   behalf of all others similarly situated, )
                                            )
13                 Plaintiff,               )   ORDER GRANTING IN PART AND
                                            )   DENYING IN PART PLAINTIFFS'
14           vs.                            )   MOTION FOR CLASS CERTIFICATION
                                            )
15   AMERICAN HONDA MOTOR CO,               )
     INC.; HONDA OF AMERICA                 )
16   MANUFACTURING, INC.,                   )
                                            )
17                 Defendant.               )
                                            )
18   _____        )

19
20          On December 10, 2010, plaintiffs David J. Keegan, Luis Garcia, Betty Kolstad, Carol

21   Hinkle, Eric Ellis, Charles Wright, and Jonathan Zdeb filed this putative class action against

22   American Honda Motor Co., Inc., and Honda of America Manufacturing, Inc., alleging claims

23   under the California Consumer Legal Remedies Act ("CLRA"), the California Unfair Competition

24   Law ("UCL"), the Song-Berly Act, the Magnuson-Moss Warranty Act, California Commercial

25   Code § 2313, and various states' consumer protection and implied warranty statutes.[1]  Plaintiffs

26
27          [1]Complaint, Docket No. 1 (Dec. 10, 2010).  The complaint initially alleged claims against
     Honda North America, Inc., Honda Motor Company, Ltd., Honda Manufacturing of Alabama
28   LLC, and Honda Engineering North America, Inc.  The first two defendants were dismissed by

1 | filed a first amended complaint on May 23, 2011.[2]

2 | On November 21, 2011, plaintiffs filed a motion for class certification under Rules 23(a)

3 | and 23(b)(3) of the Federal Rules of Civil Procedure.[3]  Defendants opposed the motion.[4]  In

4 | response to the court's tentati ve ruling issued at the hearing, both parties submitted supplemental

5 | briefs regarding the effect of state law on class certification issues.[5]

6 |

7 | **I.  FACTUAL BACKGROUND**

8 | **A.      The Complaint's Allegations**

9 | Plaintiffs bring this action on behalf of all individuals who purchased or leased certain

10 | allegedly defective model year 2006 and 2007 Honda Civic and 2006 through 2008 Honda Civic

11 | Hybrid vehicles that were designed, manufactured, distributed, marketed, sold, and leased by

12 | _____

13 | stipulation.  (Order Dismissing Defendants Honda Motor Co., Ltd. and Honda North America,
    | Inc. Without Prejudice, Docket No. 56 (Jul. 20, 2011).  The last two were terminated because

14 | they were not named in the first amended complaint.

15 | [2]First Amended Complaint ("FAC"), Docket No. 39 (May 23, 2011).

16 | [3]Plaintiffs' Motion for Class Certification ("Motion"), Docket No. 81 (Nov. 22, 2011).

17 | See also Plaintiff's Reply Memorandum of Points and Authorities ISO Their Motion for Class
    | Certification ("Reply"), Docket No. 81 (Jan. 9, 2012).

18 |

19 | [4]Defendant American Honda Motor Co., Inc.'s Opposition to Plaintiffs' Motion for Class
    | Certification ("Opp."), Docket No. 123 (Dec. 19, 2011).

20 |

21 | [5]Plaintiffs' Supplemental Brief Concerning State Consumer Protection and Express
    | Warranty Law ("Pls.' Supplemental Brief"), Docket No. 131 (Feb. 6, 2012); Defendant American

22 | Honda Motor Co., Inc.'s Supplemental Brief in Opposition to Class Certification ("Honda
    | Supplemental Brief"), Docket No. 132 (Feb. 6, 2012).

23 | Defendants devote a portion of their supplemental brief to rearguing class certification

24 | issues about which the court did not order supplemental briefing, e.g., commonality and
    | predominance.  Plaintiffs object to these portions of the brief, contending that defendants exceeded

25 | the court's instructions.  Plaintiffs' supplemental brief, for its part, shifts ground by eliminating
    | claims and classes under certain state laws and seeking to certify more limited classes than those

26 | originally proposed.  While the court preliminarily approved such a step at the class certification

27 | hearing, defendants filed their supplemental brief on the understanding that plaintiffs did not intend
    | to alter their class definitions.  As neither party fully followed the court's directive, it will

28 | consider all portions of the briefs that have been filed.

defendants (collectively, the "class vehicles").[6]  Plaintiffs allege that the rear suspension in the class vehicles is defective.[7]  Specifically, plaintiffs allege that the rear control arm originally installed in the vehicles was too short.[8]  This purported defect ("the suspension defect") affects the alignment and geometry of the rear suspension, causing the vehicles to become misaligned. This in turn results in uneven and premature wear on the rear tires.[9]  The misalignment also causes "occupants to experience an extremely rough ride, as well as exceptionally loud and disruptive noise, while driving the class vehicles."[10]

Plaintiffs allege that Honda learned of the suspension defect through pre-release testing data, early consumer complaints to Honda and its dealers, testing conducted in response to the complaints, and "other internal sources."[11]  They contend that Honda "actively concealed" the defect from its customers,[12] but had a duty to disclose the defect because it poses an "unreasonable safety hazard," and Honda had "exclusive knowledge or access to material facts" about the vehicles and the rear suspension problem that were unknown and not reasonably discoverable by plaintiffs.[13]

Plaintiffs contend that the defect creates a safety hazard because a driver has only three

---

[6]FAC, ¶ 1, 94-97.  On January 6, 2012, the court granted in part and denied in part defendants' motion to dismiss, giving plaintiffs leave to file a second amended complaint. (Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Docket No. 110 (Jan. 6, 2012.)  That pleading has not yet been filed.  For purposes of this motion, the court relies on the first amended complaint to describe the basic factual allegations at issue.

[7]Id., ¶ 103.

[8]Id., ¶ 10.

[9]Id., ¶ 104.

[10]Id.

[11]Id., ¶ 105.

[12]Id.

[13]Id., ¶ 106.

means of controlling a car – braking, accelerating, or steering.  Each is dependent on rolling friction with the ground beneath the wheels, and the only contact the vehicle has with the ground is through its tires.[14]  The defect allegedly causes uneven tread wear on the tires, which can result in "catastrophic" tire failure because one side of the tire receives more pressure than the other.[15]  The defect can thus "suddenly and unexpectedly cause tire failure while the vehicle is in operation," which can lead to car accidents, personal injury, or death.[16]

The cost of repairing the defect and replacing the worn tires allegedly can run "hundreds, if not thousands, of dollars."[17]  The defect also purportedly requires that tires be replaced prematurely, sometimes after less than 20,000 miles.[18]  Plaintiffs assert that the expected tread wear of properly functioning tires in the class vehicles is approximately 75,000 miles or more.[19]

Plaintiffs contend that "hundreds, if not thousands," of purchasers and lessees of class vehicles have experienced the defect, filed complaints with the National Highway Traffic Safety Administration ("NHTSA"), and posted information about the problem on the internet.[20]  They maintain that although Honda knew of the problem, it took no steps to notify customers of the defect or provide relief until January 2008, two years after the class vehicles had been placed on

---

[14]*Id.*, ¶ 5.

[15]*Id.*, ¶ 6.

[16]*Id.*  The complaint asserts that because of the defect, the tires on Class Vehicles do not comply with federal motor vehicle safety standards ("FMVSS"), which set tire dimensions and lab test requirements for passenger vehicle tires.  Because the defect causes unevenness along the width of the tire, a tire wear gauge will not accurately reflect the extent of the wear.  (*Id.*, n. 3.)

[17]*Id.*, ¶ 7.

[18]*Id.*

[19]*Id.*

[20]*Id.*, ¶ 107.  This paragraph quotes a number of the consumer complaints filed with NHTSA and posted on the internet.  The consumer complaints report a range of problems associated with the vehicles' rear control arms, which caused significant tire wear beyond that typically expected given the cars' mileage.

the market.[21]   At that point, Honda issued a technical service bulletin ("TSB") to its dealers and began covering "certain costs associated with temporary correction" of the defect, such as replacing the rear control arm.  It also provided reimbursement for prematurely worn tires.[22]   By the time Honda took these steps, however, many of the vehicles had already been sold or leased, and class members had replaced worn tires "without adequate reimbursement."[23]   Plaintiffs allege that, although the TSB purportedly did not reference certain class vehicles, the defects it noted are found in all class vehicles.[24]

The TSB stated that the too-short rear control arms should be replaced with longer control arms.[25]   Plaintiffs assert that the recommended modification is "only a temporary fix" that does not address the underlying problem.  They contend that consumers whose vehicles are modified will experience suspension defects in the future, which will require costly repairs, and give rise to safety hazards.[26]   Plaintiffs allege that defendants know the recommended modification does not fix the defect and that it will only "prolong the amount of time that will elapse" before the defect manifests again.[27]   They contend the delay is designed to ensure that the defect occurs outside the warranty period, shifting financial responsibility for the defect to class members.[28]

Although the TSB appears to concern vehicles still under warranty, plaintiffs assert that in practice, the modification is provided only to the "most persistent customers . . . who visit Honda's dealers and complain loudly enough about the Suspension Defect and the premature tire

---

[21]*Id.*, ¶ 108.

[22]*Id.*

[23]*Id.*

[24]*Id.*, ¶¶ 9, 108.

[25]*Id.*, ¶ 10.

[26]*Id.*, ¶ 11.

[27]*Id.*, ¶ 12.

[28]*Id.*

wear it causes."[29]  They contend that Honda's dealers fail to advise consumers about the cause of the tire wear they are experiencing and about the TSB.  Despite knowing of the defect since 2006, and of the proposed fix for it since 2008, dealers purportedly attribute the tire wear to consumers' "driving habits, road conditions, and improper maintenance."[30]  Honda has not issued a recall for the vehicles, offered reimbursement for costs incurred, or provided replacement or repairs.[31]

**B.    The Plaintiffs**

The complaint was filed on behalf of seven named plaintiffs located in six different states. Although plaintiffs' specific interactions with Honda regarding the alleged defect, and the severity of the defect they have experienced, vary, each purchased a Honda Civic from a Honda dealer and complained about premature wear of the tires.  The plaintiffs are:

- David J. Keegan, a California citizen and resident of Dublin, who purchased a new 2007 Honda Civic from Dublin Honda in April 2007;[32]

- Luis Garcia, a New York citizen, who purchased a new 2007 Honda Civic EX on March 17, 2007;[33]

- Eric Ellis, a resident of Adrian, Oregon, who purchased a new 2007 Honda Civic LX from Tom Scott Honda in Nampa, Idaho on July 6, 2007;[34]

- Charles Wright, a citizen of Montana and resident of Missoula, who purchased a Honda Civic Hybrid from University Motors in Missoula on March 3, 2006;[35]

- Betty Kolstad, a citizen of California and resident of Big Ben, California, who purchased

---

[29]*Id.*, ¶ 13.

[30]*Id.*, ¶ 15.

[31]*Id.*, ¶ 16.

[32]*Id.*, ¶ 19.

[33]*Id.*, ¶ 22.

[34]*Id.*, ¶ 40.

[35]*Id.*, ¶ 44.

1    a 2006 Honda Civic from Auto West Honda in Roseville, California on October 15, 2009,

2    with a certified pre-owned car warranty for 60 days.[36]

3    •   Carol Hinkle, a citizen of North Carolina and resident of Salisbury, who purchased a

4    Honda Civic LX at Salisbury Honda in April 2008;[37]

5    •   Jonathan Zdeb, a resident of West Palm Beach, Florida, who purchased a new 2007 Honda

6    Civic SI from Holman Honda in Fort Lauderdale, Florida in January 2007.[38]

7    **C.      The Nature of the Alleged Defect**

8    According to plaintiffs, the class vehicles are designed to give the rear wheels 1.5 degrees

9    of "negative camber."[39]  "Negative camber" means that the top of the wheel is slanted toward the

10   car relative to the bottom of the wheel.  The parties do not dispute that some degree of negative

11   camber aids vehicle stability and gives the car a different feel while driving, but plaintiffs maintain

12   that excessive negative camber can lead to disruptive tire noise and premature tire wear.[40]  It is

13   undisputed that all class vehicles were designed to have 1.5 degrees of negative camber in the rear

14   suspension.  Design tolerances, however, permit a variance of 0.75 degrees in either direction,

15   meaning that the class vehicles may have as little as 0.75 degrees negative camber or as much as

16   2.25 degrees of negative camber and still remain within acceptable tolerances.[41]  The purported

17   defect is addressed in greater detail in the balance of this order.

18

19

20

21

---

22   [36]*Id.*, ¶ 60.

23   [37]*Id.*, ¶ 68.

24   [38]*Id.*, ¶ 82.

26   [39]Motion, Exh. 2 ("Shannon Depo.") at 38:7-15, 23:21-24:8.

27   [40]Shannon Depo. at 23:21-24:8, Motion, Exh. 3 ("2008 TSB").

28   [41]Opp, Exh. 5 ("Shannon Decl."), ¶ 3.

## II. DISCUSSION

### A.   Legal Standard Governing Class Certification

A district court may certify a class only if:

"(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."
FED.R.CIV.PROC. 23(a).

In addition, a district court must also find that at least one of the several conditions set forth in Rule 23(b) is met.  "The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met."
*Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), amended by 273 F.3d 1266 (9th Cir. 2001)); see also *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Keegan seeks to certify a nationwide class of "[a]ll purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicles who reside in the United States."[42]   In the alternative, if the court concludes that California law cannot be applied to the proposed class's claims, plaintiffs propose that the court certify classes for California, New York, Florida, Idaho, Montana, and North Carolina, comprised of "[a]ll purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicles who reside" in the relevant state.[43]  Each class would assert a violation of the relevant state's consumer protection and express warranty laws.  Plaintiffs also seek to certify subclasses of vehicle purchasers or lessees in the states of California, Florida, Idaho, Montana, New York, and North Carolina, which would assert violations of the Song-Beverly Act and other states' implied

---

[42]Motion at 6.

[43]*Id.*

1   warranty laws respectively.[44]

2   **B.    Evidentiary Objections to the Parties' Respective Expert Reports**

3   **1.    Legal Standard Governing Admissibility of Expert Reports on Class**

4   **Certification Motions**

5   Before addressing the merits of the certification motion, the court must consider the parties'

6   challenges under *Daubert v. Merill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), to the

7   opposing parties' experts.   While courts in this circuit have previously concluded that expert

8   testimony is admissible in evaluating class certification without a rigorous *Daubert* inquiry, the

9   Supreme Court in *Dukes* "doubt[ed] that this is so." *Dukes*, 131 S. Ct. at 2554.   After *Dukes*,

10  the Ninth Circuit approved the application of *Daubert* to expert testimony presented in support of

11  or opposition to a motion for class certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

12  982 (9th Cir. 2011) ("In its analysis of Costco's motions to strike, the district court correctly

13  applied the evidentiary standard set forth in *Daubert*. . .").   As a result, the court applies those

14  standards to the expert reports the parties have submitted.[45]

15  Under Rule 702,

16  "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact

17  to understand the evidence or to determine a fact in issue, a witness qualified as an

18  expert by knowledge, skill, experience, training, or education, may testify thereto

19  in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

20  facts or data, (2) the testimony is the product of reliable principles and methods,

21  and (3) the witness has applied the principles and methods reliably to the facts of

22  the case." FED.R.EVID. 702.

23  See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) ("[Rule 702] consists of

24  three distinct but related requirements: (1) the subject matter at issue must be beyond the common

25

26  [44]*Id.*

27  [45]Plaintiffs do not dispute that the standards of *Daubert* and Rule 702 apply.   (Plaintiffs'
    Response to Defendants' Evidentiary Objections to the Report of Gary A. Derian ("Derian
28  Objections Response"), Docket No. 126 (Jan. 6, 2012).

knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D. Cal. 2006) ("There are three basic requirements that must be met before expert testimony can be admitted.  First, the evidence must be useful to a finder of fact.  Second, the expert witness must be qualified to provide this testimony.  Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; see also *Ellis*, 657 F.3d at 982 ("Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable").  In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJB), 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ( in turn citing *Daubert*, 509 U.S. at 592 n. 10)); see also *Walker v. Contra Costa County*, No. C 03-3723 TEH, 2006 WL 3371438, *1 (N.D. Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States*, 483 U.S. 171, 172 (1987), and *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).[46]

"In determining whether expert testimony is admissible under Rule 702, the district court

---

[46]This showing must be by a preponderance of the evidence.  See *Daubert*, 509 U.S. at 594 n. 10 (citing *Bourjaily*, 483 U.S. at 175-76).

must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier

of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation

marks omitted); see also *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir.

2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their

general approach of relaxing the traditional barriers to opinion testimony" (internal quotation

marks omitted)).   On a motion for class certification, it is not necessary for the expert testimony

to resolve factual disputes going to the merits of plaintiffs' claim or claims; instead, the testimony

must be relevant to determining "whether there was a common pattern and practice that could

affect the class as a whole." *Ellis*, 657 F.3d at 983.

## 2.    Plaintiffs' Expert: Gary Derian

In support of their motion, plaintiffs proffer the declaration of Gary Derian.[47]   Derian he

is a mechanical engineer and "registered Professional Engineer in the State of Ohio."   He reports

that he has "considerable experience" in the design and manufacture of tires, cars, and suspension

systems.[48] His educational background includes "physics, metallurgy, chemistry, failure analysis,

and machine design."   He has worked in the forensic engineering field for 21 years.[49]   Derian

worked for the BFGoodrich Company for eleven years in various capacities, including as a tire

engineer; during that time, he designed a wide variety of tires.[50]   He states that he has "been

recognized as an expert in tire cases in many states and jurisdictions," and has provided deposition

testimony in various state and federal court proceedings.[51]

Derian inspected the vehicles and tires of six plaintiffs – Ellis, Garcia, Hinkle, Keegan, and

---

[47]Motion, Exh. 1 ("Derian Decl."), Docket No 82 (Nov. 22, 2011).

[48]*Id.*, ¶ 2.

[49]*Id.*, ¶ 3.

[50]*Id.*, ¶ 5.

[51]*Id.*, ¶ 6.   A list of cases where Derian has testified is appended to his declaration as
Exhibit 1.

Kolstad – as well as a class vehicle owned by a non-party, Derek Bronish.[52]  He also reviewed Honda's 2008 TSB, the deposition transcript of Richard Shannon (one of Honda's representatives), plaintiffs' service records, Honda's internal documents, and other evidence.[53]  Derian concluded that "all of the Class Vehicles suffer from the same design defect, which is defective suspension geometry leading to excess negative camber in the rear wheels, which necessarily causes the rear tires to experience irregular and accelerated tire wear.  Virtually all class vehicles will suffer from this defect when driven."[54]

Defendants challenges the admissibility of Derian's opinion on several grounds; they attack the methodology he employed to inspect the class vehicles, the inadequacy of the sample size he used in reaching his conclusions, and the logic of his opinions.[55]  Derian's inspection methods indeed raise concerns about reliability.  As noted, one of his key findings is that most of the vehicles he inspected suffered from negative camber.  Derian did not use a calibrated alignment

---

[52]*Id.*, ¶ 7.  Bronish is a friend of Derian's son.  (Derian Objections at 7.)

[53]*Id.*

[54]*Id.*, ¶ 37.

[55]Defendant American Honda Motor Co., Inc.'s Evidentiary Objections to the Report of Gary A. Derian ("Derian Objections"), Docket No. 126 (Dec. 19, 2011), Exh. 1 ("Derian Rule 26 Report").

Defendants also question Derian's qualifications, citing deficiencies in his educational background and the fact that his expert opinions have been excluded in at least four other cases. (Derian Objections at 3-4.)  They do not seek exclusion of his testimony on this basis, however. Plaintiffs observe that the cases to which defendants refer, moreover, do not clearly demonstrate that he is unqualified to offer opinions in this case.  (Derian Objections Response at 4-7.)  In one of the cases defendants cite, for example, the court excluded one of Derian's opinions as lacking foundation, but denied defendant's motion to exclude his testimony in its entirety.  See *Green v. Goodyear Dunlop Tires North America, Ltd.*, Case No. 08-472-GPM, 2010 WL 747505, *2-4 (S.D. Ill. Mar. 2, 2010); *Green v. Goodyear Dunlop Tires North America, Ltd.*, Case No. 08-472-GPM,  2010 WL 883653, *2-3 (S.D. Ill. Mar. 5, 2010).  In another, the court granted a motion *in limine* to exclude Derian's testimony, but did so in a handwritten order that did not identify the reasons for the decision.  (Derian Objections, Exh. 5.)  Because defendants do not specifically object to admission of Derian's testimony on the ground that he is not qualified and because their challenges to his qualifications are questionable, the court declines to exclude his testimony on this basis.

rack for any of his inspections, however, although he admitted that this method would have provided more accurate measurements.  Defendants have proffered evidence that the use of such racks is common in the industry, and that it is the preferred method of measuring suspension alignment, as it ensures that the vehicle remains level and accounts for weight.[56]  Derian, in fact, conceded that he was not aware of other experts who measured alignment without using such a rack.[57]  For three of the class vehicles Derian inspected, he used a device known as a "trammel rod," in combination with a tape measure.[58]  Defendants assert that this type of measurement was common in the 1950s and 1960s, but is not generally used today.[59]  In conducting other inspections, Derian did not even take toe line and camber measurements, due to airline restrictions that prevented him from bringing his usual equipment with him.[60]  Derian examined one vehicle while it was parked in a gravel driveway, which he acknowledges may have affected his measurements,[61] and inspected another vehicle on a sloped driveway.[62]  He inspected the vehicle of non-party Bronish in his own garage.[63]  When inspecting the tire wear level of the Kolstad vehicle, Derian used a straight edge and his thumbnail, as he had forgotten to bring his tread depth

---

[56]Derian Objections, Exh. 11 ("Supplemental Daws Decl."), ¶¶ 4-5.

[57]Derian Objections, Exh. 3 ("Derian Depo.") at 63:2-64:18.

[58]Derian Depo. at 61:9-21.  Derian described the trammel rod as a "very shallow U-shaped bar that allows me to measure directly across from the hub – hub height of the car at the tire, the front and the rear."  (*Id.*)

[59]Supplemental Daws Decl., ¶ 7.

[60]Derian Depo. at 123:16-19, 154:16-20.  A tire's "toe angle" is the "angle between the tire centerline and the centerline of the vehicle, typically measured in degrees." (Daws Decl., ¶ 17.)  Positive toe angle essentially means that the tires point outward; cars are often set with negative toe angle because cars, as they drive, tend to twist the tires inward.  (*Id.*)

[61]Derian Depo. at 62:17, 70:8-10.

[62]*Id.* at 84:18-85:1 (discussing Garcia inspection).

[63]*Id.* at 141:13-14.

gauge;[64] defendants contend that with this form of measurement, it is "impossible" to guarantee accuracy.[65]

Plaintiffs offer little explanation of the varying methods Derian used, and do not discuss at all how they may affect the consistency of his measurements.  They address only Derian's measurements of tire wear, arguing that a tread depth gauge is "not a sophisticated piece of equipment" and that there is "nothing special about the device . . ."[66]  They do not discuss the validity of Derian's camber and toe measurements at all.[67]  Derian himself provides no information concerning his methods or whether they are generally approved in his field; he merely states the conclusions he reached using those methods.  This failure to state whether his methodology is

---

[64]Supplemental Daws Decl., ¶ 8; see also Derian Depo. at 127:21-22, 130:16-19 (discussing the Kolstad inspection).

[65]*Id.*  Defendants' remaining objections to Derian's camber, toe, and tire wear measurement methods rely heavily on the fact that their own expert reached different conclusions about those measurements. (*Id.*, ¶¶ 5-7.)  The court declines to rely on objections based on disagreement with Derian's conclusions rather than his methods.

[66]Derian Objections Response at 11.

[67]Plaintiffs cite the 2008 TSB as evidence that "neither a tread depth gauge nor any other specific instrument is necessary to determine whether a tire has experienced excessive wear. . . ." (*Id.* at 11.)  Plaintiffs are mistaken.  There is no requirement that a mechanic at a Honda dealership, or an individual measuring tire wear in his own back yard, use a particular methodology to diagnose a problem with a Honda vehicle.  An individual testifying as an expert, however, must use methods that are generally used by others in his field to demonstrate that the conclusions he has reached are reliable.  See *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1141 (9th Cir. 1997) ("A proponent of scientific evidence may satisfy its burden of establishing that the evidence is scientifically valid by, *inter alia*, showing that the evidence grew out of pre-litigation research, showing that the research upon which the evidence is based has been subjected to normal scientific scrutiny through peer review and publication, or explaining precisely how the conclusions were reached and pointing to some objective source to show that the conclusions are based on 'scientific method, as it is practiced by (at least) a recognized minority of scientists in the[ ] field,'" quoting *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1318-19 (9th Cir. 1995)).
Defendants, moreover, question the methodology Derian employed in forming an opinion regarding the extent of tire wear the vehicles experienced.  Derian used a ruler and his finger to measure tire tread depth on one vehicle rather than the tire gauge he used to examine other vehicles. (Derian Depo. at 127:21-22, 130:16-19 (discussing the Kolstad inspection).)

generally accepted in the field, and defendants' proffer of evidence questioning its validity, provides some basis for excluding his testimony.  See *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (excluding an expert's testimony because he did not "demonstrate that he followed a scientific method embraced by at least some other experts in the field"); *Heisler v. Maxtor Corp.*, No. 5:06–cv–06634–JF (PSG), 2011 WL 1496114, *7 (N.D. Cal. Apr. 20, 2011) (identifying a variety of concerns with the reliability of an expert opinion, including "the fact that Plaintiffs offer no evidence that Fowler's approach is an accepted method for analyzing defects such as those at issue here, nor do they offer evidence with respect to the reliability of the tests that Fowler performed"); see also *American Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) ("The methodology underlying the tests Ezra conducted to determine whether the GL1800 met his standard also gives us pause.  Ezra tested a single, used 2006 GL1800, ridden by a single test rider, and extrapolated his conclusions to the fleet of GL1800s produced from 2001 to 2008").

Plaintiffs respond to defendants' arguments in various ways.  First, they minimize the import of Derian's declaration, stating that they rely on it only for the limited purpose of establishing that the class members' claims involve the same design defect, and that even were the court to exclude Derian's declaration in its entirety, they can satisfy their burden of showing that certification is appropriate.[68]

Second, plaintiffs' contend that any concerns regarding Derian's methodology go to the weight rather than the admissibility of his testimony.  See *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994) ("The impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue not going to the admissibility, but to the weight of the . . . evidence").  Here, the concern is not that Derian misapplied accepted technical procedures for conducting measurements or that he made mistakes in taking the measurements; it is that his inspection procedures themselves are questionable and may have led to distorted outcomes.  Plaintiffs' minimal explanation of Derian's methodology, moreover, does little to

_____

[68]Derian Objections Response at 8 n. 6.

15

assure the court that it can safely rely on his opinions.  As noted, plaintiffs' only rebuttal to

defendants' argument is that a tire wear gauge is not a sophisticated instrument.  While a tire wear

gauge may not be the *only* precise way of measuring tire wear, Derian's use of a ruler and his own

finger hardly counts as an acceptable substitute.

Third, and perhaps most persuasive, is plaintiffs' assertion that Derian's opinions are based

on a range of evidence beyond the vehicle inspections and that questions about his inspection

methodology do not render his opinions unreliable.  Derian's opinions, plaintiffs assert, merely

"confirm" what is already established by other evidence, and are primarily helpful in

"understand[ing] the evidence."[69] FED.R.EVID. 702(a).  In addition, not all of Derian's opinions

concern the vehicles' camber and toe alignment; he also offers opinions concerning issues such

as the level of tire wear the vehicles experienced.  As a result, plaintiffs argue, defendants "falsely

conclude (without citation to any evidence whatsoever) that Derian's opinion regarding the class-

wide nature of the defect is based 'in large part' upon vehicle inspections."[70]

Derian's declaration belies this argument, as almost three of nine pages discuss the vehicle

inspections he conducted.  He makes repeated references to the inspections in the "Conclusions"

section of the declaration, and it is evident that many of his opinions are based in substantial part

on his personal inspection of the class vehicles.[71]  While Derian relies on other materials,

including Honda documents, it is clear that the vehicle inspections played a substantial role in

reaching his conclusions.  The court is cognizant, however, of Rule 702's "broad parameters of

reliability, relevancy, and assistance to the trier of fact."  *Desrosiers v. Flight Int'l of Fla.*, 156

---

[69]*Id.* at 2-3.

[70]Derian Objections Response at 8.

[71]Derian Decl., ¶ 25 ("After inspection the vehicles of Garcia, Hinkle, Ellis, and Kolstad,
I found that the negative camber of the rear wheels was too high in all the vehicles. . ."); *id.*, ¶ 33
(discussing tire wear on the class vehicles and stating that it is of "a different type than would be
generated if the tires were overloaded, underinflated, or if the vehicles were driven very
aggressively"); *id.*, ¶ 35 (concluding that the class vehicles suffer from a common defect, and
relying on "analysis of the rear tire wear patterns, the vehicle inspections, and the
documents. . .").

16

F.3d 952, 960-61 (9th Cir.1998). "The Rule 702 inquiry under *Daubert* . . . 'is a flexible one,' and the 'factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 147)).

The parties do not dispute Derian's actual qualifications to offer expert opinions based on his knowledge, expertise, and experience in the field.  A close examination of Derian's declaration reveals that although many of his conclusions are based in whole or in part on his examination of plaintiffs' and Bronish's vehicles, some rely on documentary evidence and deposition testimony. Paragraphs 25 through 36 of the declaration, for example, offer opinions based not only on Derian's review of evidence in the case but on the inspections as well.  Paragraphs 30-32 and 35, by contrast, rely only on Derian's experience and his review of documentary evidence, and make no mention of his vehicle inspections.  Insofar as Derian's conclusions rely on evidence outside the vehicle inspections, they are helpful to understanding the nature of the alleged defect and its potential effect on the class vehicles.  Applying Rule 702, the court therefore admits paragraphs 30-32 and 35, and excludes the remainder of Derian's declaration.

### 3.     Defendant's Expert: John W. Daws

Defendant's expert is John W. Daws, who has a doctorate in mechanical engineering from Virginia Polytechnic Institute and State University.[72]  Daws worked for almost 20 years in engineering and technical capacities for Michelin Tire Corporation; he then joined a consulting engineering firm as a managing engineer.[73]  Daws is now the principal of his own engineering firm.[74]  In reaching his conclusions, he inspected the same vehicles Derian inspected (with the exception of Bronish's) and reviewed Honda's TSBs, plaintiffs' service records, deposition

---

[72]Derian Objections, Exh. 7 ("Daws Decl."), ¶ 2.

[73]*Id.*, ¶¶ 3-9.

[74]*Id.*, ¶¶ 10-11.

1    testimony in this case, Honda's internal reports, and other documentary evidence.[75]

2           Plaintiffs' primary challenge to Daws' testimony is that he did not review critical relevant

3    information regarding the remedy Honda devised to address the alleged suspension defect.  Based

4    on his evaluation, Daws opines "the state of any single vehicle does not indicate the state of all

5    2006-2008 MY Honda Civic vehicles with regard to the tire wear issues described in the TSB,"

6    and that "each of the vehicles . . . is unique," with "different issues, different history, and

7    different utilization."[76]  Daws concludes, *inter alia*, that "wear on every tire must be assessed

8    individually with regard to its utilization history," and that "the alignment settings on a vehicle

9    cannot be determined from the state of wear on the tires, nor do the alignment settings

10   automatically define the state of tire wear at any point in time."[77]  Daws opined that only one of

11   the six vehicles he inspected exhibited the type of tire wear discussed in the 2008 TSB.[78]

12          Plaintiffs contend that, in reaching this conclusion, Daws ignored a key piece of evidence,

13   namely, the fact that Honda engineered a single remedy for the suspension defect.  Daws conceded

14   at his deposition that altering the rear camber angle would make the class vehicles less susceptible

15   to premature tire wear.[79]  He also acknowledged that the fix proposed in Honda's 2008 TSB was

16   a "good solution."[80]  Plaintiffs argue that evidence that Honda devised a common remedy for all

17   class vehicles weighs against Daws's conclusion that there were individualized reasons for tire

18   wear in the vehicles he inspected.

19   ────────────────

20        [75]*Id.*, ¶ 11.  The documents Daws reviewed are listed in Appendix A to his declaration.
     Although he reviewed TSBs dated January 22, 2008, February 8, 2008, April 11, 2008, and
21   February 5, 2009, plaintiffs rely only on the January 22, 2008 TSB, which is Exhibit 3 to their
     motion.
22

23        [76]*Id.*, ¶ 80.

24        [77]*Id.*

25        [78]*Id.*

26        [79]Declaration of Payam Shahian in Support of Plaintiffs' Reply in Support of Motion for
27   Class Certification ("Shahian Decl."), Docket No. 129 (Jan. 9, 2011), Exh. 3 ("Daws Depo.").

28        [80]*Id.* at 25:16-19.

These arguments, however, essentially attack Daws' conclusion, not his methodology or the reliability of his opinions.  Plaintiffs ostensibly seek to discredit Daws by contending that he did not properly evaluate Honda's internal policies; they offer no evidence that Daws failed to consider this information in reaching his conclusion, however.  This reveals that their true problem with Daws's testimony is his conclusion, which they assert is "contradicted by Honda's own documents and his deposition testimony."[81]  This may well be so, but the merits of plaintiffs' substantive attack on Daws' conclusions must be resolved by the trier of fact, after assessing all of the evidence and determining which opinions are most credible.  The arguments simply do not go to the reliability of Daws's conclusions or his qualifications.  See *Kennedy*, 161 F.3d at 1230-31 ("In arriving at a conclusion, the factfinder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony.  But their presence should not preclude the admission of the expert's testimony – they go to the weight, not the admissibility"); *McClellan v. I-Flow Corp.*, 710 F.Supp.2d 1092, 1101 (D. Or. 2010) ("[E]stablishing reliability should not mean that plaintiffs "have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable," quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994)); see also *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005) (stating that the proper inquiry focuses "'solely on principles and methodology, not on the conclusions that they generate,'" quoting *Daubert*, 509 U.S. at 595, and that "[a]s long as the process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts").

The court therefore overrules plaintiffs' objection and admits Daws' testimony.  It will, however, accord it only the weight it deserves.[82]

---

[81]Daws Objections at 7.

[82]The remainder of the parties' evidentiary objections will be addressed only insofar as the court relies on the challenged evidence.  See, e.g., *Yamada v. Nobel Biocare Holding AG*, 275

## C.      Whether Keegan's Proposed Class Should Be Certified

As noted, a district court can certify a class only if the requirements of Rule 23(a) – numerosity, commonality, typicality and adequacy of representation – are satisfied.  In addition, at least one of the prerequisites set forth in Rule 23(b) must be met as well.  As the Supreme Court explained:

> "Rule 23(b)(1) allows a class to be maintained where 'prosecuting separate actions by or against individual class members would create a risk of' either '(A) inconsistent or varying adjudications,' or '(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede[ ] their ability to protect their interests.'  Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'"

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2549 n. 2 (2011).

Rule 23(b)(2) applies when "'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Id.* at 2548-49.

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551.  See also *Zinser*, 253 F.3d at 1186 ("[t]he party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule

---

F.R.D. 573, 580 n. 1 (C.D. Cal. 2011) ("Plaintiff has filed numerous evidentiary objections.  The Court need not address these objections as the challenged evidence has no bearing on the ultimate disposition of this matter").

1  23(b) have been met"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).[83]  The

2  court can only certify a class if the court "is satisfied, after a rigorous analysis, that the

3  prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon*,

4  457 U.S. 147, 160-61 (1982).[84]

5          **1.**      **Rule 23(a) Requirements**

6              **a.**      **Whether Plaintiffs Have Identified an Ascertainable Class**

7          Although not specifically mentioned in Rule 23, there is an additional prerequisite to

8  certification – that the class be ascertainable.  See, e.g., *Lukovsky v. San Francisco*, No. C 05-

9  00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit

10  requirement concerning the class definition in FRCP 23, courts have held that the class must be

11  adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz*

12  *v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)); *Thomas & Thomas Rodmakers,*

13  *Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Prior

14  to class certification, plaintiffs must first define an ascertainable and identifiable class.  Once an

15  ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four

16  requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote

17  omitted)); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)

---

[83]Defendants contend that plaintiffs must satisfy Rule 23's requirements by a preponderance of the evidence, citing out-of-circuit authority.  See *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008) ("Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence"); *Teamsters Local 445 v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("[W]e dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").  "The Supreme Court[, however,] has yet to decisively attach a standard of proof to Rule 23 requirements."  *Gregurek v. United of Omaha Life Ins. Co.*, No. CV 05-6067-GHK (FMOx), 2009 WL 4723137, *5 (C.D. Cal. Nov. 10, 2009), and defendants cite no Ninth Circuit authority that directs use of a preponderance standard in deciding class certification motions.  Because that is the general standard of proof used in civil cases, however, the court applies it here.

[84]The Supreme Court has noted that "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped."  *Dukes*, 131 S. Ct. at 2551.

(holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop v. Saab Auto. A.B.*, No. CV 95-0721 JGD (JRx), 1996 WL 33150020, *4 (C.D. Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class that they purport to represent at the time the class action is certified.  The named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)).

A class is sufficiently defined and ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member."  *O'Connor*, 184 F.R.D. at 319; accord *Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995); see also *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 347 (S.D. Ga. 1996) ("[T]he 'description of the class must be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,'" quoting *Pottinger v. Miami*, 720 F.Supp. 955, 957 (S.D. Fla. 1989)).

Plaintiffs' class definitions rely on objective criteria that are verifiable through documentation of a purchase or lease of a class vehicle.  The proposed class definitions therefore satisfy the ascertainability requirement.[85]  See *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 594 (C.D. Cal. 2008) ("The class definition identifies a particular make, model, and production period for the class vehicle, while excluding from the class persons who did not pay for repairs, persons who paid for repairs outside the warranty period, and certain persons affiliated with defendant.  Because the proposed class definition allows prospective plaintiffs to determine whether they are class members with a potential right to recover, the defined class is sufficiently ascertainable"); see also *Keilholtz v. Lennox Hearth Products, Inc.*, 268 F.R.D. 330, 336 (N.D. Cal. 2010) ("The definition of the class is relatively straightforward.  Class members must (1) live in the United States and (2) own a home within which a Superior or Lennox brand single-paned sealed glass front fireplace was installed after a particular date.  This definition is not subjective or imprecise").

---

[85]Defendants do not dispute that plaintiffs have met their burden on this Rule 23 requirement.

1

### b.   Numerosity

2      Under the Federal Rules of Civil Procedure, before a class can be certified, the court must

3   determine that it is "so numerous that joinder of all members is impracticable."   See

4   FED.R.CIV.PROC. 23(a)(1).   "Impracticability does not mean impossibility, [however,] . . . only

5   . . . difficulty or inconvenience in joining all members of the class."   *Harris v. Palm Springs*

6   *Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotations omitted).   There

7   is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must

8   examine the specific facts of each case to evaluate whether the requirement has been satisfied.

9   See *General Tel. Co. v. EEOC*, 446 U.S. 318, 329-30 (1980).   "As a general rule, [however,]

10   classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the

11   circumstances of each case, and classes of 40 or more are numerous enough."   *Ikonen v. Hartz*

12   *Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B J. Moore & J. Kennedy,

13   MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)).

14      Plaintiffs adduce evidence that approximately 620,000 vehicles were the subject of Honda's

15   2008 TSB.[86]   Honda North America received claims regarding 47,834 vehicles, most of which

16   were submitted after the TSB was issued.[87]   Consequently, plaintiffs have met their burden of

17   demonstrating that the proposed class is sufficiently numerous.[88]

18

### c.   Commonality

19      Commonality requires "questions of law or fact common to the class."   See

20   FED.R.CIV.PROC. 23(a)(2).   The commonality requirement is construed liberally, and the

21   existence of some common legal and factual issues is sufficient.   *Jordan v. County of Los Angeles*,

22   669 F.2d 1311, 1320 (9th Cir. 1982); accord *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th

23

24      [86]Motion, Exh. 2 ("Shannon Depo.") at 86:16-20 (testimony of Honda's corporate

25   representative); *id.*, Exh. 9 (civil tire wear service bulletin stating that 625,601 vehicles were
covered by 2006-07 TSB).

26

27      [87]*Id.*

28      [88]Defendants, once again, do not dispute plaintiffs' showing as to this requirement.

1    Cir. 1998) ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion

2    requirements of Rule 23(b)(3).  Indeed, Rule 23(a)(2) has been construed permissively"); see also,

3    e.g., *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989)

4    ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the

5    class movant show that a common question of law or fact exists;

6    the movant need not show, at this stage, that the common question overwhelms the individual

7    questions of law or fact which may be present within the class").  As the Ninth Circuit has noted:

8    "All questions of fact and law need not be common to satisfy the rule.  The existence of shared

9    legal issues with divergent factual predicates is sufficient, as is a common core of salient facts

10   coupled with disparate legal remedies within the class."  *Hanlon*, 150 F.3d at 1019.

11          That said, the putative class's "claims must depend upon a common contention – for

12   example, the assertion of discriminatory bias on the part of the same supervisor.  That common

13   contention, moreover, must be of such a nature that it is capable of classwide resolution – which

14   means that determination of its truth or falsity will resolve an issue that is central to the validity

15   of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.  Although for purposes of

16   Rule 23(a)(2) even a single common question will do, *id.* at 2556, "'[w]hat matters to class

17   certification . . . is not the raising of common 'questions' – even in droves – but, rather the

18   capacity of a classwide proceeding to generate common answers apt to drive the resolution of the

19   litigation.  Dissimilarities within the proposed class are what have the potential to impede the

20   generation of common answers.'"  *Id.* at 2551 (citing Richard A. Nagareda, *Class Certification

21   in the Age of Aggregate Proof*, 84 N.Y.U.L.REV. 97, 132 (2009)).  As the Ninth Circuit recently

22   articulated by way of example, "it is insufficient to merely allege any common question, for

23   example, 'Were Plaintiffs passed over for promotion?'  Instead, they must pose a question that

24   'will produce a common answer to the crucial question why was I disfavored.'"  *Ellis*, 657 F.3d

25   at 981 (quoting *Dukes*, 131 S. Ct. at 2552).

26          The central dispute concerning commonality in this case turns on the nature of the

27   purported defect.  Plaintiffs contend that all class members' claims involve the same design defect,

28   the same warranty, and the same class vehicles.  They also identify a number of purportedly

common issues, including whether the class vehicles suffer from the defect in question, whether Honda knew about the defect, whether Honda breached its express warranty, and whether Honda violated the consumer protection laws of various states.  The suspension defect is a design aspect of the class vehicles that allegedly gives their rear wheels too much "negative camber."[89] "Camber" is the angle between the center line of the tire and a line drawn perpendicular to the ground.[90]  Camber angle is positive if the tire tilts away from the vehicle, and negative if it tilts toward the vehicle's center line.[91]  All class vehicles were designed to have a negative 1.5 degree camber, meaning that they tilt inward.[92]  While some negative camber can aid vehicle stability, excessive negative camber can lead to the problems about which plaintiffs complain, including premature tire wear.[93]

Although defendants contend there are numerous problems with this analysis, their arguments are based on a misapprehension of what commonality demands.  Defendants assert that the central "injury" in this case is not merely excessive negative camber but the premature tire wear it can cause.[94]  Based on examination of certain of the class vehicles, defendants cite evidence that the amount of tire wear they have experienced varies; they contend that proving liability will require determining whether the tire wear each class vehicle suffered was premature

---

[89]Shannon Depo. at 38-7-15.

[90]Daws Decl., ¶ 18.

[91]Shannon Depo. at 38-7-15.

[92]*Id.* at 27:23-28:2.

[93]Motion at 11 ("Plaintiffs . . . suffer from the same injury – excess tire wear due to the Suspension Defect. . .").  See also Shannon Depo. at 20:20-24:8; Motion, Exh. 3 ("2008 TSB") (stating that the "combination of the tires and the rear suspension geometry" can cause "uneven or rapid tire wear, a roaring noise from the car, and/or a vibration at high speeds").

[94]Opp. at 12.  Defendants also argue that a certain amount of negative camber is appropriate and even necessary, for engineering reasons.  This does not mean that the design specification in question is not defective, however.  Plaintiffs' theory is that the design specification results in *excessive* negative camber.

1   or excessive.  Defendants warn that if they can demonstrate that some class representatives'

2   vehicles have exhibited premature tire wear, while others have not, they will "not necessarily be

3   entitled to judgment against every [member of the class], because some [class vehicles may] have

4   experienced premature or excessive tire wear."[95]  This, they assert, defeats commonality.

5        The commonality requirement demands only that "class members' 'situations share a

6   common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation

7   of all claims for relief.'"  *Wolin v. Jaguar Land Rover North America*, LLC, 617 F.3d 1168, 1172

8   (9th Cir. 2010) (quoting *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171,

9   1175 (9th Cir.1990)).[96]  The fact that some vehicles have not yet manifested premature or

10  excessive tire wear is not sufficient, standing alone, to defeat commonality.  It is undisputed that

11  the rear suspension of the class vehicles was designed to have some degree of negative camber.

12  Plaintiffs assert that this design choice was defective in that it caused class vehicles to exhibit a

13  propensity for premature tire wear.

14

15

16       [95]Opp. at 13.

17       [96]Defendants challenge *Wolin's* applicability to this case, relying largely on the California

18  Court of Appeal's recent decision in *American Honda Motor Co. v. Superior Court*, 199
    Cal.App.4th 1367 (2011), which addressed a factual scenario similar to that here.  *American

19  Honda* applied California's certification standard, which is set forth in Code of Civil Procedure
    § 382.  See *id.* at 1371-72.  That standard somewhat merges commonality and predominance as

20  federal courts use those terms.  As the *American Honda Motor Co.* court stated: "The community
    of interest requirement [for class certification] embodies three factors: (1) *predominant common*

21  *questions* of law or fact; (2) class representatives with claims or defenses typical of the class; and
    (3) class representatives who can adequately represent the class,'" quoting *Richmond v. Dart*

22  *Industries, Inc.*, 29 Cal.3d 462, 470 (1981) (emphasis added)).  The *American Honda Motor Co.*

23  court appeared to acknowledge that the case raised common questions.  See *id.* at 1376 (noting
    that the vehicles allegedly had "the same defect . . . , the same symptoms . . . , and the same

24  remedy . . . ," and identifying at least five "common questions").  It concluded, however, that
    this did not suffice to "establish that common questions predominate."  *Id.*; see *id.* at 1378 ("Lee

25  has failed to demonstrate by substantial evidence that common questions of law and fact

26  predominate as to the class certified").  Defendants assert that the varying likelihood that the
    suspension defect will manifest in premature or excessive tire wear defeats both commonality and

27  predominance here.  The court believes, however, that the argument is best addressed in assessing

28  predominance, which is a more demanding standard than commonality.

                                        26

1   "The claims of all prospective class members involve the same alleged defect, covered by

2   the same warranty, and found in vehicles of the same make and model." *Wolin*, 617 F.3d at

3   1172; see also *Mazza v. American Honda*, 666 F.3d 581, 589 (9th Cir. 2012) (characterizing

4   commonality as a "limited burden," the court stated: "[C]ommonality only requires a single

5   significant question of law or fact. . . . Even assuming *arguendo* that we were to agree with

6   Honda's 'crucial question' contention, the individualized issues raised go to pre[dominance] under

7   Rule 23(b)(3), not to whether there are common issues under Rule 23(a)(2).   Honda does not

8   challenge the district court's findings that common questions exist as to whether Honda had a duty

9   to disclose or whether the allegedly omitted facts were material and misleading to the public").

10   The Ninth Circuit has deemed these facts sufficient to meet the commonality requirement, and the

11   court reaches the same conclusion here. See *Wolin*, 617 F.3d at 1172 ("Appellants easily satisfy

12   the commonality requirement").

13                    **d.      Typicality**

14          Typicality requires a determination as to whether the named plaintiffs' claims are typical

15   of those of the class members they seek to represent.   See FED.R.CIV.PROC. 23(a)(3).

16   "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class

17   members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; see also *Schwartz*

18   *v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if

19   it arises from the same event or course of conduct that gives rise to claims of other class members

20   and the claims are based on the same legal theory").

21          "The test of typicality is whether other members have the same or similar injury, whether

22   the action is based on conduct which is not unique to the named plaintiffs, and whether other class

23   members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (citation

24   and internal quotations omitted).   Typicality, like commonality, is a "permissive standard[ ]."

25   *Hanlon*, 150 F.3d at 1020.   Indeed, in practice, "[t]he commonality and typicality requirements

26   of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157-58 n. 13.   See also *Dukes*, 131 S. Ct. at

27   2551 n. 5 ("We have previously stated in this context that '[t]he commonality and typicality

28   requirements of Rule 23(a) tend to merge.   Both serve as guideposts for determining whether

under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest,'" citing *Falcon*, 457 U.S. at 158 n. 13).

Typicality may be found lacking "if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'"  *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).  To be typical, a class member need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails.  Instead, she must establish that she is not subject to a defense that is "[a]typical of the defenses which may be raised against other members of the proposed class."  *Id.*; see also *Ellis*, 657 F.3d at 984.

The named plaintiffs in this case are all owners or lessees of class vehicles, who assert that they have experienced premature tire wear as alleged in the complaint.[97]  Although defendants' expert contends that only one of the six vehicles he inspected exhibited premature tire wear, this defense is one that defendants can be expected to raise against all or many members of the class; it is not unique or idiosyncratic to the named plaintiffs.  Indeed, despite proffering this evidence, Honda does not challenge the named plaintiffs' typicality.  Consequently, the court concludes that the typicality requirement is satisfied.

### e.  Adequacy

The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously

---

[97]Motion, Exhs. 11-16 (declarations of named plaintiffs stating that they own or lease a class vehicle and have experienced premature or excessive tire wear).

on behalf of the class?" *Hanlon*, 150 F.3d at 1020; accord *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985. Individuals are not adequate representatives of a class when "it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs." *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 7 (N.D. Ill. 1977). "Several district courts thus have properly denied class certification where the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987); *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 409-10 (W.D. Okla. 1990). While credibility is a "relevant consideration with respect to the adequacy analysis," to show that a class representative is not adequate, credibility problems must relate to "'issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud.'" *Harris*, 753 F.Supp.2d at 1015 (quoting *Ross v. RBS Citizens, N.A.*, No. 09 CV 5695, 2010 WL 3980113, *4 (N.D.Ill. Oct. 8, 2010); see also *Del Campo v. American Corrective Counseling Servs., Inc.*, No.: C 01–21151 JW (PVT), 2008 WL 2038047, *4 (N.D.Cal. May 12, 2008) (stating that, "'[g]enerally, unsavory character or credibility problems will not justify a finding of inadequacy unless related to the issues in the litigation,'" quoting *Byes v. Telecheck Recovery Services, Inc.*, 173 F.R.D. 421, 427 (E.D. La. 1997)).

Plaintiffs submit evidence attesting to the adequacy of the class representatives.[98] The class representatives have been engaged participants in this litigation, submitting declarations in support of plaintiffs' motions and making themselves available for deposition testimony. Defendant raises no questions about their credibility, and no evidence of a conflict of interest between plaintiffs and members of the putative class. In addition, class counsel has submitted evidence of their

---

[98]Motion, Exh. 17 ("Cadell Decl."), Exh. 18 ("Shahian Decl."), Exh. 19 ("Starr Decl."), Exh. 20 ("Mendelsohn Decl.").

qualifications to represent the class, and their experience litigating similarly complex class actions.[99]   The court finds this evidence sufficient, and deems the adequacy requirement satisfied.[100]

### 2.   Whether Plaintiffs Have Satisfied the Requirements of Rule 23(b)(3)

Having concluded that the Rule 23(a) requirements are met, the court turns to Rule 23(b)(3).[101]   Rule 23(b)(3) requires two separate inquiries: (1) do issues common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy.   See FED.R.CIV.PROC. 23(b)(3).

### a.   Predominance

The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a).   *Amchem Products*, 521 U.S. at 623-24.   If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied.   *Hanlon*, 150 F.3d at 1022. "'[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.'"   *Zinser*, 253 F.3d at 1190 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535-39 (1986)).   This is because, *inter alia*, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified."   *Id.*

The parties' dispute concerning predominance focuses on two main subjects: (1) the interplay between the Ninth Circuit's decision in *Wolin*, 617 F.3d 1168, and the California Court

---

[99]*Id.*

[100]Defendants raise no challenges to either the class representatives' or class counsel's adequacy.

[101]Plaintiffs do not seek to certify a Rule 23(b)(1) or (b)(2) class.

of Appeal's decision in *American Honda Motor Co.*, 199 Cal.App.4th 1367, which come to opposite conclusions concerning predominance; and (2) whether California law can be applied to individuals residing outside the state, who purchased cars outside the state. The court addresses each issue in turn.

### i. *Wolin* and *American Honda*

Plaintiffs in *Wolin* asserted that their Land Rover vehicles were defective because a "geometry defect in the vehicles' alignment . . . caused uneven and premature tire wear and gave their vehicles a rough ride." 617 F.3d at 1170. Based on this purported defect, they sued, asserting claims under the consumer protection and warranty laws of Michigan and Florida. *Id.* at 1171. On appeal from the district court's denial of class certification, the defendant made the same argument Honda asserts here, i.e., that "the evidence will demonstrate that the prospective class members' vehicles do not suffer from a common defect, but rather, from tire wear due to individual factors such as driving habits and weather." *Id.* at 1173. The Ninth Circuit rejected this contention, citing *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975), for the proposition that "proof of the manifestation of a defect is not a prerequisite to class certification." *Id.* While defendant focused on the condition of the tires in class vehicles, the court focused on the alleged defect, observing that "the defect exists in the alignment geometry, not in the tires." *Id.* Thus, with respect to plaintiffs' consumer protection claims, the court concluded that allegations that "Land Rover failed to reveal material facts in violation of consumer protection laws, and that Land Rover was unjustly enriched when it sold a defective vehicle" were susceptible of common proof. *Id.*

Turning to plaintiffs' warranty claims, the court stated that "[a]ll plaintiffs received the same allegedly defective product, and all had the same express warranty claim that the car did not conform to the written warranty." *Id.* These facts were sufficient to satisfy predominance as to claims arising from Land Rover's general limited warranty. The court also addressed a separate tire warranty, which provided that when tire wear was necessarily caused by a vehicle defect, Land Rover would pay for new tires and/or realignment. *Id.* The court noted that tire wear can be caused by a variety of factors, and suggested that the causation issue might "make classwide

1  adjudication inappropriate." *Id.* As the district court had not considered this question, the court

2  of appeals directed it to examine the issue on remand. *Id.*

3       *Wolin* appears to be on all fours with this case. In considering similar facts, the Ninth

4  Circuit's analysis focused on the alleged design defect and held that its existence was enough to

5  support a finding of predominance. See *id.* ("Common issues predominate such as whether Land

6  Rover was aware of the existence of the alleged defect, whether Land Rover had a duty to disclose

7  its knowledge and whether it violated consumer protection laws when it failed to do so"). It

8  further held that the presence or absence of tire wear on each class member's vehicle, i.e.,

9  whether the defect had manifested, went to the merits of the claim and did not overlap with the

10  predominance inquiry. *Id.*

11       Defendants argue that *Wolin* is distinguishable because the court there applied Florida and

12  Michigan law, not California law. They cite *American Honda Motors Co.*, decided a few months

13  ago, which distinguished *Wolin* on precisely this basis. 199 Cal.App.4th at 1375. In *American*

14  *Honda Motors Co.*, plaintiffs alleged that the manual transmission on certain Acura vehicles

15  sometimes "shift[ed] stiffly or popp[ed] out of gear." *Id.* at 1369. A 2008 TSB stated that the

16  "probable cause" of the problem was a "faulty 3rd gear synchronizer or 3-4 shift sleeve," and that

17  vehicles affected by the problem could exhibit "noticeable shift qualify problems" warranting

18  replacement of the third gear set. *Id.* at 1370. Plaintiffs pled claims under the Song-Beverly Act,

19  California's breach of warranty statutes, and the UCL. They sought to certify a class of all

20  individuals in California who had purchased Honda Acura vehicles identified in the TSB, and

21  "who have not had the redesigned third gear set installed." *Id.*

22       The trial court granted certification, relying heavily on the Ninth Circuit's opinion in

23  *Wolin*, but the Court of Appeal reversed, disagreeing with *Wolin*'s conclusion that to secure

24  certification of a class, plaintiffs did not need to demonstrate that the defect in their vehicles was

25  "substantially certain to manifest in a future malfunction." *Id.* at 1375; *id.* at 1376 ("*Wolin* does

26  not address California law. The Ninth Circuit in *Wolin* was instead presented with federal

27  procedural law and Florida and Michigan substantive law"). Addressing the warranty claims, the

28  Court of Appeal conceded that while "the law does not require a current malfunction to prove

breach of warranty," that did "*not* mean it should not require proof of any malfunction, present or future.  A breach of warranty cannot result if the product operates as it was intended to and does not malfunction during its useful life." *Id.*  The *American Honda* court thus held that "the party moving for class certification must provide substantial evidence of a defect that is substantially certain to result in malfunction during the useful life of the product." *Id.* at 1376.

Applying this rule, the Court of Appeal concluded that plaintiff had failed to adduce evidence that the class vehicles suffered from an "inherent defect" that was "substantially certain" to cause the product to malfunction.  *Id.* at 1377 (citing *Hicks v. Kaufman and Broad Home Corp.*, 89 Cal.App.4th 908, 922-23 (2001) ("We conclude, therefore, if plaintiffs prove their foundations contain an inherent defect which is substantially certain to result in malfunction during the useful life of the product they have established a breach of Kaufman's express and implied warranties")).  Instead, it noted, the evidence showed that only four percent of the class had made warranty claims for third gear problems, and there was "no valid showing that [there existed] some vast pool of class members who suffered the defect in silence." *Id.*  Moreover, the evidence showed "variances in what caused the third gear problems, whether [it be] design defect, abuse, misuse or drag racing." *Id.*  Consequently, it held, "whether each proposed class member's third gear malfunctioned, if it will malfunction, how it malfunctioned and why it malfunctioned are individual questions not amenable to common proof." *Id.*

Similar problems afflicted plaintiff's UCL claim.  The Court of Appeal held that variability in the representations Honda and its dealers made to the class members meant that Honda's purported failure to disclose the defect was not subject to common proof across the class.  It noted that one class member had been told that the problem would "go away" in time, another had been told that the problem was "characteristic of the vehicle," and still another was informed that a TSB had advised technicians to switch out the transmission fluid. *Id.*  Some class members, moreover, never contacted Honda or its dealers about the third gear problem, and therefore were "never exposed to [any] alleged misrepresentation[ ]." *Id.*  Given the differences in what class members were told, the Court of Appeal held that individualized issues precluded a finding of predominance.

The parties dispute the import of *Wolin* and *American Honda Motors Co.* because they dispute the nature of the defect that has been alleged in this case. Plaintiffs contend that all of the class vehicles suffer from the same design defect, namely, a specification that requires setting the rear wheel suspension so that the rear tires have 1.5 degrees of negative camber.[102] They assert that this purported design defect results in vehicles having too much negative camber, which can lead to disruptive tire noise and excessive and premature tire wear.[103] Defendants focus on the "injury" alleged in the complaint - i.e., that a defect in the rear suspension results in premature tire wear, which may render the vehicle unsafe. They adduce evidence that, because design tolerances permit a variance of 0.75 degrees in either direction, the alleged design defect does not manifest in the same degree of tire wear across all class vehicles.[104] Plaintiffs proffer no evidence that a negative camber of 0.75 degrees is inherently defective, meaning that, even in plaintiffs' view, a vehicle could be manufactured within design tolerances and not exhibit any real defect.[105] Defendants, moreover, have adduced evidence that not all class vehicles are "substantially likely" to exhibit premature tire wear, which is the primary malfunction about which plaintiffs complain.

The question, therefore, becomes whether under *Wolin*, the fact that all class vehicles suffer from the same alleged design defect – rear tires that have 1.5 negative camber – is enough to show predominance and warrant certification, or whether under *American Honda Motors Co.*, variation in the ways the alleged defect manifests defeats predominance.

In attempting to reconcile the competing authority, the court notes first that *Wolin* is a Ninth Circuit case that the court is bound to apply. While it is true that *Wolin* addressed the

_____

[102]Shannon Depo. at 28:7-15.

[103]*Id.* at 23:231-24:8; 2008 TSB.

[104]Opp., Exh. 3 ("Shannon Decl."), ¶ 3.

[105]Plaintiffs have submitted evidence that negative camber in the 1.0 to 2.25 range can result in premature tire wear, but have not specifically indicated that negative camber in the 0.75 to 1.0 range will result in the problems complained of. (Shahian Decl., Exh. 6.)
  In response to the problems with the class vehicles, defendant's subsequent Honda Civic design specifications require only a 0.75 negative camber. (Opp. at 4.)

substantive law of Michigan and Florida, not California law, the Ninth Circuit's application of Rule 23(b) did not turn on the substantive law at issue. Indeed, the court's discussion of predominance and superiority makes almost no reference to the substantive law underlying plaintiffs' claims; it is mentioned only in connection with the court's description of the allegations in the complaint. 617 F.3d at 1173 (mentioning the consumer product laws of Michigan and Florida). *Wolin*, moreover, applies Rule 23, while *American Honda Motor Co.* applies California's standard for class certification. The court thus concludes that *Wolin* cannot be completely distinguished.

*American Honda Motor Co.* constitutes persuasive authority as to certain matters, however – i.e., what proof is needed under California law to prove a breach of warranty claim and a violation of the UCL. The case does not discuss CLRA claims such as those asserted here, however. Moreover, as respects plaiintiffs' UCL claim, the *American Honda Motors Co.* court did not address the California Supreme Court's decision in *In re Tobacco II Cases*, 46 Cal.4th 298 (2009), which, at least in the context of a case based on an across-the-board failure to disclose, such as this one, indicates that individualized proof of reliance and causation is not required. The court will therefore consider *American Honda Motors Co.*, together with binding Ninth Circuit interpretations of California law and other California authority addressing the issues. The court will address predominance separately with respect to each of plaintiffs' CLRA, UCL, and express and implied warranty claims.

### ii.     The CLRA Claim

"A CLRA claim . . . requires each class member to have an actual injury caused by the unlawful practice." *Stearns*, 655 F.3d at 1022 (citing *In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 155–56 (2010)). "'Causation, on a classwide basis, may be established by materiality,'" however. *Id.* (quoting *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 129 (2009)). "This rule applies to cases regarding omissions or 'failures to disclose,'" which is the theory advanced by plaintiffs in this case. *Id.* A misrepresentation or omission is material under California law "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question. . . ." Consequently, it "is

35

1    generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury

2    could not reasonably find that a reasonable man would have been influenced by it." *Steroid*

3    *Hormone Prod. Cases*, 181 Cal.App.4th at 157.  If a claim based on a failure to disclose arises

4    outside the warranty period, the undisclosed defect must pose "'safety concerns.'" *Smith v. Ford*

5    *Motor Co.*, 749 F.Supp.2d 980, 987 (N.D. Cal. 2010) (citing *Daugherty v. Am. Honda Motor*

6    *Co., Inc.*, 144 Cal.App 4th 824, 835-38 (2006)).

7         The court's earlier order on defendants' motion to dismiss identified the "root cause of the

8    problem" about which plaintiffs complain as the class vehicles' rear suspension; it concluded

9    plaintiffs had adequately alleged that a defect in the rear suspension posed "safety concerns," such

10   that defendants' failure to disclose it could constitute a material omission.  Plaintiffs assert that the

11   design defect causes the vehicles to exhibit excessive negative camber, which in turn leads to

12   problems such as disruptive tire noise and excessive tire wear, the last of which may pose safety

13   hazards.[106]

14        Defendants assert that common questions do not predominate on the CLRA claim because

15   (1) not all vehicles exhibit the same amount of negative camber due to design tolerances; (2) not

16   all vehicles have exhibited premature tire wear; and (3) premature tire wear is very difficult to tie

17   to a specific cause common to the entire class.  See *Zinser*, 253 F.3d at 1192 (upholding the denial

18   of class certification in a personal injury lawsuit since the injury alleged could have a wide variety

19

20   _____

21   [106]Plaintiffs argue that the relevant "malfunction" is the "excessive" negative camber that
     results.  This argument is unpersuasive.  There is no evidence that a certain degree of excessive

22   negative camber, in and of itself, renders the vehicles unable to function.  The complaint,
     moreover, focuses not on the degree of negative camber, but rather on the manner in which the

23   "alignment/geometry" defect in the class vehicles causes the "rear tires [to] wear unevenly and

24   prematurely, causing the occupants to experience an extremely rough ride, as well as exceptionally
     loud and disruptive noise, while driving. . . ."  (FAC, ¶ 4.)  The next paragraph asserts that

25   "[t]ires are one of the most important mechanical components for vehicle control and safe
     driving."  (*Id.*, ¶ 5.)  As can be seen, negative camber is not identified as the cause of the "rough

26   ride" and other problems; rather, it appears to be important only insofar as it actually results in
     premature tire wear.  At oral argument, in fact, plaintiffs' counsel conceded that to succeed on

27   the CLRA claim, plaintiffs would need to prove that the defect led to safety problems.  This too

28   indicates that "excessive" negative camber, standing alone, is insufficient.

of causes, citing *Haley v. Medtronic*, 169 F.R.D. at 653)).

As respects design tolerances, it is evident that even though the back wheels of the class vehicles were designed to have 1.5 degrees of negative camber, as manufactured, not all class vehicles have that precise amount of camber.[107]  Daws's examination of plaintiffs' vehicles, for example,  showed variance in rear suspension negative camber.[108]  It is unclear how much of this variance existed when the vehicles left the manufacturing plant, and how much of it was the result of other problems, as the vehicles had been driven for quite some time when the measurements were taken.[109]

Plaintiffs counter with evidence that the class vehicles experience premature or uneven tire wear across a range of negative camber readings, i.e., 1.0 to 2.25 degrees of negative camber. This range coincides with most of the design tolerance band.[110]  While one of defendant's representatives testified that vehicles exhibiting tire wear "were higher on the tolerance end of being more negative camber,"[111] this does little to controvert plaintiffs' showing that manufacturing tolerances did not necessarily lead to tremendous variation in the way in which class vehicles manifested the alleged defect.

Defendants fare better in arguing that plaintiffs have failed to adduce evidence that all class vehicles are likely to exhibit the safety defect pled, and in showing that premature tire wear is difficult to attribute to a single cause.  As a first step in evaluating these arguments, it is useful to clarify the relevance of tire wear to plaintiffs' CLRA claim.  As noted, the defect plaintiffs allege is a design specification that requires the back tires of each class vehicle to have 1.5 degrees of negative camber (within certain design tolerances).  There is no dispute that this specification

---

[107]Shannon Depo. at 62:22-63:3.

[108]Daws Decl., ¶ 78.

[109]*Id.* (noting that "slight vehicle deformations can and do occur due to road hazard impacts and wear on the suspension").

[110]Shahian Decl., Exh. 6 ("AHM116553").

[111]Hernandez Depo. at 254:20-21.

is common to the entire class of vehicles.  Plaintiffs are thus correct that defendants repeatedly "confuse[ ] the defect at issue . . . with the consequences of that defect, which include[ ] premature or uneven tire wear."[112]  The Ninth Circuit disfavors this type of mingling of issues, and requires that courts accept plaintiffs' theory of relief as it is stated.  See *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers Int'l Union, AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (holding that district court was incorrect to "treat[ ] plaintiffs' actual legal theory as all but beside the point" because it questioned their ability to prove that theory, and was concerned about the individualized inquiries that would result if they failed).

Nonetheless, whether class vehicles are likely to exhibit excess tire wear posing safety hazards such as tire blowouts and accidents *is* relevant assessing whether plaintiffs can prove causation on a classwide basis.  Under the CLRA, causation can be shown as to an entire class by proving materiality.  *Stearns*, 655 F.3d at 1022 (observing that "[c]ausation, on a classwide basis, may be established by materiality.  If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class," a rule that applies to omissions (quoting *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 129 (2009)).  Defendants allegedly provided the same information to the entire class, i.e., no information, concerning the possibility of excessive negative camber.  As long as plaintiffs can prove that this omission was material, therefore, they will have met their burden of proving causation as to the entire class.

Whether an omission is material is a fact-intensive question that asks whether "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  *In re Steroid Hormone Product Cases*, 181 Cal. App. 4th 145, 157 (2010).  As a result, to show that defendants' omission was material, plaintiffs must demonstrate that the alleged design defect is likely to manifest in premature tire wear in class vehicles of the type pled in the complaint.  It is only with such proof that a jury could find that

---

[112]Reply at 2.

defendants' omission was material – i.e., that it was information that would have influenced a reasonable consumer's decision whether to purchase a class vehicle.

While defendants' expert has adduced some evidence that premature tire wear has a number of causes,[113] the fact that the existence of alternative causes for premature tire wear may make it difficult for plaintiffs to prove materiality basis does not demonstrate a lack of predominance. Indeed, the *Wolin* court considered and rejected this very argument; it held that engaging in such an analysis exceeded the scope of the predominance inquiry. See *Wolin*, 617 F.3d at 1173 ("Land Rover argues that the evidence will demonstrate that prospective class members' vehicles do not suffer from a common defect, but rather, from tire wear due to individual factors such as driving habits and weather. . . .  What Land Rover argues is whether class members can win on the merits. For appellants' claims regarding the existence of the defect and the defendant's alleged violation of consumer protection laws, this inquiry does not overlap with the predominance test").

Although the *Wolin* court noted that "early tire wear cases [can] be particularly problematic for plaintiffs seeking class certification," it was not persuaded by "Land Rover's suggestion that automobile defect cases can categorically never be certified as a class." *Id.*  Rather, it held that while "individual factors may affect premature tire wear, they do not affect whether the vehicles were sold with an alignment defect." *Id.*  Following the Ninth Circuit's logic, plaintiffs alleging a design defect that manifests in tire wear may be able to show that class vehicles are likely to exhibit tire wear as a result of the defect, e.g., by introducing evidence such as TSBs, consumer complaints, warranty data, internal reports, and/or expert testimony. If a jury finds such proof convincing, then materiality would be proved because the likelihood that such wear might occur would have been material to a reasonable consumer.

Defendants asserted in their briefs and at oral argument that to succeed on the CLRA claim, plaintiffs would have to prove that *each* class vehicle experienced premature or uneven tire wear

---

[113]Daws Decl., ¶ 86 (citing driving habits, road conditions, type of tire, the weight a vehicle regularly carries, and other factors as giving rise to individualized inquiries that defeat predominance).

as a result of the purported design defect.[114]  The court is aware of no case authority supporting this proposition.  Indeed, the case law suggests the contrary.  It mandates only that plaintiffs show there was a defect in the class vehicles that created an "unreasonable risk" of safety problems. See *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 836 (2006) (rejecting plaintiff's assertion in that case that defendant had knowledge of an "unreasonable safety risk" at time of sale); see also *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1191 n. 25 ("The risk of injury and/or death associated with the alleged SUA defect is the type of 'unreasonable risk' that leads to a duty to disclose under California law," quoting *Daugherty*, 144 Cal.App.4th at 836.)); *Smith*, 749 F.Supp.2d at 987-88 (discussing claims based on the safety risk posed by the defect); *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1094 (N.D. Cal. 2007) ("*Daugherty* emphasized that an 'unreasonable' safety risk would lead to a duty to disclose"); cf. *Ehrlich v. BMW of North America, LLC*, 801 F.Supp.2d 908, 918 (C.D. Cal. 2010) ("The Court is not persuaded . . . that Plaintiff must plead that consumers have been injured by the alleged unreasonable safety risk. . . . The alleged unreasonable risk of safety created by compromised windshields during rollover accidents is relevant to the materiality of BMW's omissions, and Plaintiff has alleged a plausible unreasonable safety risk that would have been material to the reasonable consumer").

The CLRA prohibits the failure to disclose "material" facts.  Here, whether class vehicles have a propensity or likelihood to experience excessive and premature tire wear, even if each one does not necessarily manifest the problem, will be a question of fact for the jury.  Cf. *Collins v. eMachines, Inc.*, 202 Cal.App.4th 249, 255-56 (2011) ("At the time the allegedly defective eMachines computers were marketed and sold, floppy disks provided the primary means of storing and transporting computer data.  According to the complaint, the alleged FDC Defect could and did corrupt computer data.  A reasonable consumer would certainly attach importance to the

---

[114]Opp. at 13.  Honda frames the question thus: "If the trier of fact found that two plaintiffs' tires exhibited wear of the sort described in the TSB, but that the other three did not, what possible judgment could be rendered for or against the class?"  (*Id.*)  It would appear that judgment in Honda's favor would have to be entered on the class claims if the only evidence plaintiffs adduced was the fact that of five class vehicles, some did and some did not exhibit premature tire wear.

disclosure of the FDC Defect"); compare *Quacchia v. DaimlerChrysler Corp.*, 122 Cal.App.4th 1442, 1451-52 (2004) ("Here, as discussed above, there is evidence that the *risk* of accidental release of Gen–III buckles in the operation of DCC vehicles would vary from model to model, and from year to year" (emphasis added)).

Moreover, plaintiffs' claim is not that each and every class vehicle exhibited premature and excessive tire wear; it is that as a result of the design defect, class vehicles had a likelihood of doing so, and that a reasonable consumer would have behaved differently had he or she known of this propensity. Defendants argue that plaintiffs will have difficulty proving this assertion. But it would be error to "equate a 'rigorous analysis' with an in-depth examination of the underlying merits . . . . The district court is required to examine the merits of the underlying claim in this context, only inasmuch as it must determine whether common questions exist; not to determine whether class members [can] actually prevail on the merits of their claims." *Ellis*, 657 F.3d at 983 n. 2 (citing *Dukes*, 131 S.Ct. at 2552 n. 6); *id.* ("To hold otherwise would turn class certification into a mini-trial"); *United Steel, Paper & Forestry*, 593 F.3d at 810 ("What a district court may not do is to assume, *arguendo*, that problems will arise, and decline to certify the class on the basis of a mere potentiality that may or may not be realized").

Consequently, the court concludes that plaintiffs have satisfied the predominance requirement as respects their CLRA claim. See *Wolin*, 617 F.3d at 1173 ("Land Rover represented that the vehicles had particular characteristics or were of a particular standard when they were of another, and Land Rover failed to reveal material facts about the vehicles. . . . Common issues predominate such as whether Land Rover was aware of the existence of the alleged defect, whether Land Rover had a duty to disclose its knowledge and whether it violated consumer protection laws when it failed to do so"); see also *Stearns*, 655 F.3d at 1022 (stating that a showing that "material misrepresentations or omissions" were made "to the whole class" was a requirement for class certification); *Parkinson*, 258 F.R.D at 596 ("Plaintiffs' CLRA claim is based largely on defendant's alleged uniform failure to 'disclose numerous facts that a reasonable consumer might find material.' Thus, the common questions for determining whether class members may recover under the CLRA include: (1) whether defendant was aware of the

alleged defect; (2) whether defendant had a duty to disclose its knowledge; (3) whether defendant failed to do so; (4) whether the alleged failure to disclose would be material to a reasonable consumer; and (5) whether defendant's actions violated the CLRA" (internal citation omitted)); see also *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 1292 (2002) ("[T]he causation required by Civil Code section 1780 does not make plaintiffs' [CLRA] claims unsuitable for class treatment" since causation under the CLRA "'is commonly proved more likely than not by materiality,'" quoting *Blackie*, 524 F.2d at 907 n. 22).

### iii.    The UCL Claim

The court concluded in its prior order that plaintiffs could base their UCL claim on defendants' alleged violation of the CLRA, since the UCL penalizes behavior that is "unlawful," "unfair," or "fraudulent." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 18-81 (1999).   Even if plaintiffs did not rely entirely on the CLRA, however, defendants' argument that *American Honda Motors Co.* forecloses certification of the UCL claim fails.   The Ninth Circuit recently affirmed the general California rule "'that relief under the UCL is available without individualized proof of deception, reliance and injury.'" *Stearns*, 655 F.3d at 1021 (quoting *In re Tobacco II*, 46 Cal.4th at 320).   For this reason, the circuit court dismissed the lower court's concerns regarding the necessity of individualized proof of reliance and causation, and deemed them insufficient to preclude a finding of predominance. *Id.*   A UCL claim is distinct in this regard from common law fraud, as "the UCL's focus [is] on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *In re Tobacco II*, 46 Cal.4th at 312.   As a result, and because the UCL claim focuses on defendants' failure to disclose and the impact that it had on class members' decision to purchase class vehicles, the fact that class vehicles experienced varying degrees of tire wear does not mean that the claim cannot be proved through the presentation of common evidence.

*American Honda Motors Co.* is not to the contrary.   First, that case involved alleged affirmative representations to class members, while this case involves an alleged across-the-board

failure to disclose.[115]  The *American Honda Motors Co.* court based its conclusion that plaintiff

had not shown that common questions predominated on the fact that he did "not contend that

Honda or its dealers made standard or scripted representations to class members.  Instead," the

court stated, "the evidence submitted by Lee to support his certification motion demonstrates how

variable the representations made to class members were."  *American Honda Motors Co.*, 199

Cal.App.4th at 1379; see also *Stearns*, 655 F.3d at 1020 ("We do not, of course, suggest that

predominance would be shown in every California UCL case.  For example, it might well be that

there was no cohesion among the members because they were exposed to quite disparate

information from various representatives of the defendant").  Here, by contrast, all class members

received the same information from defendants regarding the purported defect – which is to say,

no information concerning the possibility of premature and excessive tire wear.

As is clear from the California Supreme Court's decision in *In re Tobacco II Cases*, 46

Cal.4th 298 (2009), moreover, there is no need to prove reliance on an individual basis.  Rather,

"*In re Tobacco II Cases* set out a liberal approach to the reliance inquiry," permitting plaintiffs

to prove a UCL violation by presenting "generalized evidence that Defendants' conduct was

'likely to deceive' members of the public."  *Plascencia v. Lending 1st Mortgage LLC*, 259 F.R.D.

437, 448 (N.D. Cal. 2009).  Indeed, as with the CLRA, materiality is relevant to prove reliance,

since "a presumption, or at least an inference, of reliance arises wherever there is a showing that

a misrepresentation was material."  *In re Tobacco II*, 46 Cal.4th at 327.  Consequently, a violation

of the UCL can be proved with common evidence regarding the nature of the design defect in

question, the likely effect of the defect on class vehicles, its likely impact on vehicle safety, what

Honda knew or did not know, and what it disclosed or did not disclose to consumers.  See

*Yamada*, 275 F.R.D. at 578 ("[I]t is unlikely that a member of the putative class would have

purchased the NobelDirect product without having been influenced by Defendants' uniform

marketing claims.  Furthermore, it is reasonable to assume that no rational member of the putative

---

[115]Motion, Exhs. 12-16 (plaintiffs' declarations stating that they were not informed of
suspension defect before purchasing vehicle).

43

1    class would have purchased and used the NobelDirect implant had he or she been aware of the

2    alleged defective design"); *Delarosa v. Boiron, Inc.*, 275 F.R.D 582, 594 (C.D. Cal. 2011) ("In

3    addition, Defendant's arguments that it can present proof that Coldcalm worked for some

4    individual class members goes to the proof of the merits of Plaintiff's claim, not to the common

5    question as to the overall efficacy of the product").

6           Consequently, the court concludes that plaintiffs have satisfied the predominance

7    requirement with respect to their UCL claim.

8                                    **iv.    Express Warranty**

9           The substantive requirements of California law, as articulated in *American Honda Motors*

10   *Co.* and *Hicks*, do not require proof of a current malfunction to assert breach of express warranty

11   claims, but do require proof that the defect is "substantially certain to manifest in a future

12   malfunction." *American Honda Motors Co.*, 199 Cal.App.4th at 1376; see also *Hicks*, 89

13   Cal.App.4th at 918 ("[P]roof of breach of warranty does not require proof the product has

14   malfunctioned but only that it contains an inherent defect which is substantially certain to result

15   in malfunction during the useful life of the product. . . . Cars and tires have a limited useful life.

16   At the end of their lives they, and whatever defect they may have contained, wind up on a scrap

17   heap.  If the defect has not manifested itself in that time span, the buyer has received what he

18   bargained for"); *Hewlett-Packard Co. v. Superior Court*, 167 Cal.App.4th 87, 96 (2006)

19   (applying *Hicks* and concluding that "under this theory, an actual malfunction of the notebook

20   screens would not be necessary to establish defect, if it could be established that the notebook

21   screens were substantially certain to fail prematurely").  Thus, under California law, a defect that

22   remains "latent" during the useful life of the product and does not manifest in an actual

23   malfunction will not support a cause of action for breach of express warranty.

24          The question is whether this requirement of substantive California law necessitates that

25   plaintiffs show more to certify a breach of warranty class than to secure certification of classes

26   asserting claims under California's consumer protection statutes.  Defendants argue that common

27   issues do not predominate on the breach of express warranty claim because class vehicles do not

28   uniformly exhibit the type of premature or excessive tire wear alleged in the complaint.

Defendants' "best estimate," based on the evidence they have adduced, is that fewer than ten percent of the class vehicles have experienced premature tire wear as a result of negative camber.[116] Defendants' expert examined six of the named plaintiffs' vehicles, and concluded that only one exhibited the type of wear identified in Honda's 2008 TSB.[117] While plaintiffs dispute defendants' estimates and their expert's finding – citing the number of people who reported premature tire wear to Honda or its dealers – they adduce no real evidence that the number of complaints exceeds ten percent of the proposed class.[118] As a result, it is unclear that the design defect plaintiffs allege is "substantially certain to manifest in malfunction during the useful life of the product." *American Honda Motors Co.*, 199 Cal.App.4th at 1375; see also *id.* at 1377 (noting that class members owning less than four percent of class vehicles had reported a problem or received a new third gear, and that plaintiff had presented no evidence that it was substantially certain that the remaining class members would experience similar problems).

The question thus becomes whether, in light of the Ninth Circuit's holding in *Wolin* and the decisions of California Courts of Appeal in *Hicks* and *American Honda Motors Co.*, plaintiffs' allegation that all class vehicles have a common defect suffices to show predominance, or whether, to satisfy predominance, it is also necessary to show that the alleged defect is substantially certain to result in malfunction during the useful life of the vehicle. *Wolin*, which applied the substantive law of Michigan and Florida, held that predominance was satisfied because plaintiffs asserted that all class vehicles suffered from the same defect and that Land Rover had breached the terms of its warranty by failing to repair or replace the relevant components of the cars. See 617 F.3d at 1174.

Here, as in *Wolin*, plaintiffs allege that all class vehicles have the same defect and that

---

[116]Opp., Exh. 2 ("Hernandez Depo.") at 99:13-15, 145:4, 152:16-18. Specifically, it appears that about 37,000 individuals made complained directly to Honda about the design defect at issue here. (Anderson Depo. at 77:7-11.) This figure does not include individuals who may have paid for repairs themselves, as some plaintiffs allegedly did. (Opp. at 10 n. 5.)

[117]Daws Decl., ¶ 80.

[118]Reply at 10 (citing Anderson Depo. at 78:19:79:4).

defendants breached an express warranty by refusing to repair or replace the rear suspension and control arm free of charge and replace tires damaged as a result of the defect.[119]  Although *Wolin* held that manifestation of a defect is not a prerequisite to class certification, *id.* at 1173 – a holding consistent with California law as explicated in *Hicks* and *American Honda Motors Co.* – it had no occasion to consider whether, in addition to proof of an alleged common defect and defendant's refusal to honor its warranty to repair that defect, plaintiffs also had to adduce proof – under California law – that it was substantially certain that the alleged defect would cause a malfunction during the future useful life of the class vehicles in order to show predominance.

Relying heavily on *American Honda*, defendants contend that although this question goes to the merits of plaintiffs' breach of express warranty claim, it overlaps with the predominance inquiry.  Compare *Wolin*, 617 F.3d at 1173 (holding that common questions predominated with respect to plaintiffs' claims under state consumer protection laws because the merits of the claims did "not overlap with the predominance inquiry").  *American Honda*, however, appears to have conflated the substantive requirements of California warranty law and California procedure governing class certification.  The *American Honda* court read *Hicks* to require that at the class certification stage, plaintiffs present evidence that the defect common to the product purchased by class members is substantially certain to manifest in a malfunction during the useful life of the product.  *Hicks*, however, appears to have addressed this question as a matter of substantive California warranty law, and to have reversed the trial court's denial of class certification because it relied on an erroneous interpretation of California warranty law, i.e., that because each plaintiff had to show that a malfunction had manifested in his or her individual product, common questions did not predominate.  As the court reads *Hicks*, it did not hold that proof that a malfunction would occur during the useful life of the product was required to show predominance for class certification purposes.  The *American Honda* court clearly disagreed with this interpretation of *Hicks*.  See *American Honda Motors Co.*, 199 Cal.App.4th at 1375 ("*Hicks* extends its holding to include the requirement that the party moving for class certification must provide substantial

---

[119]FAC, ¶ 171.

46

evidence of a defect that is substantially certain to result in malfunction during the useful life of the product. This is an issue that must be considered not only to determine the merits of a plaintiff's claim, but also in a class certification motion").

Even if *American Honda Motors Co.* correctly applies California procedural law, however, federal procedural law governs in this case. Consequently, the court is bound to apply *Wolin*. Applying *Wolin*, and having considered the analysis in *Hicks* and *American Honda Motors Co.*, the court cannot discern why, at the class certification stage, plaintiffs must adduce evidence that a defect is substantially certain to arise in all class vehicles during the vehicles' useful life. A merits inquiry will resolve that question in one stroke – if a design specification of 1.5 degrees of negative camber is substantially certain to result in the malfunctions alleged in the complaint, plaintiffs will prevail. If not, the class's express warranty claim will fail, and defendants will be entitled to have judgment entered in their favor. The necessary analysis, in fact, seems particularly suited to resolution as a class action.

Relying on *Hicks*, another California Court of Appeal came to just this conclusion. In *Hewlett-Packard Co.*, plaintiffs sought to certify a class of Hewlett-Packard laptop purchasers who claimed that the computers had defective inverters that could potentially cause dim displays. 167 Cal.App.4th at 89-90. Defendant asserted that *Daugherty*, 144 Cal.App.4th at 838-39, "a product malfunction is required in order for the product to be considered defective" so as to support a breach of warranty claim. *Hewlett-Packard Co.*, 167 Cal.App.4th at 95. The Court of Appeal concluded that this argument went primarily to the merits of the case, and did not defeat class certification:

> "Contrary to HP's argument in this case, whether or not the alleged defects occurred during the warranty period does not affect a finding of community of interest in the present case. Plaintiffs here allege a common defect in the HP notebook computers and their display screens. In order to prove that defect, plaintiffs will present evidence of call records reporting dim displays, records of repairs of faulty inverters, service notes documenting defects that were known to HP, and an HP policy that all notebooks returned for any reason would have their

47

1    inverter repaired, regardless of whether the screen actually failed.  A jury could

2    find, based on this evidence, that the inverters in question were defective and that

3    HP is liable for the defect.  The issue of whether the inverters were defective is

4    appropriate for a joint trial with common proof.  For example, if the jury finds that

5    the inverters were defective, then each plaintiff would not need to separately prove

6    that his or her inverter was defective, only that he or she had a computer that

7    contained that type of inverter."  *Id.* at 96.

8    Although the *Hewlett-Packard* court did not use the "substantially certain" test articulated in *Hicks*

9    and *American Honda Motors Co.*, it appears to have assumed that evidence that a substantial

10   number of laptops had manifested the defect would be a sufficient basis upon which a jury could

11   conclude that the class should prevail.  It thus appears to have utilized a legal test that was similar,

12   if not identical, to that employed by the *Hicks* and *American Honda Motors Co.* courts.

13   Consequently, applying federal procedural law as articulated in *Wolin*, and attempting to

14   harmonize California authority and apply California substantive law, the court concludes that

15   plaintiffs have adequately demonstrated predominance with respect to the express warranty claim.

16   That claim will succeed if plaintiffs are able at trial to show that all class vehicles are substantially

17   certain to manifest the excessive and premature tire wear and loud and disruptive noise alleged in

18   the complaint.  It will fail if such evidence is lacking.  As the Ninth Circuit has observed,

19   "a court can never be assured that a plaintiff will prevail on a given legal theory

20   prior to a dispositive ruling on the merits, and a full inquiry into the merits of a

21   putative class's legal claims is precisely what both the Supreme Court and we have

22   cautioned is not appropriate for a Rule 23 certification inquiry."  *United Steel,*

23   *Paper, & Forestry*, 593 F.3d at 809.

24   As noted, the *United Steel* court held that it was legal error for the district court to conclude "that

25   merely because it was not assured that plaintiffs would prevail on their primary legal theory, that

26   theory was not the appropriate basis for the predominance inquiry."  *Id.*  While class certification

27   requires some analysis regarding the merits of plaintiffs' express warranty claim, the

28   predominance problems defendants identify here are better resolved on the merits.

### v.   Implied Warranty

"[A]n implied warranty of merchantability guarantees that 'consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; [and] (4) Conform to the promises or affirmations of fact made on the container or label." CAL. CIV. CODE § 1791.1(a). "Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law. . . . [I]t provides for a minimum level of quality." *American Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 1295-96 (1995). Thus, a plaintiff claiming breach of an implied warranty of merchantability must show that the product "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406 (2003) (citing CAL. COM. CODE § 2314(2)); see also *Pisano v. American Leasing*, 146 Cal.App.3d 194, 198 (1983) ("Crucial to the inquiry is whether the product conformed to the standard performance of like products used in the trade").   The implied warranty of merchantability set forth in § 1791.1(a) requires only that a vehicle be reasonably suited for its ordinary use. It need not be perfect in every detail so long as it "provides for a minimum level of quality." *American Suzuki*, 37 Cal.App.4th at 1296.. The basic inquiry, therefore, is whether the vehicle is fit for driving. See *id.* ("Courts in other jurisdictions have held that in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation").

The court's analysis regarding plaintiffs' express warranty claim dictates the outcome with respect to their breach of implied warranty claim, since cases such as *Hicks* have applied the "substantial certainty" requirement to both express and implied warranty claims. See *Hicks*, 89 Cal.App.4th at 917-23 ("Plaintiffs contend that to prove breach of the express and implied home warranties they only need to prove Fibermesh is an inherently defective product the use of which is substantially certain to lead to foundation failure. . . . We conclude, therefore, if plaintiffs prove their foundations contain an inherent defect which is substantially certain to result in malfunction during the useful life of the product they have established a breach of Kaufman's

express and implied warranties"); see also *Ehrlich v. BMW of North America, LLC*, 801 F.Supp.2d 908, 924 (C.D. Cal. 2010) ("[S]o long as a latent defect existed within the one-year period, its subsequent discovery beyond that time did not defeat an implied warranty claim"); *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1305–06 (2009) ("In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery").

As with plaintiffs' express warranty claim, if defendants can demonstrate that the design specification requiring 1.5 degrees of negative camber is not "substantially certain" to result in the excessive and premature tire wear about which plaintiffs complain, they will prevail. If plaintiffs, on the other hand, can demonstrate that the specification is substantially certain to result in premature and excessive tire wear that renders the vehicles unfit for driving, they will prevail. The breach of implied warranty claim is therefore susceptible of common proof, and the court will certify the implied warranty claim for class treatment.

### vi.     The Applicability of California Law to Residents of Other States

Defendants also oppose certification of the CLRA, UCL, express warranty and implied warranty claims on the basis that plaintiffs seek to apply California law to individuals who reside outside the state and purchased their cars outside the state. Plaintiffs contend that due process and California choice of law principles permit the application of California law to such individuals. Although the parties do not denominate this issue a predominance question, it is clear that it affects the definition of the class and whether common issues predominate. The court thus addresses it at this juncture. See *Mazza*, 666 F.3d at 589-94 (considering the choice of law inquiry as part of predominance analysis).

Following the motion hearing and in light of *Mazza*, plaintiffs modified their position regarding the classes to be certified. They no longer seek to certify a nationwide class, and instead request that the court certify a UCL/CLRA class of California, Florida and New York residents, an express warranty class of California, New York, and North Carolina residents, and

1     an implied warranty class of California residents.[120]

2                          **aa.     Due Process Requirements**

3            "To apply California law to claims by a class of nonresidents without violating due

4     process, the court must find that California has a '"significant contact or significant aggregation

5     of contacts" to the claims asserted by each member of the plaintiff class, contacts "creating state

6     interests," in order to ensure that the choice of [the forum state's] law is not arbitrary or unfair.'"

7     *Keilholtz*, 268 F.R.D. at 339 (quoting *Phillips Petroleum, Co. v. Shutts*, 472 U.S. 797, 821-22

8     (1985)).   "'When considering fairness in this context, an important element is the expectation of

9     the parties.'"  *Id.*   "[S]o long as the requisite significant contacts to California exist, a showing

10    that is properly borne by the class action proponent, California may constitutionally require the

11    other side to shoulder the burden of demonstrating that foreign law, rather than California law,

12    should apply to class claims."  *Washington Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906,

13    921 (2001) (rejecting an amici curiae's argument that in a nationwide class action, the law of other

14    states in which class members resided governed their claims unless the proponent of class

15    certification affirmatively demonstrated that California law was more properly applied).[121]

16           Plaintiffs adduce evidence that defendants have substantial contacts with California.  They

17    note that they conduct a significant amount of business and run nationwide operations from the

18

19

20

21

22    _____

              [120]Pls.' Supplemental Brief at 1.

23

24           [121]In so concluding, the Court noted that "[a] number of federal courts ha[d] approved
      nationwide or multistate class action certification for pendent state law claims where the
25    defendants [had] failed to show that foreign law [was] more properly applied to the claims of
      nonresident class members under California's governmental interest analysis."  *Id.* (citing, *inter
26    alia*, *Harmsen v. Smith*, 693 F.2d 932, 946-47 (9th Cir. 1982); *Roberts v. Heim*, 670 F.Supp.
      1466, 1494 (N.D. Cal. 1987); *In re Pizza Time Theatre Securities Litigation,* 112 F.R.D. 15,
27    20-21 (N.D. Cal. 1986); *In re Computer Memories Securities Litigation*, 111 F.R.D. 675, 685
      (N.D. Cal. 1986)).
28

state.[122]   Honda's customer service group and its technical line group are located in California.[123] It appears that the decision to issue the TSB concerning the alleged defect was made, at least in part, in California.[124]   Plaintiffs also contend that almost 19 percent of class vehicles are located in California and that the state with the next largest number of vehicles is Florida, at approximately seven percent; the evidence on these points, however, is not clear.   Although plaintiffs cite the deposition testimony of Honda's corporate representative as support for this proposition, he did not so testify.[125]   Plaintiffs also proffer a document that was purportedly produced during discovery, titled "AHM-0116684," which lists what appear to be unit counts per state for class vehicles' model years.[126]   Plaintiffs presumably used this document to calculate the percentages noted above; beyond stating that it was produced in discovery, however, they provide no information however, concerning the document's significance (e.g., whether it reflects units sold in a particular state, units shipped to a particular state, or something else, and whether it covers the entire class period or some other time frame, etc.).[127]   Although defendants do not attempt to rebut plaintiffs' statements regarding the number of vehicles located in each state, the court is reluctant to rely on a document whose contents are not explained.   The basic fact that Honda does a substantial amount of business in California is undisputed, however.

Based on the totality of the evidence plaintiffs have adduced, the court concludes that plaintiffs have made a sufficient showing that the application of California law to non-California residents would not offend the class members' due process rights; in this regard, the court follows

---

[122]Shannon Depo. at 71:5-10 (testifying that Honda's service engineering group were located in Torrance, CA, as well as offices of deponent, who was Honda's designated corporate representative).

[123]Id. at 77:2-17.

[124]Id. at 73:7-9.

[125]Reply at 22 (citing Shannon Depo. at 23:8-9.)

[126]Shahian Decl., Exh. 8 ("AHM-0116684").

[127]Shahian Decl., ¶ 10.

1    other courts that have reached similar conclusions based on parallel facts.  See *Wolph v. Acer*

2    *America Corp.*, 272 F.R.D. 477, 485 (N.D. Cal. 2011) ("By contrast, where Acer is incorporated

3    in California and has its principal place of business and headquarters in San Jose, California,

4    consumers who purchase an Acer notebook would have some expectation that California law

5    would apply to any claims arising from alleged defects such that the application of California law

6    would not be arbitrary or unfair"); *Keilholtz*, 268 F.R.D. at 339 (finding that "[o]verall, this class

7    action involves a sufficient degree of contact between Defendants' alleged conduct, the claims

8    asserted and California to satisfy due process concerns," in a case where nineteen percent of

9    defendants' sales were made in California, and seventy-six percent of defendants' goods were

10   partly manufactured, assembled or packaged at plants in California as well as partly in at least one

11   other state); *Parkinson*, 258 F.R.D. at 597-98 ("Plaintiffs make a sufficient state contacts showing

12   under *Shutts* to establish that application of California law comports with due process. . . .

13   [P]laintiffs allege that defendant conducts substantial business in the state through its fifty

14   California dealerships.  Finally, given the volume of California automobile sales and the number

15   of in-state dealerships, plaintiffs claim it is likely that more class members reside in California

16   than any other state"); see also *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal.App.3d 605, 613

17   (1987) ((finding "sufficient . . . contacts" where plaintiff contended that "defendants do business

18   in California, defendant Southern Pacific Corporation's principal offices are in California, a

19   significant number of Sprint subscribers are California residents, and defendant GTE Sprint

20   Communications Corporation's employees and agents who prepare advertising and promotional

21   literature for the Sprint service are located in California and thus the alleged fraudulent

22   misrepresentations forming the basis of the claim of every Sprint subscriber nationwide emanated

23   from California").

24                              **bb.    California Choice-of-Law Analysis**

25           Since application of California law to the claims of the class does not violate due process,

26   defendants bear the burden of showing that foreign law, rather than California law, should apply.

27   *Keilholtz*, 268 F.R.D. at 340 (citing *Martin v. Dahlberg*, 156 F.R.D. 207, 218 (N.D. Cal. 1994);

28   see *Church v. Consolidated Freightways*, No. C-90-2290 DLJ, 1992 WL 370829, *4 (N.D. Cal.

Sept. 14, 1992) ("This Court generally presumes that California law will apply unless defendants demonstrate conclusively that the laws of the other states will apply")).

California choice-of-law analysis proceeds in three steps:

"First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.  Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.  Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied." *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 81–82, (2010).

The Ninth Circuit has noted its disapproval of applying California consumer protection law such as the UCL and CLRA to residents of other states who conducted transactions in other states. Recently, in *Mazza*, 666 F.3d 581, the court confronted a case in which plaintiffs had successfully sought certification of a nationwide class whose members resided in 44 jurisdictions.  *Id*. at 587 n. 1.  The court thoroughly examined the laws of the other jurisdictions and concluded that material differences existed among them.  See *id*. at 591 (describing differences between California laws and the laws of other states).

The Ninth Circuit warned that "[c]onsumer protection laws are a creature of the state in which they are fashioned.  They may impose or not impose liability depending on policy choices made by state legislatures or, if the legislators left a gap or ambiguity, by state supreme courts." *Id*.  It further noted that "once violation is established, there are also material differences in the remedies given by state laws." *Id*.  The court concluded that such differences were "material." *Id*.

The *Mazza* court next addressed the interest foreign jurisdictions have in having their laws

54

1    enforced, and noted that "each state has an interest in setting the appropriate level of liability for

2    companies conducting business within its territory." *Id.* at 592. "Maximizing consumer and

3    business welfare," the court stated, "requires balancing competing interests," and each state is

4    entitled to strike the balance as it sees fit. *Id.* It further noted: "As it is the various states of our

5    union that may feel the impact of such effects, it is the policy makers within those states . . . who

6    are entitled to set the proper balance and boundaries between maintaining consumer protection .

7    . . and encouraging and attractive business climate." *Id.*

8         Turning to the third step of the choice-of-law analysis, the *Mazza* court concluded that

9    "each foreign state has an interest in applying its law to transactions within its borders and that,

10   if California law were applied to the entire class, foreign states would be impaired in their ability

11   to calibrate liability to foster commerce." *Id.* at 593. It observed that "foreign states have a

12   strong interest in the application of their laws to transactions between their citizens and

13   corporations doing business within their state," *id.* at 594, and concluded that applying California

14   law to non-residents who purchased their cars outside the state was unwarranted as a consequence.

15        While *Mazza* did not address warranty law, the Ninth Circuit's caution against the

16   unwarranted extraterritorial application of California law applies to such a claim as well.   As

17   noted, plaintiffs have modified their proposed classes in an attempt to eliminate any material

18   differences in state law.[128]  The court addresses the proposed consumer protection class and the

19   express warranty class in light of the proposed new class definitions below.

20                        **(1)     The Consumer Protection Class**

21        Plaintiffs now seek to certify a consumer protection class comprised of California, Florida,

22   and New York residents only; they no longer seek to include residents of Montana, North

23   Carolina, and Idaho as class members.[129]  In the alternative, they seek to certify three separate

24   ─────────────────────

25   [128]The plaintiffs do not seek to certify a multistate implied warranty class; they concede that
     that class must be comprised of California residents only.  (Pls.' Supplemental Brief at 1.)
26

27   [129]Pls.' Supplemental Brief at 1.  Defendants note that Zdeb, the lone Florida resident in
     this litigation, has elected not to participate, and is not longer a class representative.  (*Id.*, Exh.
28   B (email string between counsel indicating that Zdeb will not be participating in the action).)  They

classes comprised of California, Florida, and New York residents.

Defendants, as the parties asserting that variations in state law defeat predominance, bear the burden on the issue.  They identify two purportedly material differences in the consumer protection  laws of California, New York and Florida.[130]  The first concerns the causation and reliance elements of the state law consumer protection claims.  "California . . . requires named class plaintiffs to demonstrate reliance, while some other states' consumer protection statutes do not."  *Mazza*, 666 F.3d at 591.  Under the CLRA and the UCL, however, demonstrating that a misrepresentation was material gives rise to an inference that all members of the class relied.  See *Stearns*, 655 F.3d at 1020-22 (discussing *In re Tobacco II Cases*, 46 Cal.4th 298, and *In re Vioxx Class Cases*, 180 Cal.App.4th at 129, observing that under the UCL, relief was "available without individualized proof of deception, reliance and injury," while under the CLRA, "causation may be established by materiality," and concluding consequently that it is possible to adduce evidence that causes an inference of reliance to arise as to the entire class (internal citations and quotations

_____

assert that the loss of the sole Florida plaintiff means that plaintiffs lack standing to represent a class of Florida consumers.  See *In re Apple & AT & TM Antitrust Litig.*, 596 F.Supp.2d 1288, 1309 (N.D. Cal. 2008) ("Since named Plaintiffs here only reside in California, New York, and Washington, but have alleged violations of the consumer protection laws of forty-two states and the District of Columbia, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' consumer protection claims for all jurisdictions except for California, New York, and Washington").  *In re Apple* stands only for the proposition that a plaintiff who is not resident of a state lacks standing to represent a class of individuals asserting claims under the laws of that state.  Zdeb's absence prevents plaintiffs from asserting claims under Florida law, and would prevent them from obtaining certification of a Florida subclass.  Plaintiffs seek subclass certification only as an alternative, however.  Their primary request is that the court certify of a class that includes individuals who live in various states, including Florida, but who assert violations of *California* law.  Plaintiffs' California class representative remain in the action and have standing to assert such claims.  The fact that they are not Florida residents does not prevent them from representing individuals living in that state.

[130]Defendants also identify differences in the various states' scienter requirements ; based on their supplemental brief, however, it appears that California, New York and Florida law is similar in this regard.  (Honda's Supplemental Brief at 6.)  The only state with a scienter requirement materially different from other states' is Idaho.  Plaintiffs no longer seek to include Idaho plaintiffs in their class, however.

omitted)).  Although defendants argue that this is a rule neither Florida nor New York applies,
the information they have provided regarding those states' laws indicates otherwise.

New York requires that a defendant's conduct be materially deceptive or misleading and
that the deception have proximately caused plaintiff's injury.  See *Goshen v. Mut. Life Ins. Co.*,
774 N.E.2d 1190, 1195 (N.Y. 2002) (stating that a *prima facie* case "requires a showing that
defendant is engaging in an act or practice that is deceptive or misleading in a material way and
that plaintiff has been injured by reason thereof,'" quoting *Oswego Laborers' Local 214 Pension
Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995)).  As the *Oswego Laborers'* court
held, this means that the deceptive practice must be "likely to mislead a reasonable consumer
acting reasonably under the circumstances." *Oswego Laborers'*, 85 N.Y.2d at 26.  Reliance is
not an element of the cause of action, however.  See *Stutman v. Chemical Bank*, 95 N.Y.2d 24,
29 (2000) (stating that "as we have repeatedly stated, reliance is not an element of a section 349
claim" and collecting cases).

Similarly, in Florida "a party asserting a deceptive trade practice claim need not show
actual reliance on the representation or omission at issue." *Office of Atty. Gen., Dept. of Legal
Affairs v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. App. 2004); see also *Davis v. Powertel,
Inc.*, 776 So. 2d 971, 974 (Fla. App. 2000) ("[T]he question is not whether the plaintiff actually
relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a
consumer acting reasonably in the same circumstances").

With small differences in wording, all three states appear to employ the same causation and
reliance standard.  The touchstone of each state's law is whether a reasonable person would have
found the relevant omission misleading.  See *Oswego Laborers'*, 85 N.Y.2d at 26 (stating that
"while the statute does not require proof of justifiable reliance, a plaintiff seeking compensatory
damages must show that the defendant engaged in a material deceptive act or practice that caused
actual, although not necessarily pecuniary, harm," and discussing the state's "objective definition
of deceptive acts and practices" as "those likely to mislead a reasonable consumer acting
reasonably under the circumstances"); *McAdams v. Monier, Inc.*, 182 Cal.App.4th 174, 184
(2010) (given defendant's failure to disclose information "which would have been material to any

reasonable person who purchased" the product, a presumption of reliance was justified); *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 1293 (2002) ("[H]ere the record permits an inference of common reliance.  Plaintiffs contend Mass Mutual failed to disclose its own concerns about the premiums it was paying and that those concerns would have been material to any reasonable person contemplating the purchase of an N-Pay premium payment plan.  If plaintiffs are successful in proving these facts, the purchases common to each class member would in turn be sufficient to give rise to the inference of common reliance on representations which were materially deficient. . ."); *Latman v. Costa Cruise Lines*, 758 So.2d 699, 703 (Fla. App. 2000) (stating that under the FDUTPA, "[i]t is sufficient if the class can establish that a reasonable person would have relied on the representations").

While defendants argue that "distinctions in the causation standard could be dispositive" given "significant questions regarding whether the allegedly omitted facts were material and misleading,"[131] if plaintiffs fail to prove the misrepresentation was material, all of their claims will fail.  On the other hand, if plaintiffs are able to show that the omission was material, proof of individual reliance will be unnecessary.

The court is mindful of the Ninth Circuit's warning that differences in state law concerning the need for proof of reliance can "spell the difference between the success and failure of the claim."  *Mazza*, 666 F.3d at 591.  *Mazza*, however, addressed omissions in advertisements and oral statements that included differing information. The Ninth Circuit concluded that "[a] presumption of reliance [could] not arise when class members 'were exposed to quite disparate information from various representatives of the defendant.'"  *Id.* at 596 (quoting *Stearns*, 655 F.3d at 1020).  It noted further: "For everyone in the class to have been exposed to the omissions, as the dissent claims, it is necessary for everyone in the class to have viewed the allegedly misleading advertising.  Here the limited scope of that advertising makes it unreasonable to assume that all class members viewed it."  *Id.*

In this case, by contrast, plaintiffs allege that defendants did not disclose to *any* member

---

[131]Honda's Supplemental Brief at 6-7.

of the class information regarding the potential for excessive and premature tire wear caused by negative camber.   There is no question of different statements being made to different groups of consumers, or certain class members being exposed to information others were not. Consequently, the court concludes that any potential differences in state law concerning the proof of reliance that is necessary to prevail on consumer protection claims do not defeat predominance in this case.

Defendants also contend that differences in the states' respective statutes of limitations defeat predominance.   The limitations period for the UCL is four years, CAL. BUS. & PROF. CODE §17208, and the limitations period for the CLRA is three years, CAL. CIV. CODE § 1783.   Florida gives plaintiffs four years to bring claims under its consumer fraud statutes, see FLA. STAT. §95.11(3)(f), while New York affords claimants only three years to file suit, see *Gaidon v. Guardian Life Ins. Co.*, 96 N.Y.2d 201, 210 (N.Y. 2001).   Plaintiffs' definition of their proposed nationwide class, and of their amended California/New York/Florida class, contains no time limitation of any kind, seemingly ensuring that at least some members of the class will have time-barred claims.   Plaintiffs do not address this in their supplemental brief, stating, somewhat inexplicably, that "[t]he statute of limitations is not at issue in this case."[132]

Defendants contend that, in addition to differing limitations statutes, the point at which the statute of limitations commences to run on a consumer protection claim differs from state to state. Specifically, the jurisdictions differ as to whether the trigger for commencement of the limitations period is the date of discovery.   The Ninth Circuit has held that UCL claims "are subject to a four-year statute of limitations which began to run on the date the cause of action accrued, not on the date of discovery."   *Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) (citing CAL. BUS. & PROF. CODE § 17208)).   Similarly, under the CLRA, the limitations period begins to run on the date the improper consumer practice was committed.   CAL. CIV. CODE § 1783.   The discovery rule tolls the statute of limitations for CLRA claims, however.   See *Yumul v. Smart Balance, Inc.*, 733 F.Supp.2d 1134, 1141 (C.D. Cal.

---

[132]Pls.' Supplemental Brief at 12.

1  2010); *Keilholtz v. Lennox Hearth Products Inc.*, No. C 08-00836 CW, 2009 WL 2905960, *3

2  (N.D.Cal. Sept. 8, 2009).

3           Florida applies the more straightforward rule that the cause of action accrues on the date

4  of sale.  See *S. Motor Co. v. Doktorczyk*, 957 So. 2d 1215, 1218 (Fla. App. 2007) (holding that

5  the "cause of action accrued on the date of sale").  New York's consumer fraud law applies the

6  general rule that a cause of action accrues when the plaintiff suffers injury caused by the violation.

7  See, e.g., *Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F.Supp.2d 439, 453 (E.D.N.Y.

8  2007) ("Under New York law, a claimant's cause of action accrues upon injury by the deceptive

9  act or practice, i.e., 'when all of the factual circumstances necessary to establish a right of action

10 have occurred, so that the plaintiff would be entitled to relief'" (citation omitted)); *Beller v.*

11 *William Penn Life Insurance Co.*, 8 A.D.3d 310, 314 (N.Y. App. Div. 2004) ("A General

12 Business Law § 349 cause of action is governed by a three-year limitations period, which accrues

13 when the plaintiff has been injured by a deceptive trade act or practice in violation of the statute").

14 The date of the alleged injury depends on the facts of the case; the statute does not necessarily

15 begin to run on the date of purchase.  Cf. *Gaidon v. Guardian Life Ins. Co. of America*, 96

16 N.Y.2d 201, 210-12 (2001) (rejecting defendants' argument that injury "occurred at the time of

17 purchase and delivery of each life insurance policy," and holding that plaintiffs suffered injury

18 only when they were "first called upon to pay additional premiums beyond the date by which they

19 were led to believe that policy dividends would be sufficient to cover all premium costs," because

20 this was the date on which their were actually not met, and they were then called upon either to

21 pay additional premiums or lose coverage and forfeit the premiums they previously paid").

22          Here, however, plaintiffs allege that defendants' fraud resulted in actual damages when the

23 class members paid full price for allegedly defective vehicles.[133]  Although the complaint also

24 alleges injury resulting from the use of vehicles that experience "premature and uneven tire wear

25 and/or are substantially certain to experience premature and uneven tire wear before their expected

26

27  _____

28     [133]FAC, ¶ 17.

60

1    useful life has run,"[134] under New York law, the statute of limitations begins to run first injury,

2    which allegedly occurred here when plaintiffs purchased their vehicles.  See *Gristede's Foods,*

3    *Inc.*, 532 F.Supp.2d at 453 (agreeing with the general proposition "'the claim accrues only once

4    (as of the date of the initial injury) and does not continue to accrue upon each subsequent

5    violation'").

6          Therefore, the main differences in the applicable statutes of limitations is the length of the

7    particular limitations period, and application of the delayed discovery rule.  As noted, California's

8    UCL and CLRA differ on this point, as a UCL cause of action accrues when the unfair, fraudulent

9    or unlawful practice occurs. CLRA claims, however, receive the benefit of the discovery rule.

10   The delayed discovery rule does not apply to delay commencement of the limitations period on

11   Florida consumer protection claims.  See *Smoothie King Franchises, Inc. v. Southside Smoothie*

12   *& Nutrition Center, Inc.*, Civil Action No. 11–2002, 2012 WL 630010, *5 (E.D. La. Feb. 27,

13   2012) ("Defendants' allegation that they only discovered Smoothie King's allegedly deceptive

14   behavior after the termination of their franchises would not save their claim, because the Florida

15   Supreme Court has held that the 'delayed discovery' doctrine does not apply to FDUTPA claims,"

16   citing *Davis v. Monahan*, 832 So.2d 708, 709–10 (Fla. 2002)); *McKissic v. Country Coach, Inc.*,

17   No. 8:07-cv-1488, 2008 WL 2782678, *8 (M.D. Fla. July 16, 2008) ("Because the delayed

18   discovery rule does not apply to the [Florida consumer fraud statute], Plaintiffs were required to

19   make their claim within four years of the purchase date").  The same is true of New York's

20   consumer protection statute. See *Gaidon*, 96 N.Y.2d at 210 (stating that "[i]n general, a cause

21   of action accrues, triggering commencement of the limitations period, when all of the factual

22   circumstances necessary to establish a right of action have occurred, so that the plaintiff would

23   be entitled to relief"); *Williams v. Dow Chemical Co.*, No. 01 Civ. 4307(PKC), 2004 WL

24   1348932, *3-6 (S.D.N.Y. June 16, 2004) (analyzing personal injury and property claims under

25   the delayed discovery rule, but addressing consumer protection claims under a three year statute

26   of limitations that ran from date of injury).

27   _____

28   [134]FAC, ¶¶ 17-18.

1    The class, as currently defined, includes any purchaser or lessor of a 2006 or 2007 Honda
2    Civic, or a 2006 through 2008 Honda Civic Hybrid.  Some of these individuals no doubt
3    purchased or leased their vehicles during at least part of 2006 and throughout 2007, since the class
4    includes 2006 vehicles.  Absent application of the delayed discovery rule, the statute of limitations
5    would have begun to run on the date the car was purchased or leased.  Since New York does not
6    apply the delayed discovery rule, the claims of New York class members who purchased or leased
7    their vehicles prior to December 10, 2007 would be barred under General Business Law § 349.
8    Florida also does not apply the delayed discovery rule, and as that state imposes a four-year statute
9    of limitations, the claims of some Florida  class members who purchased or leased prior to
10   December 10, 2006 would be barred; the same result would obtain with respect to the claims of
11   California plaintiffs asserting a UCL claim who purchased or leased prior to that date, since there
12   is no delayed discovery under the UCL.  The claims of California plaintiffs asserting a CLRA
13   cause of action would be barred, absent application of the delayed discovery rule, if they
14   purchased or leased prior to December 10, 2007.  If the court were to certify a three state class
15   to which California law applied, therefore, the class would include individuals whose claims are
16   time-barred under the law of their own state.  Even a class comprised entirely of California
17   plaintiffs would likely include individuals whose claims under one of the statutes would be barred
18   because they could not show that they were entitled to invoke the delayed discovery rule.  As a
19   result, it is clear that defendant has identified a material difference in the laws of the three states.

20        Accordingly, the court moves to the third step in the choice-of-law analysis, which is the
21   careful evaluation and comparison of the "nature and strength of the interest of each jurisdiction
22   in the application of its own law. . . ."  *McCann*, 48 Cal. 4th at 81-82.  At this step, the court
23   does not assess the "conflicting governmental interests in the sense of determining which
24   conflicting law manifested the 'better' or the 'worthier' social policy on the specific issue. . . ."
25   *Id.* at 97.  Instead, the analysis pays due respect to the "basic concepts of federalism" and each
26   state's right to make its own policy choices, rather than "evaluating the underlying wisdom" of
27   those choices. *Mazza*, 666 F.3d at 593.

28        As the statute of limitations poses a complete bar to liability, the difference is a significant

1    one.  If the court were to certify a single UCL/CLRA class to which California law – including

2    the statutes of limitations for UCL and CLRA claims – applies would undoubtedly include New

3    York and Florida plaintiffs whose claims are time-barred under their own states' laws.  This

4    would expand defendants' liability beyond the liability they would face if Florida and New York

5    plaintiffs sued under the laws of those states.  In enacting statutes of limitations, states make

6    concrete policy choices about the extent of liability it is proper to impose on defendants.  Cf.

7    *McCann*, 48 Cal.4th at 91 ("[A]t the same time terminating all liability after that deadline

8    regardless of whether the plaintiff's injury had yet occurred or become manifest, the relevant

9    statute of repose was intended to balance the interest of injured persons in having a remedy

10   available for such injuries against the interest of builders, architects, and designers of real property

11   improvements in being subject to a specified time limit during which they would remain potentially

12   liable for their actions in connection with such improvements"); *Rodriguez v. Mahony*, No. CV

13   10–02902–JST (JEMx), 2012 WL 1057428, *9 (C.D. Cal. Mar. 26, 2012) (holding that each state

14   has strong interest in applying its own statutes of limitations, and describing the policy choices

15   embodied in each state's statute).

16         Plaintiffs have identified no countervailing California interest that outweighs the other

17   states' interest in effecting their policy choices, and the Ninth Circuit has stated that under such

18   circumstances, "California's interest in applying its law to residents of foreign states is

19   attenuated." *Mazza*, 66 F.3d at 594.  Consequently, the court concludes that it would significantly

20   impair the interests of both Florida and New York if California law were applied to residents of

21   those states.  See *id.* ("These foreign states have a strong interest in the application of their laws

22   to transactions between their citizens and corporations doing business within their state"); see also

23   *Hernandez v. Burger*, 102 Cal.App.3d 795, 802 (1980) (recognizing that "with respect to

24   regulating or affecting conduct within its borders, the place of the wrong has the predominant

25   interest").

26         The impropriety of applying California law to a three-state class does not end the inquiry,

27   however.  Courts discussing conflict of laws in analyzing predominance have noted that while such

28   variations must be considered, they will not necessarily defeat predominance.  See *Cameron v.*

63

*E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976) ("The existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones.  Given a sufficient nucleus of common questions, the presence of the individual issue of compliance with the statute of limitations has not prevented certification of class actions in securities cases"); see also *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)").       While not always the case, the court believes here that creating a single UCL/CLRA class would create fairness issues that could be avoided by certifying a consumer protection class, with three sub-classes: (1) a California UCL/CLRA class; (2) a New York General Business Law § 349 class; and (3) a Florida Deceptive and Unfair Trade Practices Act class.[135]  Consequently, pursuant to plaintiffs alternative request, the court will certify a consumer protection class with the three subclasses noted, as it concludes predominance can in this manner be assured.

### (2)      The Express Warranty Class

Plaintiffs also seek to certify an express warranty class comprised of residents of California, New York and North Carolina.  The parties raise three issues regarding potential differences in the express warranty law of those states: (1) whether all require proof of reliance, (2) whether pre-suit notice is required, and (3) whether the alleged defect must manifest during the life of the express warranty to prove a claim.

---

[135]Assuming a liability finding in the first phase, even this approach will require further proceedings in a second phase to determine which California plaintiffs can assert a UCL claim based on their date of purchase or lease, and which can assert a CLRA claim based on the delayed discovery rule.

As respects the reliance requirement, plaintiffs assert that none of the three states demands proof of reliance as an element of an express warranty claim.   Defendants, by contrast, contend that the law of California and North Carolina on this point is similar, while New York law is different.   The court concludes that neither plaintiffs nor defendants are completely correct. Nonetheless, it appears the laws of the three states differ in material respects.

Defendants contend that under California and North Carolina law, a plaintiff must prove reliance to prove an express warranty claim against a non-selling manufacturer of a product. Plaintiffs dispute this, citing *Weinstat v. Dentsply Intern., Inc.*, 180 Cal.App.4th 1213 (2010). There, the court stated: "The lower court ruling rests on the incorrect legal assumption that a breach of express warranty claim requires proof of prior reliance.  While the tort of fraud turns on inducement, as we explain, breach of express warranty arises in the context of contract formation in which reliance plays no role."   *Id.* at 1227; see also *Keith v. Buchanan*, 173 Cal.App.3d 13, 21 (1985).  Plaintiffs overlook a crucial distinction that sets this case apart from *Weinstat*, however.  There, plaintiff alleged an express warranty claim against the product seller. The claim was therefore based on privity of contract.  *Id.*  Here, none of the plaintiffs purchased his or her vehicles directly from the manufacturer.   Therefore, none was in privity with defendants.  Plaintiffs, in fact, relied on this distinction in arguing that they did not need to give defendants notice prior to filing a breach of contract claim.  See *Keegan v. American Honda Motor Co.*, Inc., __ F.Supp.2d __, 2012 WL 75443, *15-16 (C.D. Cal. Jan. 6, 2012).  As explained by another district court in this jurisdiction,

> "[n]one of the authorities Plaintiff cites in her opposition support[s] the erroneous
> proposition that reliance is not required in an express warranty action not founded
> on privity. . . .  In [*Weinstat*] the purchasers of dental equipment sued the seller,
> and the express warranty claim was based on privity.  Similarly, in *Keith*, the
> purchaser of a boat sued the company that sold him the boat and allegedly made
> express warranties antecedent to the transaction.  Neither *Weinstat* nor *Keith*
> supports Plaintiff's erroneous contention that reliance is not required where privity
> is absent."  *Coleman v. Boston Scientific Corp.*, 1:10-CV-01968, 2011 WL

65

1   3813173, *4 (E.D. Cal. Aug. 29, 2011).

2   See also *id.* at *5 (stating that "reliance (or some other substitute for privity) is required for an

3   express warranty claim against a non-selling manufacturer of a product").   Consequently, in the

4   absence of privity, California law requires a showing that a plaintiff relied on an alleged omission

5   or misrepresentation.

6   New York and North Carolina law may not impose similar requirements.   Reliance is

7   ostensibly an element of an express warranty claim under North Carolina law.   See *Harbor Point*

8   *Homeowners' Ass'n, Inc. ex rel. Bd. of Directors v. DJF Enterprises, Inc.*, 206 N.C. App. 152,

9   162 (2010) ("A claim for breach of express warranty pursuant to N.C. Gen. Stat. § 25–2–313

10   requires proof of '(1) an express warranty as to a fact or promise relating to the goods, (2) which

11   was relied upon by the plaintiff in making his decision to purchase, (3) and that this express

12   warranty was breached by the defendant,'" quoting *Hall v. T.L. Kemp Jewelry, Inc.*, 71 N.C.

13   App. 101, 104 (1984) (citing in turn *Pake v. Byrd*, 55 N.C.App. 551 (1982)).   The legislative

14   history of § 25-2-313, however, indicates that proof of reliance in the formal sense is generally

15   not required, as the element generally addresses "affirmations of fact by the seller, descriptions

16   of the goods or exhibitions of samples," and other "affirmations of fact by the seller about the

17   goods during a bargain" during negotiations.   N.C. GEN. STAT. § 25-2-313, cmt. 3 ("In actual

18   practice affirmations of fact made by the seller about the goods during a bargain are regarded as

19   part of the description of those goods; hence no particular reliance on such statements need be

20   shown in order to weave them into the fabric of the agreement").

21   Similarly, while New York courts state that reliance is an element of an express warranty

22   cause of action, see *Horowitz v. Stryker Corp.*, 613 F.Supp.2d 271, 286 (E.D.N.Y. 2009)

23   ("Under New York law, an action for breach of express warranty requires both the existence of

24   an express promise or representation and reliance on that promise or representation"), New York

25   courts have held that a plaintiff need not demonstrate reliance when an express warranty has been

26   given, since the terms of the warranty are the basis of the bargain upon which the purchaser

27   presumably relied.   See *CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503 (1990) ("The

28   express warranty is as much a part of the contract as any other term.   Once the express warranty

is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled.   The right to indemnification depends only on establishing that the warranty was breached"); see also *Norcold, Inc. v. Gateway Supply Co.*, 154 Ohio App.3d 594, 602 (2003) (including New York among the "decisive majority of courts" that have "reached the similar conclusion that reliance is not an element in a claim for breach of an express warranty").   Neither party has cited any authority indicating whether New York and North Carolina courts impose different requirements in the absence of privity.   Consequently, on the present record, the court concludes that substantial questions exist as to whether the laws of the three states are sufficiently uniform.

Defendants have identified another material difference in the laws of the respective states, which concerns pre-suit notification.   As the court has previously observed, California law does not require pre-suit notice where the consumer did not deal directly with the manufacturer.   See *Keegan*, 2012 WL 75443 at *15-16; *Sanders v. Apple, Inc.*, 672 F. Supp.2d 978, 989 (N.D. Cal. 2009) (concluding that "timely notice of a breach of an express warranty is not required where the action is against a manufacturer and is brought 'by injured consumers against manufacturers with whom they have not dealt,'" quoting *Greenman v. Yuba Power Prods.*, 59 Cal.2d 57, 61 (1963)).   It appears, by contrast, that North Carolina may require that a plaintiff provide notice even when suing a manufacturer as opposed to a seller.   See *Halprin v. Ford Motor Co.*, 420 S.E.2d 686, 688-89 (N.C. App. 1992) (noting that, under North Carolina law, the definition of "seller" includes car manufacturers, and suggesting that the state's express warranty statutes require notice to manufacturers, but observing that this interpretation was contrary to the weight of authority in other jurisdictions and that plaintiff had provided proper notice in any event);[136] see also *Maybank v. S. S. Kresge Co.*, 302 N.C. 129, 133 (1981) ("We think it obvious from the language of the statute that seasonable notification is a condition precedent to the plaintiff-buyer's

---

[136]Defendants argue that *Halprin* definitively held that notice to a manufacturer not in privity is required.  The case explicitly reserved the question, however, and its holding rested on other grounds.  (Honda Supplemental Brief at 11-12.)

recovery"); but see *Allen v. American Honda Motor Co., Inc.*, 264 F.R.D. 412, 429 (N.D. Ill. 2009) (including North Carolina in a list of states that do not require pre-litigation notice, although citing no state authority for that proposition), vacated on other grounds by *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813 (7th Cir. 2010).

The parties' discussion of New York law on this subject indicates that it is evolving. While plaintiffs contend that in New York, the complaint itself can constitute reasonable notice after discovery of the breach, the case they cite for that proposition makes clear that plaintiffs in that action provided other forms of pre-suit notice that may have satisfied the notice requirement. *Panda Capital Corp. v. Kopo Intern., Inc.*, 662 N.Y.S.2d 584, 586-87 (N.Y. App. Div. 1997); see also *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 273 (N.Y. 1995) (Simons, J., dissenting) (suggesting that a requirement of timely notice should not be imposed in cases involving "tortious personal injury," and citing *Fischer v. Mead Johnson Laboratories*, 341 N.Y.S.2d 257, 259 (1973) (holding that in a personal injury suit, the timely notice "requirement does not apply. . .")).

Certain class members' claims could stand or fall on this issue alone. Applying California's notice requirements to individuals from other states where notice may be required, therefore, would be inappropriate.[137] While it appears that the law in certain jurisdictions, especially North Carolina, is not settled on this point, defendants have made a sufficient showing of variation, and plaintiffs have not convincingly rebutted that showing.

Given certain material differences in the laws of the three states, the court proceeds to the next steps in the choice of law analysis, which addresses the interests of the foreign jurisdictions

---

[137]Defendants also assert that the relevant states have different requirements as to whether a defect must manifest prior to the expiration of the express warranty. As the court has explained, under California law, a defect that remains "latent" during the useful life of the product and does not manifest in an actual malfunction will not support an express warranty claim. *Keegan*, 2012 WL 75443 at *7-8. In New York, "[i]t is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997). North Carolina courts have not explicitly decided the issue. Consequently, the court has no basis for concluding that the law of the three states varies in this respect.

and the impairment of the other states' interests. See *Wash. Mut. Bank*, 24 Cal.4th at 921. *Mazza* dictates the conclusion on both points. As respects the interests of foreign jurisdictions, the *Mazza* court observed that "each state has an interest in setting the appropriate level of liability for companies conducting business within its territory," and that "[e]ach of our states also has an interest in 'being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future.'" *Mazza*, 666 F.3d at 591-92 (quoting *McCann*, 48 Cal.4th at 97–98). Regarding the impairment of foreign interests, the *Mazza* court held that "each foreign state has an interest in applying its law to transactions within its borders and that, if California law were applied to the entire class, foreign states would be impaired in their ability to calibrate liability to foster commerce." *Id.* at 593. While the court's discussion focused on consumer protection statutes, its guidance is equally applicable to plaintiffs' express warranty claim, as express warranty statutes involve many of the same interests that must be balanced. Given the material differences in the express warranty laws of the three states and the Ninth Circuit's guidance on these matters, the court concludes that applying California law to plaintiffs' express warranty claim is not justified. The court therefore finds that plaintiffs have failed to show predominance as to this class.

Plaintiffs alternatively seek certification of two express warranty classes – one including California residents only, and a second including New York and North Carolina residents. This suggestion is problematic for several reasons. First, plaintiffs concede that Carol Hinkle, a North Carolina resident, is no longer a plaintiff in this case.[138] As a result, none of the named plaintiffs has standing to represent North Carolina residents. While plaintiffs argue that Luis Garcia, a New York resident, can represent the New York/North Carolina express warranty class, they assume that the court can properly apply New York express warranty law to the claims of North Carolina residents because the two states' laws are sufficiently similar.[139] They offer minimal argument as

---

[138]Pls.' Supplemental Brief at 14 n. 7.

[139]*Id.* at 14.

to why this is so, however, and rely largely on the Manual for Complex Litigation. See MANUAL FOR COMPLEX LITIGATION 4TH, §§ 21.23, 22.754 (2004).  Plaintiffs' other citations primarily concern situations in which courts have certified classes of residents of states that apply "materially identical" legal standards. See *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004); see also *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 302 (3d Cir. 2011); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir.1986).

While the court appreciates the point made in the Manual for Complex Litigation  – i.e., that it is possible to address differences in state law by certifying smaller classes of plaintiffs who reside in states with similar laws – defendants have raised questions as to whether New York's and North Carolina's express warranty laws are in fact similar, and plaintiffs have failed convincingly to rebut that showing.  On the present record, the court lacks sufficient information to determine that the law of New York is sufficiently similar to the law of North Carolina that a New York plaintiff can represent a class that includes North Carolina residents.  Certainly, it cannot thoroughly examine the substantive law of the two states, nor conduct a careful choice-of-law analysis as it did before concluding that it was possible to certify a multi-state class under the relevant consumer protection laws.

Plaintiffs appear to assume that because Garcia is a named plaintiff, the court can apply New York law to North Carolina residents without engaging in a choice of law and due process analysis.  This is the not the case.  Moreover, as the court's discussion suggests, the similarity between the express warranty laws of the states is, at best, unclear.  Plaintiffs have simply not sufficiently rebutted defendants' showing regarding differences, or potential differences, in the warranty law of New York and North Carolina to justify the imposition of New York law on a class that included North Carolina residents.

In sum, the court concludes that applying California law to plaintiffs' proposed express warranty class is unwarranted, and also finds that certifying a California class and a New York-North Carolina class, as plaintiffs request, would not be appropriate.  Consequently, the court declines to revise its tentative conclusion, expressed at the motion hearing, that a class comprised of California residents is the only express warranty class that can be certified.

1

       **b.**  **Superiority**

2

   The court now examines whether a class action is the superior method of adjudicating the

3 issues in this litigation.  "Under Rule 23(b)(3), the court must evaluate whether a class action is

4 superior by examining four factors: (1) the interest of each class member in individually

5 controlling the prosecution or defense of separate actions; (2) the extent and nature of any

6 litigation concerning the controversy already commenced by or against the class; (3) the

7 desirability of concentrating the litigation of the claims in a particular forum; and (4) the

8 difficulties likely to be encountered in the management of a class action."  *Edwards v. City of*

9 *Long Beach*, 467 F.Supp.2d 986, 992 (C.D. Cal. 2006) (quoting *Leuthold v. Destination Am.,*

10 *Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

11

       **i.**  **Express and Implied Warranty Classes**

12

   Plaintiffs' express and implied warranty claims can be asserted only on behalf of a class

13 of California purchasers.  A class action is clearly a superior to individual actions as respects these

14 California warranty classes.  The cost of repairing the suspension defect is estimated to be $500;

15 this is undoubtedly too small an amount to incentivize class members to litigate their claims

16 individually.[140]  The funds required to marshal the type of evidence, including expert testimony,

17 that will be necessary to pursue these claims against well-represented corporate defendants would

18 discourage individual class members from filing suit when the expected return is so small.  See

19 *Amchem Products*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism

20 is to overcome the problem that small recoveries do not provide the incentive for any individual

21 to bring a solo action prosecuting his or her rights"); *Wolin*, 617 F.3d at 1176 ("The amount of

22 damages suffered by each class member is not large.  Forcing individual vehicle owners to litigate

23 their cases, particularly where common issues predominate for the proposed class, is an inferior

24 method of adjudication.  Accordingly, although alternative means of recovery are available, e.g.,

25 small claims court, we conclude that class-wide adjudication 'of common issues will reduce

26 litigation costs and promote greater efficiency,'" quoting *Valentino v. Carter-Wallace, Inc.*, 97

27 _____

28   [140]Anderson Depo. at 136:16-137:3.

F.3d 1227, 1234 (9th Cir. 1996)); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 639 (S.D. Cal. 2011) ("Moreover, individuals would not have an incentive to bring an action solely to get Clorox to change its label and packaging, relief that is at the heart of a misrepresentation case. Additionally, multiple individual claims could overburden the judiciary and lead to different orders regarding appropriate labeling and packaging").

In response to plaintiffs' argument that the amount of money at issue is small, defendants focus, once again, on the fact that many putative class members have not experienced premature tire wear, and on the fact that some individuals have had the rear suspension on their vehicle repaired through "goodwill" programs.[141] Defendants contend that given these variations, a class action is not a superior means of adjudicating the claims since there will be "no practicable way" to identify the "small handful" of class members entitled to payment. As plaintiffs note, however, the focal point of the litigation is a purported design specification that is common to all class vehicles. In the liability context, how many class vehicles experienced premature tire wear is relevant only to show that the alleged defect was sufficiently likely to result in a safety problem that defendants had a duty to disclose. Which vehicles actually experienced premature or excessive tire wear, and which may already have been repaired are questions relevant to damages. See *Stearns*, 653 F.3d at 1026 ("We have held that the mere fact that there might be differences in damage calculations is not sufficient to defeat class certification"); *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("In this circuit, however, damage calculations alone cannot defeat certification. We have said that '[t]he amount of damages is invariably an individual question and does not defeat class action treatment,'" quoting *Blackie*, 524 F.2d at 905). As a consequence, defendants' arguments do not demonstrate that a class action is not a superior method of adjudicating the claims.

---

[141]"Goodwill" programs are repairs Honda provides in situations that may not be covered by a warranty. (Anderson Depo. at 20:25-21:14, 22:14-24.) Defendants estimate that they have spent approximately $15 million fixing alleged defects in class vehicles. (Shannon Depo. at 127:23-128:1.) Keegan, for example, received free replacement arms at approximately 77,000 miles. (Opp., Exh. 8 ("Keegan Depo.") at 40:17-41:6.)

1

2

                           **ii.**     **The Consumer Protection Class and State Subclasses**

3          Plaintiffs have satisfied their burden of demonstrating that a consumer protection class with

4 three separate state subclasses comprised of California, Florida and New York residents satisfies

5 the predominance requirement.  The court must thus consider whether litigating these claims on

6 behalf of such subclasses is a superior means of adjudicating class members' disputes.  Although

7 certifying three separate state subclasses makes this case somewhat less manageable, the

8 complication is not sufficient to defeat plaintiffs' showing on superiority.  There are no material

9 differences in the consumer protection laws of the three states other than the applicable statutes

10 of limitations.  Thus, with the parties' concurrence, the court can proceed as if the substantive law

11 that governs the claims of the subclasses is identical, and use a single set of liability jury

12 instructions for the sub-classes at trial.  Cf. *Johns v. Bayer Corp.*, __ F.R.D. __, 2012 WL

13 368032, *7 (S.D. Cal. Feb. 3, 2012) ("Plaintiffs contend that both the legal question governing

14 tolling of a statute of limitations and the factual question of whether the statute was tolled present

15 class issues that compel certification, rather than defeat it. Under the UCL and CLRA, whether

16 the class properly includes consumers who purchased before the applicable statutes of limitation

17 is a merits-based, classwide issue."); *Herrera v. LCS Financial Services Corp.*, 274 F.R.D. 666,

18 680-81 (N.D.Cal. 2011) (stating that statute of limitations issue and a bona fide error defense were

19 not sufficient to defeat findings of predominance and superiority).

20          The individual states' statutes of limitations will only become relevant if there is a liability

21 finding and damages need to be determined.  The main barrier to a finding that a class action is

22 a superior method of litigating plaintiffs' consumer protection claims is that the remedies available

23 to residents of the three states differ.  The *Mazza* court noted that differences in remedies could

24 be material.  666 F.3d at 591.   It addressed the laws of Michigan and New Jersey, however,

25 which are not at issue here.  Additionally, it focused its discussion on the fact that those states

26 required a showing of scienter before a plaintiff was entitled to certain remedies.  *Id.*  As a result,

27 each class member had to prove a separate element during the liability phase of proceedings to

28 show his or her entitlement to those remedies.  This case does not raise a similar issue.

1    The most substantial difference in remedies that defendants identify is the availability of

2    punitive damages.  Under the CLRA, a plaintiff can recover actual damages, injunctive and

3    restitutionary relief, and punitive damages.[142] CAL. CIV. CODE § 1708.  Recovery under the UCL

4    is limited to restitution and injunctive relief only.  CAL. BUS. & PROF. CODE § 17203.  Neither

5    New York nor Florida authorizes the recovery of punitive damages under its consumer protection

6    statute.  See N.Y. GEN. BUS. L. § 349(h) (authorizing the recovery of actual damages, and giving

7    the court discretion to increase the damage award to an amount not exceeding treble the actual

8    damages or $1000); *Greenspan v. Allstate Ins. Co.*, 937 F.Supp. 288, 295 (S.D.N.Y. 1996); FLA.

9    STAT. § 501.211 (authorizing the recovery of actual damages, attorneys' fees and costs); *Heindel*

10   *v. Southside Chrysler-Plymouth, Inc.*, 476 So.2d 266, 272 (Fla. App. 1985); see also *Rollins, Inc.*

11   *v. Black*, No. 3:03-cv-772-J-9, 2004 WL 5572913, *3 (M.D. Fla. Oct. 7, 2004) (noting that "the

12   plain language of the statute limits recovery to actual damages, attorneys fees and court costs").

13

14   The Supreme Court has indicated that awarding punitive damages for conduct committed

15   outside a jurisdiction may violate due process.  See *State Farm Mut. Auto. Ins. Co. v. Campbell*,

16   538 U.S. 408, 421-22 (2003) ("Nor, as a general rule, does a State have a legitimate concern in

17   imposing punitive damages to punish a defendant for unlawful acts committed outside of the

18   State's jurisdiction.  Any proper adjudication of conduct that occurred outside Utah to other

19   persons would require their inclusion, and, to those parties, the Utah courts, in the usual case,

20   would need to apply the laws of their relevant jurisdiction").

21   Plaintiffs do not appear to dispute that imposing punitive damages in connection with injury

22   suffered by non-California residents is inappropriate.  Instead, they propose a method for ensuring

23   that these state-specific questions do not impede classwide adjudication.  Specifically, they request

24

25

26

27   [142]Defendant also identifies differences in the manner in which each state addresses the
     availability of treble damages and attorneys' fees.  Their argument, however, primarily concerns

28   the laws of Montana, Idaho, and North Carolina, which are no longer relevant.  (*Id.* at 8, 10.)

74

bifurcation of the liability and damages phases of the trial.[143]  Plaintiffs suggest that, if the jury returns a verdict in their favor on the consumer protection claims, they can be directed to complete a special verdict form that takes into account any variation among the remedies available under the laws of the different states.   In the second phase of the trial, where individual damage determinations will be necessary, plaintiffs suggest the appointment of a special master or magistrate judge who can oversee the process, and apportion damages as appropriate under the laws of the respective states. See *Gable v. Land Rover North America, Inc.*, No. SACV 07–0376 AG (RNBx), 2011 WL 3563097, *6-7 (C.D. Cal. July 25, 2011) ("Liability will primarily relate to issues concerning the alignment of the vehicles, while damages will involve many separate factors related specifically to tire wear.  Therefore bifurcation will serve the interest of judicial economy by allowing the parties to separately and efficiently focus on these distinct issues.  In fact, bifurcation might eliminate the need to consider evidence of damages at all if Defendant prevails at the liability stage of trial.  Finally, bifurcation will not only improve efficiencies in the litigation process, but it will also help prevent juror confusion at trial by allowing the jury to decide issues that are as narrowly tailored as possible").

The court generally finds this bifurcation plan appropriate, and concludes that the superiority requirement is met.  It notes, however, that plaintiffs have not articulated a workable trial plan for the classes they now propose.  The court therefore directs plaintiffs to submit a trial plan that explains in detail (1) the subjects that they propose be addressed in separate phases of the trial; (2) the specific ways in which differences among available remedies will be addressed in special verdict forms during the liability phase of the trial; and (3) the specific mechanisms they suggest for handling the damages phase of the trial.  See *Gartin v. S&M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) ("Neither Plaintiff nor her counsel has provided any suggestions – much less a plan – to this Court regarding managing the proposed class action"); see also *Zinser*, 253 F.3d at 1189 ("[The] court cannot rely merely on assurances of counsel that any problems with predominance or superiority can be overcome").

---

[143]Pls.' Supplemental Brief at 15.

### III. CONCLUSION

For the reasons stated, the court certifies the following two classes:

• "All purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the vehicle in California and who alleges claims for breach of express and implied warranty under California law."

• "All purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the vehicle in California, Florida, and New York, divided into the following three subclasses:

(1) a California UCL/CLRA class of purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the vehicle in California between December 10, 2006 and December 10, 2010;

(2) a New York General Business Law § 349 class of purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the vehicle in New York between December 10, 2007 and December 10, 2010; and

(3) a Florida Deceptive and Unfair Trade Practices Act class of purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the vehicle in Florida between December 10, 2006 and December 10, 2010."[144]

---

[144]The court's conclusion remains subject to ongoing evaluation. It has noted above its concerns with various aspects of the predominance inquiry, and the fact that the predominance inquiry also has a substantial effect on the superiority analysis. Discovery in this case is not yet complete. If at a later stage in the litigation it becomes evident that plaintiffs' claims will not be subject to common proof, or that the class action device no longer appears to be a manageable mechanism for adjudicating this dispute, the parties can bring that to the court's attention. As the Ninth Circuit has explained, "a district court retains the flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel, Paper & Forestry*, 593 F.3d at 809.

1    Consistent with this order, plaintiffs are directed to submit a trial plan on or before **July 9, 2012**.

2    Defendant may submit a response by **July 23, 2012**.

3

4    DATED: June 12, 2012

                                          _____
                                          MARGARET M. MORROW
5                                         UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28