1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID J. KEEGAN; LUIS GARCIA, BETTY KOLSTAD; CAROL HINKLE; ERIC ELLIS; CHARLES WRIGHT; JONATHAN ZDEB;  individually and behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>      vs.<br><br>AMERICAN HONDA MOTOR CO, INC.,<br><br>        Defendant. | CASE NO. CV 10-09508 MMM (AJWx)<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND REQUEST FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS |

On December 10, 2010, David J. Keegan filed this putative class action against American Honda Motor Co., Inc. ("Honda"), alleging claims under the California Consumer Legal Remedies Act ("CLRA"), the California Unfair Competition Law ("UCL"), the Song-Beverly Consumer Warranty Act ("the Song-Beverly Act"), the Magnuson-Moss Warranty Act ("the Magnuson-Moss Act"), California Commercial Code § 2313, and various states' consumer

protection and implied warranty statutes.[1]  Keegan filed a first amended complaint on May 23, 2011, adding Luis Garcia, Eric Ellis, Charles Wright, Betty Kolstad, Carol Hinkle, and Jonathan Zdeb as plaintiffs.[2]

On January 6, 2012, the court granted in part and denied in part Honda's motion to dismiss the first amended complaint.[3]  The court preserved all of the plaintiffs' claims, as asserted by at least one of the putative class representatives, with the exception of Ellis', Garcia's, and Zdeb's breach of implied warranty claims under Idaho, New York, and Florida law.[4]  On June 12, 2012, the court granted in part and denied in part plaintiffs' motion for class certification.[5]  The court certified two classes and three subclasses.[6]  Honda filed an interlocutory appeal,[7] but the Ninth Circuit declined to review the decision on November 9, 2012.[8]

On January 24, 2013, the parties advised the court that they had reached a settlement of

---

[1]Complaint, Docket No. 1 (Dec. 10, 2010).  Keegan initially alleged claims against Honda North America, Inc., Honda Motor Company, Ltd., Honda Manufacturing of Alabama LLC, Honda Engineering North America, Inc., and Honda of America Manufacturing, Inc.  The first two defendants were dismissed by stipulation.  (Order Dismissing Defendants Honda Motor Co., Ltd. and Honda North America, Inc. Without Prejudice, Docket No. 56 (Jul. 20, 2011).  The third and fourth defendants were terminated when they were not named in the first amended complaint.  Honda of America Manufacturing, Inc. was terminated because it was not named in the second amended complaint.

[2]First Amended Complaint ("FAC"), Docket No. 39 (May 23, 2011).

[3]Order Granting in Part and Denying in Part Honda's Motion to Dismiss, Docket No. 110 (Jan. 6, 2012).

[4]*Id*. at 31-33.

[5]Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification ("Class Cert. Order"), Docket No. 138 (June 12, 2012).

[6]*Id*. at 76.

[7]See Order Approving Joint Stipulation to Stay Proceedings, Docket No. 143 (July 12, 2012).

[8]Order Denying Petition for Permission to Appeal, Docket No. 146 (Nov. 9, 2012).

plaintiffs' individual and class claims;[9] they filed a motion for approval of the proposed class settlement and notice plan on March 18, 2013.[10]  On April 11, 2013, the court granted plaintiffs leave to file a second amended complaint,[11] and entered an order preliminarily approving the settlement and notice plan.[12]  The court set a final approval hearing for October 28, 2013 at 10:00 a.m.[13]  On April 12, 2013, plaintiffs filed a second amended complaint, adding Shawn Phillips and Benettia Hall as plaintiffs, and deleting Jonathan Zdeb.[14]  On September 9, 2013, class counsel filed a motion for final approval of the settlement.[15]

# I.  FACTUAL BACKGROUND

## A.    Facts Alleged in the Complaint

Plaintiffs sue on behalf of all individuals who purchased or leased certain allegedly defective 2006 and 2007 Honda Civic and Honda Civic Si's and 2006 - 2008 Honda Civic Hybrid vehicles, (collectively, the "class vehicles") that were designed, manufactured, distributed, marketed, sold, and leased by defendants.[16]  Plaintiffs allege that the rear suspension of the class

---

[9]Notice of Intent to File a Motion for Preliminary Approval ("Intent Notice"), Docket No. 148 (Jan. 24, 2013).

[10]Motion for Preliminary Settlement Approval ("Prelim. Approval Motion"), Docket No. 159 (Mar. 18, 2013).

[11]Order Granting Motion for Leave to File Second Amended Complaint, Docket No. 163 (Apr. 11, 2013).

[12]Preliminary Approval Order ("Prelim. Approval Order"), Docket No. 162 (Apr. 11, 2013).

[13]*Id.*, ¶ 15.

[14]Second Amended Complaint, Docket No. 164 (Apr. 12, 2013).

[15]Motion for Settlement Approval ("Motion"), Docket No. 165 (Sept. 9, 2013).

[16]SAC, ¶¶ 1-3, 116.

vehicles is defective.[17]  Specifically, they assert that the rear control arm originally installed in the vehicles was too short.[18]  This purported defect affects the alignment and geometry of the rear suspension, causing the vehicles to become misaligned.[19]  This, in turn, results in uneven and premature wear on the rear tires.[20]  The misalignment also causes "occupants to experience an extremely rough ride, as well as exceptionally loud and disruptive noise, while driving class vehicles."[21]

Plaintiffs contend that Honda learned of the suspension defect through pre-release testing data, early consumer complaints to Honda and its dealers, testing conducted in response to the complaints, and "other internal sources."[22]  They assert that Honda "actively concealed" the defect from customers, but had a duty to disclose because the defect poses an "unreasonable safety hazard," and Honda had "exclusive knowledge or access to material facts" about the rear suspension problem that were unknown and not reasonably discoverable by plaintiffs.[23]

Plaintiffs contend that the defect creates a safety hazard because a driver has only three means of controlling a car – braking, accelerating, and steering.[24]  Each is dependent on rolling friction with the ground beneath the wheels.[25]  The defect allegedly causes uneven tread wear on the tires, which can result in tire failure because one side of the tire receives more pressure than

---

[17]*Id.*, ¶¶ 3-4.

[18]*Id.*, ¶ 10.

[19]*Id.*, ¶ 4.

[20]*Id.*

[21]*Id.*

[22]*Id.*, ¶ 97.

[23]*Id.*, ¶ 98.

[24]*Id.*, ¶ 5.

[25]*Id.*

the other.[26]   The defect thus can "suddenly and unexpectedly cause tire failure while the vehicle is in operation," which can lead to car accidents, personal injury, or death.[27]

The cost of repairing the defect and replacing the worn tires allegedly can run "hundreds, if not thousands, of dollars."[28]   The defect also purportedly requires that tires be replaced prematurely, sometimes after less than 20,000 miles.[29]   Plaintiffs assert that the expected tread wear of properly functioning tires on class vehicles is approximately 75,000 miles or more.[30]

Plaintiffs contend that "hundreds, if not thousands," of purchasers and lessees of class vehicles have experienced the defect, filed complaints with the National Highway Traffic Safety Administration ("NHTSA"), and posted information about the problem on the internet.[31]   They maintain that although Honda knew of the problems, it took no steps to notify customers of the defect or provide relief until January 2008, two years after the class vehicles had been placed on the market.[32]   At that point, Honda issued a technical service bulletin ("TSB") to its dealers and began covering "certain costs associated with temporary correction" of the defect, such as

---

[26]*Id.*, ¶ 6.

[27]*Id.*   The complaint asserts that because of the defect, the tires on class vehicles do not comply with federal motor vehicle safety standards ("FMVSS"), which set tire dimensions and lab test requirements for passenger vehicle tires.  Because the defect causes unevenness along the width of the tire, a tire wear gauge will not accurately reflect the extent of the wear.  (*Id.*, n. 3.)

[28]*Id.*, ¶ 7.

[29]*Id.*

[30]*Id.*

[31]*Id.*, ¶ 99.  This paragraph quotes a number of the consumer complaints filed with the National Highway Traffic Safety Administration and posted on the internet.  The consumer complaints report a range of problems associated with the vehicles' rear control arms, which caused significant tire wear beyond that typically expected given the cars' mileage.  (*Id.*)

[32]*Id.*, ¶ 100.

replacing the rear control arm.[33]  It also provided reimbursement for prematurely worn tires.[34]

By the time Honda took these steps, however, many of the vehicles had already been sold or leased, and class members had purportedly replaced worn tires "without adequate reimbursement."[35]  Plaintiffs allege that, although the TSB did not reference certain class vehicles, the defects it noted are found in all non-Si class vehicles.[36]

The TSB stated that rear control arms that are too short should be replaced with longer control arms.[37]  Plaintiffs assert that the recommended modification is "only a temporary fix" that does not address the underlying problem.[38]  They contend that consumers whose vehicles are modified will experience suspension defects in the future, which will require costly repairs, and give rise to safety hazards.[39]  They assert that defendants know the recommended modification does not fix the defect and that it will only "prolong the amount of time that will elapse" before the defect manifests again.[40]  Plaintiffs contend this delay is designed to ensure that the defect occurs outside the warranty period, shifting financial responsibility to class members.[41]

Although the TSB appears to concern all vehicles still under warranty, plaintiffs assert that in practice, the correction is offered only to the "most persistent customers . . . who visit Honda's dealers and complain loudly enough about the Suspension Defect and the premature tire wear it

---

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*, ¶ 101.

[37]*Id.*, ¶¶ 9-10.

[38]*Id.*, ¶ 11.

[39]*Id.*

[40]*Id.*, ¶ 12.

[41]*Id.*

1    causes."[42]  They contend that Honda dealers fail to advise consumers about the cause of the tire

2    wear they are experiencing and about the TSB.[43]  Despite knowing of the defect since 2006, and

3    of a proposed fix for it since 2008, dealers purportedly attribute the tire wear to consumers'

4    "driving habits, road conditions, and improper maintenance."[44]  Honda has not issued a recall for

5    the vehicles, offered reimbursement for costs incurred, or provided replacement or repairs.[45]

6    **B.    The Certified Classes**

7    As noted, the court granted in part and denied in part the plaintiffs' motion for class

8    certification.[46]  It certified two classes and three subclasses, subject to ongoing evaluation should

9    the class become unmanageable or should it become apparent that the plaintiffs' claims are not

10    subject to common proof:

11    (1)    The Warranty Class:  "All purchasers and lessees of any 2006 through 2007 Honda

12             Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased

13             the vehicle in California and who allege claims for breach of express and implied

14             warranty under California law;" and

15    (2)    The Consumer Protection Class: "All purchasers and lessees of any 2006 through

16             2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who

17             purchased or leased the vehicle in California, Florida, and New York, divided into

18             the following three subclasses:"

19             (A)    The California Consumer Protection Subclass: "A California UCL/CLRA

20                      class of purchasers and lessees of any 2006 through 2007 Honda Civic and

21                      2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the

22

23    _____

24    [42]*Id.*, ¶ 13.

25    [43]*Id.*, ¶ 14.

26    [44]*Id.*, ¶ 15.

27    [45]*Id.*, ¶ 16.

28    [46]Class Cert. Order.

7

vehicle in California between December 10, 2006 and December 10, 2010;"

(B)  The New York Consumer Protection Subclass: "A New York General Business Law § 349 class of purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the vehicle in New York between December 10, 2007 and December 10, 2010;" and

(C)  The Florida Consumer Protection Subclass: "A Florida Deceptive and Unfair Trade Practices Act class of purchasers and lessees of any 2006 through 2007 Honda Civic and 2006 through 2008 Honda Civic Hybrid vehicle who purchased or leased the vehicle in Florida between December 10, 2006 and December 10, 2010."[47]

## C.   The Class Representatives

The eight named plaintiffs are located in six different states.  Although plaintiffs' specific interactions with Honda regarding the alleged defect, and the manifestation of the defect they have experienced, vary, each purchased a Honda Civic from a Honda dealer and complained about premature wear of the tires.  The plaintiffs are:

- David J. Keegan, a California citizen and resident of Dublin, who purchased a new 2007 Honda Civic from Dublin Honda in April 2007;[48]

- Luis Garcia, a New York citizen, who purchased a new 2007 Honda Civic EX on March 17, 2007;[49]

- Eric Ellis, a resident of Adrian, Oregon, who purchased a new 2007 Honda Civic LX from Tom Scott Honda in Nampa, Idaho on July 6, 2007;[50]

---

[47]*Id.* at 76 & n.144.

[48]*Id.*, ¶ 19.

[49]*Id.*, ¶ 22.

[50]*Id.*, ¶ 40.

8

- Charles Wright, a citizen of Montana and resident of Missoula, who purchased a Honda Civic Hybrid from University Motors in Missoula on March 3, 2006;[51]
- Betty Kolstad, a citizen of California and resident of Big Ben, California, who purchased a 2006 Honda Civic from Auto West Honda in Roseville, California on October 15, 2009, with a 60-day certified pre-owned warranty.[52]
- Carol Hinkle, a citizen of North Carolina and resident of Salisbury, who purchased a Honda Civic LX at Salisbury Honda in April 2008;[53]
- Benittia Hall, a resident of Jacksonville, Florida, who purchased a 2007 Honda Civic from a Honda dealer in Florida in or about June 2007;[54]
- Shawn Phillips, a resident of Mojave, California, who purchased a 2007 Honda Civic Si from a Honda dealer in San Luis Obispo, California, in or about July 2007.[55]

### D.    The Settlement Agreement

#### 1.    Settlement Negotiations

The parties began settlement negotiations prior to the date Honda filed a petition for interlocutory review in the Ninth Circuit.  They continued to discuss settlement during the pendency of that appeal.[56]  The parties participated in a formal mediation with Maureen Summers on July 12, 2012.[57]  At a follow-up meeting between counsel on November 15, 2012, Honda agreed to the forms of relief outlined in the settlement agreement and the parties began to

---

[51]*Id.*, ¶ 44.

[52]*Id.*, ¶ 60.

[53]*Id.*, ¶ 68.

[54]*Id.*, ¶ 82.

[55]*Id.*, ¶ 86.

[56]Declaration of Michael A. Caddell in Support of Motion for Final Approval of Settlement ("Caddell Decl."), Docket No. 165-1 (Sept. 9, 2013), ¶ 35.

[57]*Id.*, ¶ 35.

formalize a settlement agreement.[58]  After the parties agreed on the parameters of the settlement, they participated in a final mediation with Maureen Summer on January 11, 2013, at which they resolved attorneys' fees, expenses, and incentive awards for class representatives.[59]  The parties report that their negotiations were at all times arm's length and that the relief the settlement class would receive was decided before and without reference to any agreement concerning attorneys' fees, expenses, and incentive awards.[60]

As noted, on January 24, 2013, the parties advised the court that they had reached a settlement of plaintiffs' individual and class claims,[61] and plaintiffs filed a motion for preliminary approval of the settlement on March 18, 2013.[62]  Plaintiffs attached a copy of the settlement agreement, proposed claims form, and a proposed notice form to that motion.[63]  The court preliminarily approved the settlement and directed the parties to sent notice of the proposed settlement and the final fairness hearing to settlement class members.[64]  For settlement purposes, the court certified a class comprised of "[a]ll residents of the United States, Commonwealth of Puerto Rico, U.S. Virgin Islands, and Guam who currently own or lease, or previously owned or leased, 2006 and 2007 Honda Civics, 2006 and 2007 Honda Civic Hybrids, and 2008 Honda Civic Hybrids with a VIN range of JHMFA3 85000001 – JHMFA3 85010456, distributed for sale or lease in the United States (including Puerto Rico, Guam, and the U.S. Virgin Islands)."[65]  It

---

[58]*Id.*, ¶ 36.

[59]*Id.*, ¶ 37.

[60]*Id.*, ¶ 36.

[61]Intent Notice.

[62]Prelim. Approval Motion.

[63]Declaration of Michael A. Caddell in Support of Motion for Preliminary Approval of Settlement ("Caddell Prelim. Decl."), Docket No. 159-1 (Mar. 18, 2013), Exh. D (Settlement Agreement, Exhs. 1 (Proposed Claim Form), 2 (Proposed Notice)).

[64]Prelim. Approval Order.

[65]*Id.*, ¶ 3.

also certified a settlement subclass of "[a]ll members of the Settlement Class who currently own or lease, or previously owned or leased, a Settlement Class Vehicle designated as a 'Civic Si.'"[66] The court appointed the eight named plaintiffs as class representatives and appointed Shawn Phillips as class representative for the Si subclass.[67]  After the approved notice and a copy of the claims form had been sent to 1,254,673 settlement class members, plaintiffs filed a motion for final approval of the settlement.[68]

### 2.    The Terms of the Settlement Agreement

The settlement agreement provides that the settlement class members will release all claims against Honda that arise from or relate to the alleged suspension defect, except personal injury and property damage claims.[69]  In exchange for this release, Honda agrees to provide three types of relief to settlement class members.  First, all settlement class members who provide proof that the tires on their settlement class vehicles have experienced "reimbursable tire wear" may obtain a replacement control arm without charge from an Authorized Honda Dealer, at an estimated value of $302 per replacement.[70]  Class members can prove tire wear either (1) by having an inspection at an authorized Honda dealer that finds reimbursable tire wear, or (2) by providing proof of payment that establishes reimbursable tire wear.  To be eligible, class members must bring their class vehicle to an authorized Honda dealer and provide the required information within the claim

---

[66]*Id.*, ¶ 4.

[67]*Id.*, ¶ 7.

[68]Motion; Declaration of Gregory A. Romer in Support of Motion for Preliminary Approval of Settlement ("Romer Decl."), Docket No. 165-29 (Sept. 9, 2013), ¶ 3.

[69]Caddell Decl., Exh. D (Settlement Agreement, ¶ 7.1).

[70]*Id.*, ¶ 4.2(a)); Caddell Decl., ¶ 38.  "Reimbursable tired wear" is defined as "diagonal or inner edge wear on the tires of Settlement Class Vehicles where the tires were replaced by a Settlement Class Member at a mileage (and if available a tread depth) sufficient for reimbursement consistent with the issues identified in the Technical Service Bulletin and pursuant to the Tire Reimbursement Chart attached hereto as Exhibit 5."  (*Id.*, Exh. D (Settlement Agreement, ¶ 1.20).)

period.[71]  Honda will also reimburse class members who previously paid for parts and labor associated with a control arm replacement, so long as they provide proof of payment and submit a valid claim form within the claim period.[72]  Finally, Honda will reimburse class members who replaced their tires due to reimbursable tire wear, so long as they provide proof of payment and submit a valid claim form within the claim period.[73]  The average reimbursement is estimated to be $243.52.[74]

Honda will reimburse this last group of class members' out-of-pocket expenses for parts, but not labor, based on a schedule that fixes the percentage of expense that will be reimbursed according to the mileage and tread depth of the vehicle at the time of replacement.[75]  The schedule provides that Honda will reimburse some portion – ranging from 25% to 100% – of the cost of tires for those class members who purchased new tires due to reimbursable tire wear when their car had between 0 and 25,000 miles on it.[76]  Honda will not reimburse class members for tires purchased after their cars had been driven for more than 25,000 miles.[77]  The percentage of reimbursement also depends on the tread depth of the tires on the car at the time the class member had the tires replaced.[78]  Under the schedule, Honda will reimburse some portion – again, ranging

[71]*Id.*, ¶ 4.2(a).

[72]*Id.*, ¶ 4.2(b)

[73]*Id.*, ¶ 4.3.

[74]Amended Supplemental Declaration of Michael A. Caddell in Support of Motion for Attorneys' Fees and Expenses ("Amended Supp. Caddell Decl."), Docket No. 170 (Nov. 21, 2013), ¶ 3.

[75]Caddell. Decl., Exh. D (Settlement Agreement, ¶ 4.3).  There are two different reimbursement charts, one for all class vehicles except Honda Civic Si's and one for Honda Civic Si's.  (*Id.*)

[76]Caddell Decl., Exh. D (Settlement Agreement, Exh. 5 (Tire Reimbursement Schedule)).

[77]*Id.*

[78]*Id.*

from 25% to 100% – of the cost of tires for those class members who purchased replacement tires when the tread on the tires was between 0/32" and 5/32".[79]   Honda will not reimburse class members for tires purchased after the tread depth of the tires was 6/32" or more.[80]

Honda retains the right to verify each class member's eligibility, but must give class members an opportunity to cure any deficiencies in their claim.  Class members whose claims are denied have the right to appeal to the Better Business Bureau, with Honda bearing any fees charged by the bureau.[81]   There is no cap on Honda's liability; it must pay all valid claims submitted.[82]

The settlement agreement also provides that Honda will not oppose an application for, and will pay, attorneys' fees and expenses up to $3.165 million.[83]   Plaintiffs' final approval motion seeks fees of $2,865,413.47 and expenses of $299,586.53.[84]   Similarly, the settlement agreement states that Honda will not oppose an application for, and will pay, incentive awards to the named plaintiffs of up to $35,000 in the aggregate.[85]   Plaintiffs' motion for final approval requests that in recognition of the time expended by plaintiffs on the case, the court award $5,500 to each of Keegan, Garcia, Ellis, Wright, Kolstad, and Hinkle, and $1,000 to each of Phillips and Hall, for

---

[79]*Id.*

[80]*Id.*

[81]*Id.*, ¶¶ 5.3, 9.3.

[82]Motion at 8.

[83]Caddell Decl., Exh. D (Settlement Agreement, ¶ 12).

[84]Motion at 18, 24.  After the hearing, class counsel submitted evidence that they had expended additional time subsequent to the filing of the motion for attorneys' fees, which added $132,387.50 to the lodestar, for a total of $4,076,550.50.  (Supp. Caddell Decl., ¶ 6.)  In a post-hearing supplement, class counsel submitted evidence that they had incurred an additional $3,610.61 in expenses following the filing of the motion for attorneys' fees, for total reimbursable expenses of $303,197.14.  (*Id.*, ¶ 4.)

[85]Caddell Decl., Exh. D (Settlement Agreement, ¶ 4.4).

a total of $35,000.[86]

## II. DISCUSSION

### A.    Whether the Court Should Finally Approve the Parties' Settlement

As noted, the court certified one class and one subclass for settlement purposes.[87]   Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure requires that the court "approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class."   Approval under Rule 23(e) involves a two-step process "in which the [c]ourt first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted."   *National Rural Telecommunications Cooperative v. DIRECTV, Inc.* ("*NRTC*"), 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.14, at 236-37 (1995)).   The Ninth Circuit has noted that, in considering whether finally to approve a class settlement, "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."   *In re Synocor ERISA Litigation*, 516 F.3d 1095, 1101 (9th Cir. 2008); see *id.* ("This policy is also evident in the Federal Rules of Civil Procedure and the Local Rules of the United States District Court, Central District of California, which encourage facilitating the settlement of cases"); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation"), cert. denied, 459 U.S. 1217 (1983).

### 1.    Notice Requirements

Rule 23(e) requires that "notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs."   FED.R.CIV.PROC. 23(e).   The notice given must be "reasonably calculated, under all the circumstances, to apprise

---

[86]Motion at 24-25.

[87]Prelim. Approval Order, ¶ 3-4.

interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); see also *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("To comply with the spirit of [Rule 23(e)], it is necessary that the notice be given in a form and manner that does not systematically leave an identifiable group without notice").

The court's role in reviewing a proposed settlement is to represent those class members who were not parties to the settlement negotiations and agreement.  See *San Francisco NAACP v. San Francisco Unified School District*, 59 F.Supp.2d 1021, 1027 (N.D. Cal. 1999) ("The purpose of Rule 23(e) is to protect 'unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are unable to secure satisfaction of the individual claims by a compromise,'" quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  One aspect of the court's role is to ensure that all class members receive adequate notice of the proposed settlement.

Honda worked with R.L. Polk & Co., a nationally recognized automotive data provider, and state departments of motor vehicles to identify 1,254,673 individuals who are members of the settlement class.[88]  Between June 14 and July 31, 2013, Polk sent a court-approved notice of the proposed settlement and claim forms by first-class mail to all identified class members.[89]  As of September 6, 2013, Polk had re-mailed all notices returned as undeliverable for which there was a forwarding address.[90]

In addition to mailing notice and claim forms, Honda established and has maintained a toll-free telephone number that class members could call to obtain information concerning the

---

[88]Romer Decl., ¶ 3.

[89]*Id.*

[90]*Id.*

settlement.[91]  The number became operational on June 14, 2013,[92] and as of September 6, 2013, Honda had received approximately 5,100 calls.[93]  Honda also established and has maintained a settlement website at www.settlement-claims.com/controlArm, which became operational on June 14, 2013, and provides access to the settlement agreement, the notice of settlement, answers to frequently asked questions, and other pleadings and information regarding the case and the settlement.[94]  Honda estimates that as of September 6, 2013, there have been approximately 12,000 visits to the website.[95]

The court is satisfied that these efforts have been effective to provide notice of the settlement to potential class members. See *Mullane*, 339 U.S. at 318-19 (stating that "the mails today are recognized as an efficient and inexpensive means of communication" that is reasonably calculated to provide notice).  The parties not only mailed notice to a comprehensive list of known class members, but resent notices to class members for which they were able to obtain a forwarding address.  They also established a toll-free telephone line class members could call to pose questions concerning the settlement, and set up a website that provided access to information concerning the case, the proposed settlement, and the steps required for class members to opt out of or object to the settlement.[96]  The notice form that was mailed to class members clearly apprised them of the action and of their legal options.  Consequently, the court finds that unnamed class members had adequate notice of the settlement and adequate opportunity to file a valid claim form,

---

[91]*Id.*, ¶ 5.

[92]*Id.*

[93]*Id.*

[94]*Id.*

[95]*Id.*

[96]Although not determinative in evaluating whether notice was reasonably calculated to apprise class members of the case and the settlement, the court notes that there have been thousands of calls to the toll-free telephone number, visits to the website, requests for control arm replacements, and claim forms submitted since notice was mailed and the telephone line and website became operational.

opt out, or object to the settlement.  The notice requirement of Rule 23(e) has thus been satisfied.

## 2. Fairness of the Proposed Settlement

"The role of a court . . . reviewing the proposed settlement of a class action under Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and comport with due process and to examine the settlement for fairness and adequacy." *Vaughns v. Board of Education of Prince George's County*, 18 F.Supp.2d 569, 578 (D. Md. 1998).  The district court's role, in reviewing "what is otherwise a private consensual agreement negotiated between the parties to a lawsuit, must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

The parties assert that the settlement is presumptively fair because it is the result of an arms-length negotiation.[97] See *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated reslution"); *NRTC*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair," citing *City Partnership Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996)).  The parties negotiated the settlement over a period of six months, and their negotiations included two sessions with experienced mediator Maureen Summers, many telephone conferences, and an in-person meeting between counsel.[98]  The parties assert that counsel are experienced in this area of the law, and that class counsel acted in good faith and represented their clients' best interests in reaching the settlement.[99]  Additionally, the parties agreed on the relief the class would receive before negotiating attorneys' fees, expenses,

---

[97]Motion at 10-11; Caddell Decl., ¶ 36.

[98]Caddell Decl., ¶¶ 34-37.

[99]*Id*. at 11.

or incentive awards.[100]   It appears, therefore, that the agreement was reached in good faith after a well-informed, arms-length negotiation, and that it is entitled to a presumption of fairness.

Nonetheless, the court must examine the terms of the settlement, considering relevant factors, to determine whether the settlement is indeed fair.  In making this assessment, the court balances:

> "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."  *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

This list of factors is not exclusive, "and different factors may predominate in different factual contexts."  *Torrisi v. Tuscon Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  See also *Churchill Village*, 361 F.3d at 576 n. 7 ("Because the settlement evaluation factors are non-exclusive, discussion of those factors not relevant to this case has been omitted"); *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, *3 (N.D. Cal. Mar. 28, 2007) (adding as relevant factors "(9) the procedure by which the settlements were arrived at, see MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.6 (2004), and (10) the role taken by the plaintiff in that process").

### a.    Strength of Plaintiffs' Case

While asserting that they "have confidence in their claims," plaintiffs acknowledge that they would have faced serious obstacles had the action proceeded.[101]   While most of their causes of action survived Honda's motion to dismiss, plaintiffs note that Honda raised a number of

---

[100]Caddell Decl., ¶¶ 36-37.

[101]Motion at 12.

substantive defenses, including that it had no prior knowledge of the alleged defect, that it had no duty to disclose the defect to consumers, that plaintiffs could not prove the defect was safety-related, and that plaintiffs could not prove causation because other factors – including aggressive driving habits, poor vehicle maintenance, and improper tire inflation – can also cause premature tire wear.[102]   The court had no opportunity to evaluate the sufficiency of the evidence adduced during discovery with respect to these issues because the parties settled before a motion for summary judgment was filed.   The fact, however, that causation and Honda's duty to disclose – required elements of plaintiffs' causes of action – were contested favors a finding that the settlement is fair.   See *In re Portal Software, Inc. Securities Litigation*, No. C-03-5138 VRW, 2007 WL 4171201, *3 (N.D. Cal. Nov. 26, 2007) ("Factor (1), the strength of plaintiffs' case, somewhat favors settlement because plaintiffs' remaining claims are tenuous.   Plaintiffs assert that establishing liability and damages at trial would be difficult because of the uncertainties associated with proving its claims, which are 'exacerbated by the unpredictability of a lengthy and complex jury trial'").   The court therefore concludes that this factor weighs in favor of final approval of the settlement.

### b.   The Risk, Expense, Complexity, and Likely Duration of Further Litigation

The parties contend that, had the case not been resolved through settlement, continued litigation would have been expensive and lengthy, and would have required the retention of costly expert witnesses by both parties.[103]   As a result, the parties assert, this factor weighs in favor of approval.[104]   The court agrees.   Given the amount of motion practice that had already occurred, and the hotly contested issues that remained, it is likely that a motion for summary judgment would have been filed.   Given Honda's petition for interlocutory review, moreover, and the fact

---

[102]Motion at 12; Honda's Motion to Dismiss, Docket No. 28 (Mar. 28, 2011), at 7-8; Caddell Decl., ¶ 41.

[103]Motion at 13; Caddell Decl., ¶ 40.

[104]Motion at 13.

that the court explicitly retained the right to re-evaluate its certification decision, there might well have been a motion for decertification of the class filed as well.  It is virtually certain that, whatever the outcome of a trial, the losing party would have appealed.  The case has been pending since December 2010, and it is likely that further proceedings would have been protracted, given the number of claims and defenses, and the need for expert testimony concerning the alleged suspension system defect, its effect on vehicle tires, and Honda's independent causation allegations.  As the court stated in *Glass v. UBS Financial Services, Inc.*, No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007):

> "In light of the above-referenced uncertainty in the law, the risk, expense, complexity, and likely duration of further litigation likewise favors the settlement. Regardless of how this Court might have ruled on the merits of the legal issues, the losing party likely would have appealed, and the parties would have faced the expense and uncertainty of litigating an appeal. 'The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement.' See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 458 (9th Cir. 2000).  Here, the risk of further litigation is substantial." *Id.* at *4.

See also *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (in weighing the risk of future litigation, "a court may consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation" (internal quotation marks omitted)); *Young*, 2007 WL 951821 at *3 ("Because this litigation has terminated before the commencement of trial preparation, factor (2) also militates in favor of the settlement"); see also *Officers for Justice*, 688 F.2d at 626; *Milstein v. Huck*, 600 F.Supp. 254, 267 (E.D.N.Y. 1984) ("The expense and possible duration of the litigation are major factors to be considered in evaluating the reasonableness of this settlement").

Because both plaintiffs and Honda would have had to engage in extensive, expensive pretrial activities, because both faced the prospect that they would not prevail, and because any outcome would likely have been appealed, this factor supports approval of the settlement. See *In*

*re Portal Software, Inc. Securities Litigation*, 2007 WL 4171210 at *3 (recognizing that the "inherent risks of proceeding to . . . trial and appeal also support the settlement").

        **c.**    **The Risk of Maintaining Class Action Status Throughout Trial**

Whether or not the action would have been tried as a class action is also relevant in assessing the fairness of the settlement. Here, as mentioned, the court had certified warranty and consumer protection classes, as well as three consumer protection subclasses prior to the parties' settlement. Plaintiffs, however, faced the risk of decertification, since the court expressed "concerns with various aspects of the predominance inquiry" and, by extension, the superiority analysis.[105] It noted that "[d]iscovery . . . [was] not yet complete," and that "[i]f at a later stage in the litigation[,] it bec[a]me[ ] evident that plaintiffs' claims [would] not be subject to common proof, or that the class action device [was] no longer . . . a manageable mechanism for adjudicating th[e] dispute," Honda could file an appropriate motion.[106] Avoiding the risk of decertification, especially where there are doubts concerning the viability of the class, favors approval of the settlement. See *McKenzie v. Federal Exp. Corp.*, No. CV 10–02420 GAF (PLAx), 2012 WL 2930201, *4 (C.D. Cal. July 2, 2012) ("[S]ettlement avoids all possible risk [of decertification]. This factor therefore weighs in favor of final approval of the settlement"); *Catala v. Resurgent Capital Services L.P.*, Civil No. 08cv2401 NLS, 2010 WL 2524158, *3 (S.D. Cal. June 22, 2010) ("The avoidance of risk of maintaining class action certification throughout trial favors settlement of this action"); *Lane v. Facebook, Inc.*, No. C 08–3845 RS, 2010 WL 9013059, *4 (N.D. Cal. Mar. 17, 2010) ("The risk that a class action may be decertified at any time generally weighs in favor of approving a settlement," citing *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009)). Compare *Kim v. Space Pencil, Inc.*, No. C 11–03796 LB, 2012 WL 5948951, *5 (N.D. Cal. Nov. 28, 2012) ("[B]ased on the record presented, the court considers the risk of decertifying the class to be low. This factor, therefore, weighs slightly against approving the Settlement Agreement"). Accordingly, this factor too weighs in favor of

---

[105]Class Cert. Order at 77 n. 144.

[106]*Id.*

granting the settlement.

### d. The Amount Offered in Settlement

As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis original). Rather, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). "'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n. 2 (2d Cir. 1974)). Estimates of a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).

As noted, Honda has agreed to provide three forms of relief to class members: free control arm replacements, reimbursement of out-of-pocket expenses for parts and labor associated with a control arm replacements class members already obtained, and reimbursement of out-of-pocket expenses for parts associated with class members' replacement of tires with reimbursable tire wear.[107] There is no cap on the amount Honda must pay to provide these forms of relief. It will provide control arm replacements and reimbursements for as many class members as are entitled to them under the terms of the settlement. The value of each control arm replacement is approximately $302.[108] Plaintiffs estimate that the total value of the available free control arm replacements is at least $12.08 million.[109]

---

[107]Caddell Decl., Exh. D (Settlement Agreement, ¶¶ 4.2-4.3).

[108]Caddell Decl., ¶ 38.

[109]Plaintiffs state that this estimate "is based on an assumption that approximately twice as many Settlement Class Members will receive the Control Arm Replacement as have done so to

Although plaintiffs did not achieve all of the results they sought in their complaint, as the original complaint also sought statutory and punitive damages, the provision of free control arm replacements provides the equitable relief they sought, while the reimbursement of out-of-pocket expenses provides compensation for class members who previously paid for tires or repairs to the vehicles.[110]  While it is possible that going to trial might have resulted in additional compensation for class members in the form of statutory and punitive damages, the settlement offers a guaranteed recovery for eligible class members without the risk or further expense of litigation.

Honda, moreover, has already begun to replace control arms and reimburse eligible class members.  As of as of November 19, 2013, it had performed 35,883 control arm replacements, and received 14,340 claims for reimbursement;[111] half of these sought reimbursement for control arm replacements, while the remaining fifty percent sought reimbursement for the purchase of tires.[112]  In all, 67.75% of the reimbursement claims[113] have been rejected, but the claimants are eligible to reapply.[114]  The immediacy of the relief provided by the parties' settlement eliminates

date."  Motion at 23 n. 9.  As of September 6, 2013, Honda had performed a control arm replacement for approximately 20,000 class members.  (Romer Decl., ¶ 7.)

[110]Compare Complaint, ¶ 96(c) with Caddell Decl., Exh. D (Settlement Agreement, ¶¶ 4.2-4.3).

[111]Amended Supp. Caddell Decl., ¶ 3.

[112]Supplemental Declaration of Michael Caddell in Support of Motion for Attorneys' Fees and Expenses ("Supp. Caddell Decl."), Docket No. 168-1 (Nov. 4, 2013).

[113]A reimbursement form can have more than one claim for reimbursement, e.g., a claim for reimbursement of the cost of the control arm replacement, and a reimbursement claim for the purchase of new tires or a reimbursement claim for the purchase of multiple sets of new tires.  (Amended Supp. Caddell Decl., ¶ 3.)  The 67.75% figure includes situations in which one of multiple reimbursement claims submitted on a single form were denied. Accordingly, it does not necessarily represent the percentage of Honda Civic owners who were denied any type of reimbursement.

[114]Id.  The rejection rate appears to be high because class members have submitted claims that report the mileage on their car at the time they replaced the tires rather than the number of miles the tires had been driven at the time they were replaced, and because many class members have sought reimbursement for tires replaced at mileage levels higher than permitted by the Tire

the possibility that class members might have had to wait years to receive compensation.  The claims process, moreover, is fairly straight forward.  Class members need only bring their vehicle to a Honda dealer and provide appropriate documentation to receive a free control arm replacement.  Similarly, class members seeking reimbursement need only complete a claim form and provide appropriate documentation.  This procedure eliminates the need for each class member to adduce evidence of actual damage following a finding of liability.

The compensation contemplated by the settlement represents a compromise reached following extensive arms-length negotiation, and takes into account the risks the class faced.  For these reasons, the court finds that the settlement amount is fair and adequate, and will provide more immediate monetary and equitable relief to the class than proceeding with the litigation.  See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d at 459 (holding that, given the difficulties inherent in complex securities litigation, one-sixth of the potential recovery was fair and adequate); *Officers for Justice*, 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair"); *Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2008 WL 346417, *9 (N.D. Cal. Feb. 7, 2008) ("The settlement amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial").  The court therefore finds that this factor weighs in favor of approving the settlement.

              **e.**      **The Stage of the Proceedings and Extent of Discovery Completed**

"'The extent of discovery may be relevant in determining the adequacy of the parties' knowledge of the case.'"  *NRTC*, 221 F.R.D. at 527 (quoting MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.42 (1995)).  "'A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case.'"  *Id.* (quoting 5 W. Moore, MOORE'S FEDERAL PRACTICE, § 23.85[2][e] (Matthew Bender 3d ed.)).  The more the

Reimbursement Schedule.  (*Id.*)

discovery completed, the more likely it is that the parties have "'a clear view of the strengths and weaknesses of their cases.'"   *Young*, 2007 WL 951821 at *4 (quoting *In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 745 (S.D.N.Y. 1985)).

There has been extensive discovery and motion practice in this case; the parties briefed and argued Honda's motion to dismiss, a motion for class certification, and a motion for interlocutory review.[115]  In terms of discovery, class counsel engaged in two months of pre-filing discovery, which, among other activities, involved setting up a website to field hundreds of inquiries from prospective class members, reviewing Honda manuals and technical service bulletins, as well as blogs discussing the alleged defect, and visiting tire facilities.[116]  Both parties, moreover, reviewed "voluminous quantities of evidence and retained multiple experts."[117]  Honda produced, and class counsel reviewed, more than 115,000 documents.[118]  Experts retained separately by both sides inspected each of the named plaintiffs' vehicles.[119]  The parties also took the depositions of six of the plaintiffs, four Honda witnesses, and a Honda expert.[120]  Following this, the parties engaged in two mediations with Maureen Summers.  They report that the extensive discovery they conducted "informed" the mediation sessions and resulted in a settlement.  In *Browning v. YahooA Inc.*, No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007), the court found that a similar amount of discovery and the stage of the proceedings, including multiple mediation sessions, weighed in favor of approving the settlement proposed in that case.  *Id.* at *12 (finding that the extent of discovery and stage of the proceedings weighed in favor of approving a settlement where the case had been pending three years and "involved discovery and motion

---

[115]Caddell Decl., ¶¶ 23-31.

[116]*Id.*, ¶ 22.

[117]Motion at 13-14; Caddell Decl., ¶¶ 26-28.

[118]*Id.*, ¶ 26.

[119]*Id.*, ¶ 24.

[120]Caddell Decl., ¶¶ 23-24.

practice, including a motion to dismiss," and "the parties [had] engaged in multiple rounds of mediation," and concluding that "[a]s a result [of these activities], the parties and this Court are well positioned to assess the strength of this case and the comparative benefits of the proposed settlement").

Here, too, the court concludes that the action is at a stage where the parties have a "clear view of the strengths and weaknesses of their cases." See *True v. American Honda Motor Co.*, 749 F.Supp.2d 1052, 1078 (C.D. Cal. 2010) (finding, in a case where "class counsel reviewed 'thousands of pages of relevant documents,'" that "discovery has been sufficient to permit the parties to enter into a well-informed settlement, and this factor weighs in favor of approval"). The court accordingly concludes that this factor also weighs in favor of approving the settlement.

### f.    The Presence of a Governmental Participant

This factor does not apply because no government entity participated in the case. The court notes, however, that despite notice to relevant federal and state authorities as required by the Class Action Fairness Act, 28 U.S.C. § 1711 et seq., none objected to the settlement or submitted adverse comments concerning it.[121] If the court were to consider this factor, therefore, it would conclude that it favored a finding that the settlement is fair and reasonable. See *Browning*, 2007 WL 4105971 at * 12. ("Because numerous governmental agencies . . . were given notice of the settlement and have not objected, this factor weighs in favor of the settlement").

### g.    The Experience and Views of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979) (citations omitted). "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995). The attorneys representing

---

[121]Declaration of Michael C. Andolina in Support of Motion for Settlement Approval ("Andolina Decl."), Docket No. 165-26 (Sept. 9, 2013), ¶¶ 2-4.

the class are "highly experienced in class-action and automobile product defect litigation."[122] They state that they "view this as an excellent settlement."[123]  While the weight to be given to this factor is tempered somewhat by counsel's "obvious pecuniary interest in seeing the settlement approved," *Young*, 2007 WL 951821 at *5, the court nonetheless concludes that counsel's views weigh in favor of approving the settlement.  See *Fernandez v. Victoria Secret Stories*, No. CV 06-04149 MMM (SHx), 2008 WL 8150856, *7 n. 32 (C.D. Cal. Jul. 21, 2008) ("While the court agrees that this factor must be discounted to some degree in recognition of the personal interest of class counsel in having the settlement approved, it declines to discount the well-considered views of counsel entirely").

**h.    Class Members' Reaction to the Proposed Settlement**

All of the named plaintiffs support the settlement.[124]  In order to gauge the reaction of the other class members, it is appropriate to evaluate the number of requests for exclusion, as well as the objections submitted.  See *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors," quoting *Pallas v. Pacific Bell*, No. C-89-2373 DLJ, 1999 WL 1209495, *6 (N.D. Cal. July 13, 1999) ("The greater the number of objectors, the heavier the burden on the proponents of settlement to prove fairness")).

As noted, Honda identified and mailed notices to 1,254,673 class members.[125]  As of

---

[122]Motion at 14. See e.g., Caddell Decl., ¶¶ 8-14 (setting forth Caddell's experience in class action litigation while at Caddell & Chapman).

[123]*Id.*

[124]Caddell Decl., Exhs. 5 (Declaration of David J. Keegan, ¶ 8), 6 (Declaration of Luis Garcia at 2), 7 (Declaration of Eric Ellis, ¶ 8), 8 (Declaration of Charles Wright, ¶ 7), 9 (Declaration of Betty Kolstad, ¶ 8), 10 (Declaration of Carol E. Hinkle, ¶ 8), 11 (Declaration of Shawn Phillips, ¶ 7), 12 (Declaration of Benittia Hall, ¶ 7).

[125]Romer Decl., ¶ 3.

October 7, 2013, there have been 133 exclusion requests,[126] representing .0106% of the class. An even smaller number of class members – just 38 – filed objections to the settlement.[127]  The objectors are .0032% of the class.  The relatively low number of opt-outs and objections indicates that the class generally approves of the settlement.  See *Churchill Vill., LLC v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming the approval of a class action settlement where 90,000 members received notice and 45 objections were received); *Chun-Hoon v. McKee Foods Corp.*, 716 F.Supp.2d 848, 852 (N.D. Cal. 2010) (concluding, in a case where "[a] total of zero objections and sixteen opt-outs (comprising 4.86% of the class) were made from the class of roughly three hundred and twenty-nine (329) members," that the reaction of the class "strongly supports settlement"); *Garner v. State Farm Mut. Auto Ins.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, *15 (N.D. Cal. Apr. 22, 2010) (finding that an opt-out rate of 0.4 percent supported "the fairness of the Settlement"); *Glass*, 2007 WL 221862 at *5 (approving a settlement

---

[126]Tabor Decl., ¶ 5.

[127]Response at 1.  Seven of the objections were received after the court's September 23, 2013 objection deadline.  (*Id.* at 17; Exhs. 11 (Scott Carter Objection), 14 (Kara and James Geckler Objection), 17 (Mitchell Jacobs Objection), 22 (Myra S. Lee Objection), 25 (Ronald and Lu Ann Nickelson Objection), 28 (Pamela S. Rumback Objection), 29 (Troy Scott Objection); Prelim. Approval Order at 5 ("Any Settlement Class Member who objects to any aspect of the settlement may appear in person or by his or her attorney at the Final Settlement Hearing and present evidence or argument provided the Settlement Class Member files with the Court and serves upon Class Counsel and Honda's counsel, by Monday, September 23, 2013, an objection. . .").)  It appears that the notice class counsel mailed to class members, however, provided that objections had to be filed electronically or postmarked by September 23, 2013, not that they had to be received by September 23, 2013, as the court's preliminary approval order required.  (Caddell Decl., Exh. D (Settlement Agreement, Exh. 3 (Notice)).)  With the exception of Nickleson's objection, whose postmark is illegible, the belated objections were postmarked by September 23, 2013, and therefore complied with the notice provided by class counsel.  Because the notice sent to class members set an objection date later than that approved by the court, and because six of the seven belated objections complied with the notice, the court deems the objections timely and will consider them.  Additionally, the court received six objections not sent to class counsel; these were submitted by Darrel E. and Anita Bruner, Melvin Flanigan, Richard Harvey, Kimberly Mackie, Hattie Mahone, and Mark C. Maloney.  All but Maloney's objection (which was postmarked October 8, 2013), were timely.  Each of these objectors criticized various aspects of the tire reimbursement schedule discussed *infra*.

where the opt-out rate was 2%); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) (finding that an opt-out rate of .10614 percent and an objection rate of .0052 percent represented "overwhelming support" for the settlement by class members and that it was "strong circumstantial evidence supporting the fairness of the Settlement").

When considering class members' objections, the district court must also evaluate whether the objectors raise serious challenges to the fairness of the proposed settlement. See *Bennett v. Behring Corp.*, 737 F.2d 982, 988 (11th Cir. 1984) (affirming the approval of a class settlement despite significant objections by class members because "the reasons for that opposition [were] thoroughly considered and ultimately rejected by the district court"); *Californians for Disability Rights, Inc. v. Cal. DOT*, No. C 06-5125 SBA, 2010 WL 2228531, *2 (N.D. Cal. June 2, 2010) ("If objections are filed, the district court is to evaluate whether they suggest serious reasons why the settlement proposal might be unfair"); *Boyle v. Arnold-Williams*, No. C01-5687JKA, 2006 U.S. DIST. LEXIS 91920, *10–11 (W.D. Wash. Dec. 20, 2006) ("T]he fact that there is opposition does not necessitate disapproval of the settlement. Instead, the court must independently evaluate whether the objections being raised suggest serious reasons why the proposal might be unfair").

Here, the majority of objectors – 30 of 38, or 79% – disagree with the amount of compensation provided under the tire reimbursement schedule. They argue that the percentage reimbursement for the cost of replacement tires should be higher and that class members should be reimbursed for the replacement of tires on cars with higher mileage and less. These objectors also contend that they should be reimbursed for labor on tire replacements and for additional services, such as alignment, that were performed at the time tires were replaced.[128]

-------

[128]Response, Exhs. 3 (Norma Amundson Objection at 1), 4 (Richard Arnold Objection at 2), 6 (Gordon Barr Objection), 7 (Russell Bimber Objection at 4), 8 (Kazue Blackwell Objection at 1), 9 (Manuel Camara Objection at 1, 2), 10 (Kathleen H. Carley Objection), 11 (Scott Carter Objection at 1), 12 (Brandy T. Clary Objection at 1), 14 (Kara and James Glecker Objection at 3), 15 (Jose M. Gonzalez Objection at 1), 16 (Donald Ipock Objection at 1), 17 (Mitchell Jacobs Objection at 1), 18 (Earl and Irene Jones Objection at 1-2), 20 (Walter Klein Objection at 1), 22 (Myra S. Lee Objection), 23 (Robin Lombardo Objection at 2), 24 (Richard Longacre Objection at 1), 25 (Ronald and Lu Ann Nickelson Objection at 1), 26 (Ricard S. and Rosalie D. Ramirez), 27 (Robert and Maxine Rubin Objection at 1), 28 (Pamela S. Rumback Objection at 1), 29 (Troy

Plaintiffs respond that the reimbursement schedule is designed to compensate only for tire wear caused by the alleged defect, not for all tire wear, since all tires eventually wear out and need to be replaced.[129]  For that reason, they contend, the reimbursement schedule reflects payment of only a portion of the cost of replacement tires, ranging from 0% to 100% depending on the vehicle's mileage and the amount of tire wear at the time of replacement.  For example, a class member who purchased replacement tires after his or her car had been driven between 9,501 and 12,500 miles will be reimbursed for 75% of the cost of new tires if the old tires had a tread depth of 0/32" to 2/32" at the time of replacement; 50% if the old tires had a tread depth of 3/32" or if the tires' tread depth was not measured at the time of replacement; 25% of the cost if the old tires had a tread depth of 4/32" at the time of replacement; and 0% if the tires had a tread depth of 5/32" or more at the time of replacement.[130]  Plaintiffs note there is a separate tire reimbursement schedule for Civic Si vehicles because they are designed to offer a "sportier ride," and to permit more "aggressive handling that wears tires more rapidly."

After review, the court finds the tire reimbursement provision fair.  In a similar class action against Honda for alleged compressor defects, a court in the District of New Jersey found that a settlement agreement that provided a sliding reimbursement scale depending on the age of the vehicle and the miles it had been driven was reasonable.  *Alin v. Honda Motor Co. Ltd.*, No 08-cv-4825, 2012 WL 8751045, *15 (D.N.J. Apr. 13, 2012) ("The parties weighed the obligation to cover those damages against the reality that Honda cannot act as a perpetual insurer for all

---

Scott Objection at 1), 30 (Ellen Simich Objection at 1-2), 31 (David B. Tarr Objection), 32 (Terry D. Vanderveen Objection), 36 (James Wallius Objection at 1), 37 (Michael Widman Objection), 39 (Jonathan Wilson Objection), 40 (Gregory Wynn Objection at 1).  Mark Lange also objected on this basis.  (*Id.*, Exh. 21 (Mark Lange Objection).)  Class counsel represent, however, that they explained to Lange that the settlement benefit was not limited to the replacement of his original tires and that this explanation resolved his objection.  (Response at 4 n. 4.)  The court thus does not consider Lange in calculating the number of class members who object to the tire reimbursement aspect of the settlement agreement.

[129]*Id.* at 5.

[130]Caddell Decl., Exh. D (Settlement Agreement, Exh. 5 (Tire Reimbursement Schedule)).

compressor breakdowns, and they ultimately settled on a sliding scale that ends at eight years and 96,000 miles. . . .  It was reasonable to exclude older, more traveled vehicles from coverage"). Like the settlement in *Alin*, the settlement here is designed to compensate class members for tire wear caused by the alleged defect, not to overcompensate them by paying labor and the entire cost of replacement tires, since it is clear that class members would eventually have to had to pay to have tires replaced regardless of any defect in the vehicle.

Plaintiffs also justify this aspect of the settlement on the basis that they "faced real litigation risk from Honda's defense[ ]" that it was not liable for tire replacement costs because tires are not covered under its express warranty.[131]  Given this risk, they contend, a sliding reimbursement scale provides a fair result for the class.[132]  The court agrees.  See *Browne v. American Honda Motor Co., Inc.*, No. CV 09–06750 MMM (DTBx), 2010 WL 9499072, *13 (C.D. Cal. July 29, 2010) (finding a settlement fair and adequate where "the compensation provided by the settlement will cover a good portion of the reasonable expenses incurred"); *Glass*, 2007 WL 221862 at *6 ("Settlements by their very nature are not intended to provide full compensation for the claimed losses and consequently cannot be calculated with the same precision as actual damages").  For these reasons, the court concludes that class members' objections to the tire reimbursement schedule do not raise serious concerns regarding the fairness of the settlement.

Four class members object to the documentation required in order to obtain replacement tires.[133]  Plaintiffs contend that the information and documentation required to submit a proper claim is less than what would have been required had class members had to adduce evidence at an individual damages trial.[134]  They also contend that, because tires are costly, class members who do not have receipts for an earlier tire replacement likely remember where they purchased

---

[131]*Id*. at 6.

[132]*Id*.

[133]Response, Exhs. 4 (Richard Arnold Objection), 5 (Monty Ault Objection), 16 (Donald Ipock Objection), 19 (Kevin R. and Linda M. Kilsdonk).

[134]Response at 8-9.

the tires and can contact the store to obtain a receipt.[135]  Courts frequently approve settlements that require class members to submit receipts or other documentation; they find that such a requirement is reasonable and fair, given the defendant's need to avoid fraudulent claims.  See e.g., *Browne*, 2010 WL 9499072 at *5 (approving a settlement that required class members to submit a receipt or other documentation of out-of-pocket costs to the claims administrator); *In re Lawnmower Engine Horsepower Mktg & Sales Practices Litig.*, 733 F.Supp.2d 997, 1010 (E.D. Wis. 2010) (holding that a requirement that class members seeking reimbursement include serial number of their lawnmower and lawnmower engine on claim forms was reasonable, despite the fact that it posed a difficulty for some class members, because it was necessary to prevent fraudulent claims).  The court does not find requiring proof of tire or control arm replacement unduly burdensome.  Indeed, more than 12,000 class members have already been able to provide such evidence.  For these reasons, the court concludes that these objections also do not raise serious concerns regarding the fairness of the settlement.

Finally, one class member has objected that he did not have enough time to review and object to class counsel's attorneys' fees request.[136]  The deadline for filing objections was September 26, 2013, while the deadline for class counsel to file a motion for approval of the settlement and an application for attorneys' fees, costs, and incentive awards was September 9, 2013.[137]  Objectors therefore had seventeen days to review the fee application and motion for settlement approval and file objections.  This afforded sufficient time for class members to consider and lodge objections to the attorneys' fees request or settlement terms.  Other courts have set similar schedules.  See *In re AT & T Mobility Wireless Data Services Sales Tax Litigation*, No. MDL 2147, No. 10 C 2278, 2011 WL 2204584, *31 (N.D. Ill. June 2, 2011) (setting January 26, 2011 as the date for class counsel to file an attorneys' fees application and February 2, 2011 as the deadline for objections).  In *In re Mercury Interactive Corp. Securities Litigation*,  618 F.3d

---

[135]*Id*. at 9.

[136]Response, Exh. 13 (Thomas Cox Objection at 2).

[137]Prelim. Approval Order, ¶¶ 11-13.

988 (9th Cir. 2010), the Ninth Circuit explicitly declined to "adopt a bright-line rule of a time period that would meet Rule 23(h)'s requirement that the class have an adequate opportunity to oppose class counsel's fee motion." *Id.* at 994.   The fact that objectors were able to review the fee application and prepare objections both to the settlement and the fee request, as well as provide substantial documentation concerning their individual damages, indicates that they had sufficient time to respond.   Indeed, under the Local Rules of this court, parties typically have one week to file opposition to a motion filed by their adversary.   See CA CD L.R. 7-9; see also *id.*, 7-10.   The court concludes, therefore, that this objection also does not raise a serious concern regarding the fairness of the settlement.[138]

Frank Gumbinger, a member of the class who received notice of the settlement, but did not object or file a notice of intention to appear, was present at the hearing, and asked to be heard. Because Gumbinger failed to file a timely objection and notice of intention to appear, he was not permitted under the terms of the preliminary approval to be heard.   Because the parties had some opportunity to respond to his comments, however, the court will consider Gumbinger's objections. Gumbinger first argued that notice to the class was insufficient.   This argument appeared to concern the fact that he was at his local Honda dealer in August, and the dealer did not mention the settlement to him although he owned a class vehicle.   The court addressed the class notice above, and found that it was adequate.   While posting a bulletin or otherwise notifying all class members who brought their vehicles to a Honda dealer during the claims period was another possible way in which class members could have been notified, it would not have been sufficient, in and of itself, to ensure adequate notice, because many class members might not have gone to

---

[138]Cox also argued that the notice plan approved by the court does not meet the requirements of Rule 23(c)(2)(B) because it was not the best notice practicable under the circumstances. (Thomas Cox Objection at 2.)   The court has already found that the notice plan satisfied the requirements of Rule 23.   For the reasons stated *supra*, the court concludes that this aspect of Cox's objection does not raise serious concerns regarding the fairness of the settlement. Finally, Cox asserts that the attorneys' fees request is unreasonable. (*Id.* at 5-6.)   Objector Erin Vitus agrees, arguing that the lawsuit is frivolous and will inordinately benefit class counsel. (Response, Exh. 35 (Erin Vitus Objection).)   The court addresses these objections *infra*.

the dealer during the claims period.  Others might not have noticed a posted bulletin.  Requiring Honda dealers orally to advise class members, moreover, would have required that the parties and court rely on entities and individuals who are not parties to this litigation, and whose actions would have been difficult, if not impossible, to police.  As mentioned, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action."  *Mullane*, 339 U.S. at 314.  The court does not believe that posting bulletins at all Honda dealerships or having Honda issue a directive to all Honda dealers requiring that they orally advise owners of class vehicles of the settlement would have been more likely to apprise the class of the action and the proposed settlement than mailing all class members a notice.  Indeed, Gumbinger acknowledged that he had received the mailing and had probably not read it fully.

Gumbinger's second objection appeared to be that the tire reimbursement schedule did not provide a fair outcome for class members.  He asserted that he had purchased three or four sets of tires, but under the schedule, was not eligible to receive any reimbursement.  The court has already addressed this concern above.  Gumbinger's final argument was that the class notice was deceptive  because it stated that class members did not need to complete a claims form to receive a control arms replacement at a Honda dealership.  The class notice clearly communicated that class members seeking reimbursement for tires or prior control arm replacements were required to complete and submit a claims form.[139]  It also clearly stated that class members who wished to obtain a control arm replacement did not have to complete a claims form, but had to bring their vehicle to a Honda dealer, have the dealer inspect the vehicle for reimbursable tire wear or show proof of payment establishing reimbursable tire wear.[140]  The notice was therefore not deceptive.  For these reasons, and reasons already stated in prior sections of this order, the court concludes that Gumbinger's objections do not raise serious concerns regarding the fairness of the settlement.

Having considered the merits of the objections and the small number of objectors, the court determines that class counsel have met their burden of showing that the terms of the settlement

---

[139]Caddell Decl., Exh. D (Settlement Agreement, ¶¶ 4.2(b), 4.3).

[140]*Id.*, Exh. 3 (Class Notice at 3).

agreement are fair.  Comparing the extremely low number of opt-outs and objections with the significantly higher number of class members who have already obtained control arm replacements – 35,883 – or submitted a reimbursement claim – 14,340 – it is clear that the vast majority of class members favor the settlement and believe its terms are fair.[141]  See *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) ("The court had discretion to find a favorable reaction to the settlement among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four [.014 percent] submitted objections").  For the reasons stated, therefore, this factor weighs strongly in favor of approving the settlement.

### i.    Other Factors

As noted, the *Young* court considered two additional factors: the process by which settlement was achieved and the involvement of the named plaintiffs in the process.  The parties here reached agreement after intensive arms-length negotiations facilitated by a neutral mediator.  The court therefore finds that the process by which the settlement was achieved weighs in favor of approving the settlement.

Class counsel do not provide particular information regarding the named plaintiffs' involvement in the settlement process beyond proffering statements by the plaintiffs that they reviewed the proposed settlement, discussed it with their attorneys, and agree with it.[142]  Keegan, for example, states that, "he ha[s] been informed about the terms of the proposed settlement," and that, "[a]fter reviewing and discussing the terms of the proposed settlement with [his] attorneys and considering the issues in the cases, [he has] concluded that the proposed settlement obtained on behalf of the Class is fair and reasonable to the Class members in light of the circumstances."[143]

---

[141]Amended Supp. Caddell Decl., ¶ 3.

[142]Caddell Decl., Exhs. 5 (Keegan Decl., ¶¶ 7-10); 6 (Garcia Decl. at 2); 7 (Ellis Decl., ¶¶ 8-10); 8 (Wright Decl., ¶¶ 7-8); 9 (Kolstad Decl., ¶¶ 8-10); 10 (Hinkle Decl., ¶¶ 8-10) 11 (Phillips Decl., ¶¶ 7-8); 12 (Hall Decl., ¶¶ 7-8).

[143]*Id.*, Exh. 5 (Keegan Decl., ¶¶ 7-10).

The court therefore lacks sufficient information concerning the named plaintiffs' involvement in the settlement process to determine whether this factor weighs in favor of approving the settlement.  The court therefore finds it neutral.

### j.    Signs of Collusion

The Ninth Circuit has explained that, in addition to evaluating the fairness of the settlement terms, the district court should be watchful for "subtle signs" that class counsel and the class representatives have permitted self-interest to trump their obligation to ensure a fair settlement for the class as a whole.  *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011).  In *Bluetooth*, the Ninth Circuit identified three possible signs of collusion:

"(1) when the settlement terms result in class counsel receiving a disproportionate share of the settlement, or when the class receives no monetary compensation but counsel receive an ample award of attorneys' fees;

(2) the presence of a clear sailing agreement that carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for . . . accepting an unfair settlement; and

3) when the parties arrange for fees not awarded to revert to defendants, rather than being paid into the class fund."  *Id.* (citations and quotation marks omitted).

The Ninth Circuit noted that this list is not exclusive, but felt it offered some guidance to lower courts regarding the type of provisions that require "greater scrutiny than ordinarily demanded" in assessing the overall fairness of the settlement.  *Id.* at 949.

The first and third signs of collusion are absent in this case.  First, the attorneys' fees sought are not nearly as disproportionate as was the fee award at issue in *In re Bluetooth*.  There, "the amount awarded was 83.2% of the total amount defendants were willing to spend to settle the case."  *Id.* at 945.  The agreement here specifies that defendants will not object to an attorneys' fees and costs award of $3,165,000 or less.[144]  As noted, plaintiffs estimate that the value of the control arm replacements Honda has and will perform will be at least $12.08

---

[144]Caddell Decl., Exh. D (Settlement Agreement, ¶ 12.2).

million.[145]  This figure does not include the value of any expense reimbursements class members may receive – either for control arm replacements or the purchase of new tires.  Rather, it is based on class counsel's estimate that Honda will perform 40,000 control arm replacements before the end of the claims period, approximately double the number it had performed as of September 6, 2013, when they filed the motion for final approval of the settlement.[146]  Assuming the value of the settlement is $12.08 million, class counsel's requested fee of $2,865,413.47 represents 23.18% of the total value while the negotiated $3,165,000 cap equals 26.20%.

Because predictions about Honda's future liability under the terms of the settlement are admittedly uncertain, however, it is also helpful to compare the amount of attorneys' fees sought to the value of the control arm replacements Honda has already performed, and the projected value of the reimbursement requests it has received.  As of November 19, 2013, Honda had performed 35,883 control arm replacements for class members, with a total estimated value of $10,836,666.[147]  By the same date, Honda had also received 14,340 claims requesting reimbursement.[148]  Assuming, based on results to date, that Honda will deny 67.75% of these requests due to inadequate documentation, and that the average reimbursement is $243.52,[149] Honda either has paid or will be obligated to pay an additional $1,039,343.36 in settlement of class member claims.  Thus, the estimated value of the settlement as of November 19, 2013 is $11,876,009.36.  Class counsel's requested fee of $2,865,413.47 is 24.13% of this amount, while the negotiated $3,165,000 cap – which includes both fees and costs – is 26.65%.

Thus, at a maximum, the attorneys' fees and costs requested will equal approximately 26.65% of the settlement amount.  Particularly because this amount includes reimbursable out-of-

---

[145]Motion at 23 n. 9.

[146]*Id.*; Caddell Decl., ¶ 38.

[147]Amended Supp. Caddell Decl., ¶ 3.

[148]Tabor Response Decl., ¶ 5.

[149]Amended Supp. Caddell Decl., ¶ 3.

pocket costs, the court cannot say that it is unreasonable.  Moreover, while the number of additional control arm replacements performed and additional claims for reimbursement received may not double those already processed or being processed, it is likely that there will be at least some additional claims before the close of the claims period, which will increase the amount of money Honda is required to pay to class members, and decrease the percentage ratio of fees to settlement value.  Consequently, the court does not believe that the fees counsel seek are disproportionate to the benefit class members will receive.

The attorneys' fees, moreover, will not reduce the settlement amount available to class members.  For this reason as well, the settlement does not present a situation in which the fee award is so disproportionate to the class's recovery that it suggests collusion.  Compare *Harris v. Vector Marketing Corp.*, No. C–08–5198 EMC, 2011 WL 4831157, *6 (N.D. Cal. Oct. 12, 2011) (rejecting a class settlement pursuant to which "class counsel [sought] an unopposed award roughly four times greater than the actual and expected payout to the class (approximately \$4 million compared to approximately \$1 million").   Moreover, as there is no cap on Honda' s liability and Honda will perform control arm replacements and provide reimbursements to eligible class members throughout the claims period, the settlement agreement does not contain a reversion provision.  Consequently, the third sign of collusion is also absent.

The second of the signs of collusion noted in *Bluetooth* is present, however: the parties' settlement agreement contains an explicit "clear sailing" provision.[150]  "In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling."  *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 n. 1 (1st Cir. 1991) The parties' agreement states:

> "Class Counsel may apply to the Court for an award of reasonable attorneys' fees and expenses, not to exceed the total sum of \$3,165,000.  Honda will not oppose Class Counsel's application for attorneys' fees and expenses not exceeding the total

---

[150]Caddell Decl., Exh. D (Settlement Agreement, ¶ 12.2).

1    combined sum of $3,165,000."[151]

2    Clear sailing provisions are troubling on several levels.  "[T]he very existence of a clear

3    sailing provision increases the likelihood that class counsel will have bargained away something

4    of value to the class."  *In re Bluetooth*, 654 F.3d at 948 (citation omitted)*; see also Malchman v.*

5    *Davis*, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J., concurring) ("It is unlikely that a

6    defendant will gratuitously accede to the plaintiffs' request for a 'clear sailing' clause without

7    obtaining something in return.  That something will normally be at the expense of the plaintiff

8    class"), abrogated on other grounds in *Amchem*, 521 U.S. at 619.  "Such a clause deprives the

9    court of the advantages of the adversary process.  The source of the proposed payment renders

10   it improbable that class members will come forward to challenge the reasonableness of the

11   requested fee.  Meanwhile, the payor is bound by contract not to contest the application."

12   *Weinberger*, 925 F.2d at 525.

13   Here, despite the clear sailing provision, the class stands to receive a large and fair

14   monetary award.  As the Ninth Circuit has noted, moreover, the inference of collusion drawn

15   from a clear sailing provision is reduced when the agreement lacks a reversionary or "kicker

16   provision."  *In re Bluetooth*, 654 F.3d at 949 ("For this same reason, a kicker arrangement

17   reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger of

18   collusion already suggested by a clear sailing provision. . . .  The clear sailing provision reveals

19   the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit

20   if class counsel negotiates too much for its fees").  The absence of a "kicker provision" in the

21   parties' settlement reduces the likelihood that plaintiffs and Honda colluded to confer benefits on

22   each other at the expense of class members.  The fact that the parties agreed to the class relief

23   prior to negotiating attorneys' fees and costs also lessens the likelihood that class counsel

24   bargained away class members' rights in order to increase their own fee award.

25   While clear sailing agreements must be scrutinized to ensure that they do not result in

26   unfair awards of attorneys' fees, see *Weinberger*, 925 F.2d at 523 ("[T]he approval function has

27   _____

28   [151]*Id.*

39

routinely been extended to embrace fees, whether or not pre-negotiated, in those cases where the plaintiffs' attorneys are to be paid out of a common fund (and where, consequently, there is an inherent tension between the interests of the class and the interests of the lawyers)"), the court concludes that the provision at issue here does not raise an inference of collusion that warrants invalidation of the class settlement as a whole.  Rather, the court considers the nature of the attorneys' fees provision in evaluating the reasonableness of the fee award sought, so as to ensure that class members are afforded adequate relief, and that the fees their lawyers receive are proportionate to the value of the classes' recovery.

### k.    Balancing the Factors

"Ultimately, the district court's determination [concerning the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted).  "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation." *Id.*  Having considered the relevant factors, the court concludes that the circumstances surrounding the settlement weigh in favor of a finding that it is fair and adequate.  Additionally, all required criteria for class certification remain satisfied since the court provisionally certified the settlement class and subclass on April 11, 2013.  The court accordingly certifies the settlement class and subclass, and approves the settlement.

### B.    Motion for Attorneys' Fees, Costs, and Incentive Awards

The court now turns to class counsel's motion for fees, costs, and incentive payments.  The procedure for requesting attorneys' fees is set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure.  While the rule specifies that requests shall be made by motion "unless the substantive law governing the action provides for the recovery of . . . fees as an element of damages to be proved at trial," the rule does not itself authorize the awarding of fees.  "Rather, [Rule 54(d)(2)] and the accompanying advisory committee comment recognize that there must be another source of authority for such an award . . . [in order to] give[ ] effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing

such an award." *MRO Communications, Inc. v. AT&T*, 197 F.3d 1276, 1281 (9th Cir. 1999).

In class actions, statutory provisions and the common fund exception to the "American Rule" provide the authority for awarding attorneys' fees.[152]   See Alba Conte and Herbert B. Newberg, NEWBERG ON CLASS ACTIONS, § 14.1 (4th ed. 2005) ("Two significant exceptions [to the "American Rule"] are statutory fee-shifting provisions and the equitable common-fund doctrine").   Rule 23(h) authorizes a court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED.R.CIV.PROC. 23(h).   Under normal circumstances, once it is established that a party is entitled to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'"[153] *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).   The parties' settlement agreement provides that the court may approve, and Honda will not oppose, an award of attorneys' fees and expenses of as much as $3,165,000.[154] It further provides for the payment of incentive awards to plaintiffs of as much as $35,000.[155]

### 1.   Attorneys' Fees

Courts calculate attorneys' fees using either the lodestar or percentage-of-the-fund method. In a lodestar analysis, the court multiplies the number of hours reasonably expended by counsel on the matter by a reasonable hourly rate and adjusts the result upward or downward depending on a variety of factors.   In a percentage-of-the-fund analysis, the court awards a percentage of the class recovery as fees.   See *State of Florida v. Dunne*, 915 F.2d 542, 545 n. 3 (9th Cir. 1990). "Though courts have discretion to choose which calculation method they use, their discretion must

---

[152]The common fund exception recognizes that attorneys' fees can be collected from a fund preserved, protected, collected or realized by attorneys' efforts on behalf of the class of persons benefitted by or entitled to the fund.   See 38 A.L.R.3d 1384, § 4(a) & (b).

[153]At the hearing, class counsel urged the court to increase the amount of their fees award because, *inter alia*, the issue of fees had been "hotly contested" between the parties during settlement negotiations.   The fact that parties agreed on a fee award they believe is fair does not relieve the court of its obligation, on behalf of absent class members, to ensure that the requested fees are reasonable.

[154]Caddell Decl., Exh. D (Settlement Agreement, ¶ 12.2).

[155]*Id.*, ¶ 4.4.

be exercised so as to achieve a reasonable result." *In re Bluetooth*, 654 F.3d at 942 (citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997).  As respects selection of the lodestar or percentage-of-the-fund method, the Ninth Circuit has observed:

> "Despite the recent ground swell of support for mandating a percentage-of-the-fund approach in common fund cases, . . . we require only that fee awards in common fund cases be reasonable under the circumstances.  Accordingly, either the lodestar or the percentage-of-the-fund approach 'may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund.'" *Dunne*, 915 F.2d at545 (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

In cases where courts apply the percentage method to calculate fees, they should use a rough calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award.  See *In re Bluetooth*, 654 F.3d at 943 (encouraging "comparison between the lodestar amount and a reasonable percentage award"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award").  By the same token, "a court applying the lodestar method to determine attorney's fees may use the percentage-of-the-fund analysis as a cross-check." *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, *5 (W.D. Wash. Apr. 24, 2008) (citing *Wing v. Asarco Inc.*, 114 F.3d 986, 988-90 (9th Cir. 1994)).   "The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992).  This is particularly true here, where, as noted, the parties have entered into a clear sailing agreement.

Class counsel ask that the court use the lodestar method because there is no capped

common fund in this case.[156]  The court concludes that using this method of calculating fees is appropriate under the circumstances.  See *Hanlon*, 150 F.3d at 1029 (affirming the district court's choice of the lodestar method where calculation of the common fund was uncertain); *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-cv-05437, 2008 WL 1901988, *1 (W.D. Wash. Apr. 24, 2008) ("Where, as here, Settlement relief will be paid on a claims made basis with no cap to the relief available, consideration of attorneys' fees lends itself more readily to the lodestar method.  Because the attorneys' fees will be paid separately by [defendant] without reducing the relief available to the Class, the lodestar method is appropriate").

### a.    Whether Class Counsel's Attorneys' Fees Request Is Reasonable

The lodestar figure is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.  The lodestar "presumptively provides an accurate measure of reasonable attorney's fees."  See *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994); *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986).  A court may increase or decrease the lodestar amount in rare or exceptional cases.  See *Blum v. Stenson*, 465 U.S. 886, 898-901 (1984); *Harris*, 24 F.3d at 18; *Clark*, 803 F.2d at 990-91.  As the court explained in *In re Bluetooth*:

> "The court may adjust [the lodestar] upward or downward by an appropriate positive or negative multiplier reflecting a host of reasonableness factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.  Foremost among these considerations, however, is the benefit obtained for the class.  Thus, where the plaintiff has achieved only limited success, counting all hours expended on the litigation – even those reasonably spent – may produce an excessive amount, and the Supreme Court has instructed district courts to instead award only that amount of fees that is reasonable in relation to the results obtained."  *In re Bluetooth*, 654 F.3d at 941-42.

---

[156]Motion at 18-19.

Class counsel argued in their motion that their lodestar was $3,944,163.00, and noted that they had "agreed . . . unilaterally [to] reduce [it] by 20% to $3,155,330."[157] Class counsel stated that they had further reduced the lodestar by applying an "inverse multiplier" of 0.91, for a total of $2,865,413.47.[158] After the hearing, class counsel submitted evidence that they had expended additional time subsequent to the filing of the motion for attorneys' fees, which added $132,387.50 to the lodestar, for a total of $4,076,550.50.[159] Counsel also seek reimbursement of $299,586.53 in expenses.[160] In a post-hearing supplement, class counsel submitted evidence that they had incurred an additional $3,610.61 in expenses following the filing of the motion for attorneys' fees, for total reimbursable expenses of $303,197.14.[161]

### i. Reasonableness of Counsel's Hourly Rates

To assist the court in calculating the lodestar, a plaintiff must submit "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895-96 n. 11. The relevant community is that in which the district court sits. See *Schwartz v. Sec'y of Health and Human Serv.*, 73 F.3d 895, 906 (9th Cir. 1995). Declarations regarding the prevailing market rate in the relevant community suffice to establish a reasonable hourly rate. See *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir. 1996) (noting that declarations from attorneys in the community can provide adequate proof of the reasonableness of counsel's rates). See also *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1215 (9th Cir. 2003) (discussing the affidavit of "an attorney practicing in the same region as Earthquake's attorneys," which

---

[157]Motion at 22.

[158]*Id*. at 2.

[159]Supp. Caddell Decl., ¶ 6.

[160]Motion at 24.

[161]Supp. Caddell Decl., ¶ 4.

44

opined that "Earthquake's attorney rates were reasonable and customary"). Courts can also use survey data to evaluate the reasonableness of attorneys' rates. See *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) ("The parties presented two surveys of hourly rates, one reporting fees received by seven Twin Cities class action firms and the other reporting fees received by sixty-two firms doing a variety of work around the state. The court set individual hourly rates at the median of the class action survey and near the upper limit of the statewide survey, also taking into account the number of years an attorney had been admitted to practice"); *American Petroleum Inst. v. United States EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("Petitioners have provided support for the reasonableness of their rates through affidavits and a survey of rates and we hold that these rates are reasonable"); *Martin v. University of South Alabama*, 911 F.2d 604, 607 (11th Cir. 1990) ("Based on the testimony and survey produced by plaintiffs the reasonable non-contingent hourly rate for civil rights lawyers in the relevant market (Alabama) was found to be $135 to $150 per hour for senior counsel and $105 to $115 per hour for junior counsel").

In calculating the lodestar, courts typically exclude time spent on clerical or ministerial tasks because such tasks are properly considered part of an attorney's overhead and are reflected in his or her hourly rate. See *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who performs them"). Where support staff do substantive case-related work, however, fees for such work are recoverable. *Id.* at 285 ("Clearly, a 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of an attorney. Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client"); *Earthquake Sound Corp.*, 352 F.3d at 1214-15 (affirming a lodestar-based fee award that included work performed by attorneys, paralegals, and clerks); *Grays Harbor Adventist Christian Sch.*, 2008 WL 1901988 at *5 (accepting class counsel's lodestar calculation, which included fees for support staff, and noting that "if [the] recoverable lodestar were limited to attorney time, law firms would

be inclined to assign low-level work to attorneys rather than legal support staff.  The Ninth Circuit discourages such an inefficient result by recognizing the contributions of attorneys and non-attorneys").

Twenty-one attorneys working at four different law firms located in Houston, Texas, Roseland, New Jersey, and Woodland Hills and Los Angeles, California, represented the class in this case.  They seek to have the court calculate fees using the following rates for attorneys and paralegals at Caddell & Chapman:[162] $875 per hour for senior partner Michael A. Caddell (graduate of the University of Virginia Law School with 34 years of experience); $675 per hour for senior partner Cynthia B. Chapman (cum laude graduate of the University of San Diego School of Law with 21 years of experience); $650 per hour for senior partner Cory S. Fein (honors graduate of the University of Texas Law School with18 years of experience); $500 per hour for senior associate Dana B. Levy (graduate of the University of San Diego School of Law with 12 years of experience); $450 per hour for senior associates Amy E. Tabor (high honors graduate of University of Texas Law School with 10 years of experience) and Aron L. Gregg (13 years of experience); $425 per hour for senior associate Craig C. Marchiando (cum laude graduate of South Texas College of Law with 9 years of experience); $370 per hour for junior associate Clayton A. Morton (7 years of experience); $250 per hour for paralegals Kathy E. Kersh (26 years of experience), John C. Dessalet (20 years of experience), and Sylvia Z. Vargas (28 years of experience); and $175 per hour for paralegal Felicia D. Labbe (15 years of experience).[163]

Plaintiffs request that the court use the following rates for work performed by attorneys and paralegals at Mazie Slater Katz & Freeman, LLC: $825 per hour for partner David A. Mazie (1986 graduate of the George Washington University School of Law); $675 per hour for partner Eric D. Katz (1991 graduate of Pace Law School); $525 per hour for partner Matthew R. Mendelsohn (2005 graduate of Seton Hall School of Law); and $325 per hour for associates

---

[162]Where class counsel identified the law school from which they graduated and the number of years they had been in practice, or where the court was able to determine this information from a state bar website or firm website, it has noted the information in parenthesis.

[163]Caddell Decl., ¶ 47.

Cheryll Calderon (2006 graduate of Seton Hall School of Law) and John Gagnon.[164]

Plaintiffs ask that the court find the following rates reasonable for work performed by attorneys at Strategic Legal Practices, APC: $570 per hour for partner Payam Shahian (2003 graduate of the University of California, Hastings College of the Law); $520 per hour for senior counsel Gregory Yu (2003 graduate of the University of Southern California School of Law); and $325 per hour for associates Ramtin Shahian (2010 graduate of Southwestern Law School) and Christopher Swanson (2011 graduate of the University of California, Los Angeles School of Law).[165]

Finally, they request that the court utilize the following rates for work performed by attorneys and paralegals at The Law Office of Robert L. Starr: $675 per hour for partner Robert Starr (1995 graduate of Pepperdine University School of Law), $595 per hour for attorney Adam Rose (13 years of experience), $545 per hour for attorney Dara Tabesh (9 years of experience), $350 per hour for attorney Luis Duenas (3 years of experience), $225 per hour for paralegal Ben Hill III, $195 per hour for paralegal Gordon Wong, and $125 per hour for paralegals Robinson Rojas and Zandra Mora.[166]

Thus, class counsel request hourly rates for partners ranging from $570 (for a partner with ten years of experience) to $875 (for a partner with 34 years of experience). They request hourly rates for associates ranging from $325 (for an associate with two years of experience) to $595 (for an associate with 13 years of experience). And they request hourly rates for paralegals ranging from $125 to $250.

As evidence that these rates are reasonable, class counsel proffer evidence regarding the

---

[164]Declaration of Matthew R. Mendelsohn in Support of Award of Attorney's Fees and Reimbursement of Expenses ("Mendelsohn Decl."), Docket No. 165-7 (Sept. 9, 2013), ¶ 6.

[165]Declaration of Payam Shahian in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Shahian Decl."), Docket No. 165-12 (Sept. 9, 2013), ¶ 11.

[166]Declaration of Robert L. Starr in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Starr Decl."), Docket No. 165-13 (Sept. 9, 2013), Exh. A (Lodestar Chart for Law Office of Robert L. Starr).

attorneys' range of litigation and class action experience, and the experience of the law firms at which they work. Caddell, for example, states that Caddell & Chapman's current docket includes 30 national and state class action lawsuits against, *inter alia*, Nissan, Honda, and Volvo, that the firm is lead counsel in many of these cases, and that it has obtained recoveries in more than sixty cases valued at $1 million or higher since 1996.[167] Mendelsohn states that Mazie Slater won the largest personal injury verdict in New Jersey history, and identifies a number of class actions against car manufacturers in which the firm is, or has been, class counsel.[168] Shahian states that he was a lead attorney in *Mazza v. Am. Honda Motor Co., Inc.*, 254 F.R.D. 610 (2008), rev'd, 666 F.3d 581 (9th Cir. 2012); although the district court's decision was later overturned by the Ninth Circuit, Shahian states that this was one of the first cases in which a court certified UCL and CLRA claims on behalf of a nationwide class. He also identifies a number of class action suits in which he helped achieve final approval of a class settlement.[169] For his part, Starr states that he has been class counsel in a number of consumer class action lawsuits involving automobiles; defendants have included Volkswagen, Mercedes-Benz, and BMW.[170]

Class counsel also adduce evidence that courts have found their rates reasonable in recent cases in this district and in other parts of the country as well.[171] Finally, they cite cases awarding comparable fees to plaintiffs' attorneys in this district, as well as surveys of rates charged by

---

[167]Caddell Decl., ¶¶ 10-11, 18.

[168]Mendelsohn Decl., ¶ 2, Exh. A (Firm Resume at 4 (listing cases against Nissan, BMW, Honda, Volkswagen, and Volvo in which the firm has been appointed class counsel)).

[169]Shahian Decl., ¶¶ 7, 9.

[170]Starr Decl., ¶ 3.

[171]See Caddell Decl., ¶¶ 47-48 (stating that the requested rates were recently found to be reasonable and approved by district and state courts in Texas, Nevada, Georgia, and California); Mendelsohn Decl., ¶ 6 (stating that the requested rates were recently found to be reasonable and approved by district courts in New Jersey and New York); Shahian Decl., ¶¶ 17-18 (stating that the requested rates were found to be reasonable and approved by federal and state courts in the Central District of California); Starr Decl., ¶¶ 7, 9 (stating that the requested rates were found to be reasonable and approved in other cases in the Central District of California).

attorneys at law firms throughout the country.[172]   While comparing, as class counsel do, their hourly rates with the $1,095 per hour rate of the top-billing partner at Skadden, Arps, Slate, Meagher & Flom LLP, which is one of the largest and most well-known national firms in the country,[173] is not particularly persuasive, the court concludes that other evidence adduced by class counsel adequately establishes that their requested rates are reasonable.   Class counsel have many years of experience in consumer class action litigation involving automobiles, products liability, and the specific causes of action asserted in this case.   Based on the court's general knowledge of rates in the Los Angeles legal community, moreover, it believes the rates are reasonable. Accordingly, the court determines that the hourly rates requested for both the partners and associates in this case are reasonable.   See *Kearney v. Hyundai Motor Vehicle*, No. SACV 09–1298–JST (MLGx), 2013 WL 3287996, *8 (C.D. Cal. June 28, 2013) (approving hourly rates between $650 and $800 for class counsel in a class action alleging claims under the CLRA, UCL, Business & Professions Code, and express and implied warranty laws); *Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160, 1172 (C.D. Cal. 2010) (approving hourly rates of between $445 and $675 for class counsel in a class action alleging CLRA, unfair business practices, and breach of warranty claims); see also *POM Wonderful, LLC v. Purely Juice, Inc.,* No. CV 07-2633, 2008 WL 4351842, *4 (C.D. Cal. Sept. 22, 2008) (finding rates of $475 to $750 for partners and $275 to $425 for associates reasonable).

By contrast, class counsel have proffered little evidence that rates of $125 to $250 per hour for paralegals are reasonable.   Caddell lists the number of years of experience of the paralegals in his firm that worked on the case: he states that Kathy Kersh has 26 years of experience, John Dessalet 20 years, Synthia Vargas 28 years, and Felicia Labbe 15 years.[174]   He also cites several

---

[172]Motion at 19; Caddell Decl., ¶¶ 48-49; Mendelsohn Decl., ¶ 6; Shahian Decl., ¶¶ 15-18, Exh. B (National Law Journal Sampling of Law Firm Billing Rates); Starr Decl., ¶¶ 6-9.

[173]See Motion at 19-20.

[174]Caddell Decl., ¶ 47 (Lodestar Chart).

cases from other districts approving the requested rates for Kersh and Dessalet.[175]  Four paralegals from the Law Office of Robert L. Starr also worked on this case.  Counsel provide no information concerning the experience of any of these paralegals or any other information that would show that the requested rates are reasonable.

When a fee applicant fails to meet his or her burden of establishing the reasonableness of the requested rates, the court may exercise its discretion to determine reasonable hourly rates based on its experience and knowledge of prevailing rates in the community.  See, e.g., *Plan Administrator v. Kienast*, No. 2:06-cv-1529, 2008 WL 1981637, *4 (W.D. Pa. May 2, 2008) ("If a party fails to meet its burden to demonstrate a prima facie case that the requested rates were the prevailing rates in the community, 'the district court must exercise its discretion in fixing a reasonable hourly rate,'" quoting *Washington v. Philadelphia Court of Common Pleas*, 89 F.3d 1031, 1036 (3d Cir. 1996)); *Moreno v. Empire City Subway Co.*, No. CV 05-7768 (LMM) (HBP), 2008 WL 793605, *7 (S.D.N.Y. Mar. 26, 2008) (where the fee applicant "has submitted no evidence of the prevailing market rate for attorneys of like skill litigating cases similar to plaintiff's . . . it is within [the court's] discretion to determine the reasonable hourly rate at which plaintiff[']s counsel should be compensated based on [the court's] familiarity with plaintiff's case and the prevailing rates in the [relevant community]"); *Shephard v. Dorsa*, No. CV 95-8748 ER (JGx), 1998 WL 1799018, *2 (C.D. Cal. July 2, 1998) (determining a reasonable hourly rate based on "(1) the Court's own experience in considering the prevailing market rates in Los Angeles, (2) other fee awards in the relevant market, and (3) ALTMAN WEIL, PENSA, SURVEY OF LAW FIRM ECONOMICS (1996)" in a case where the fee applicant failed to establish the reasonableness of the lawyer's hourly rate).

Based on its knowledge of the prevailing rates within the Central District of California, the court finds the requested paralegal rates reasonable.  See *Craft v. County of San Bernardino*, 624 F.Supp.2d 1113, 1122 (C.D. Cal. 2008) (finding a $225 rate reasonable for paralegals); *Vasquez*, 2011 WL 3320482 at *2 (finding $210 and $200 rates reasonable for paralegals); *Jones v. Corbis*

---

[175]*Id.*, ¶ 49.

*Corp.*, CV 10–8668 SVW, 2011 WL 4526084, *4 (C.D. Cal. Aug. 24, 2011) (finding a paralegal rate of $243 reasonable), aff'd, 489 Fed. Appx. 155, 157 (9th Cir. July 16, 2012) (Unpub. Disp.); *Bernal v. Paradigm Talent & Literary Agency*, 1:09–CV–00463–OWW–SKO, 2010 WL 6397561, *5, 7 (C.D. Cal. June 1, 2010) (finding a paralegal rate of $225 reasonable); *L.A. Printex Indus., Inc. v. William Carter Co.*, No. CV 09–2449-JFW (FMOx), 2010 WL 4916634 *2-3 (C.D. Cal. Dec. 1, 2010) (using paralegal rates of $229.50 and $202.50 to calculate fees); *B–K Lighting, Inc. v. Vision3 Lighting*, CV 06–02825 MMM (PLAx), 2009 WL 3838264, *7 (C.D. Cal. Nov. 16, 2009) (finding paralegal rates between $220 and $245 reasonable); *Love* v. *The Mail on Sunday*, No. CV05-7798 ABC (PJWx), 2007 WL 2709975, *8 (C.D. Cal. Sept. 7, 2007) (finding paralegal rates of $245, $230 and $220 reasonable).

### ii.    Reasonableness of the Hours Expended

A court may award attorneys' fees only for the number of hours it concludes were reasonably expended on the litigation. *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary"). "[T]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of th[e] hours worked. . . .'" *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992)); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F.Supp. 865, 870 (E.D. Cal. 1988) ("The cases do not indicate that every minute of an attorney's time must be documented; they do, however, require that there be adequate description of how the time was spent, whether it be on research or some other aspect of the litigation. . .").

In their motion, class counsel reported that they had spent 6,407.1 attorney hours and 903 paralegal hours on the case since its inception in 2010.[176]  Subsequent to the filing of the fees

---

[176]Caddell Decl., Exh. B (Time and Lodestar Chart, showing 2,330.8 attorney hours and 337.8 paralegal hours); Mendelsohn Decl., ¶ 6 (Lodestar Chart showing 1,169.8 attorney hours); Shahian Decl., ¶ 11 (Lodestar Chart showing 1,619.7 attorney hours); Starr Decl., Exh. A

motion, these totals increased to 6,615.2 attorney hours and 940.2 paralegal hours.[177] They assert that they performed an enormous amount of work to achieve success in this case, which they describe as a complex, nationwide class action.[178] Citing the extensive discovery, use of experts, and motion practice in which they engaged, class counsel contend that the number of hours expended are reasonable.[179]  The court cannot agree.

Although a fee applicant "is not required to record in great detail how each minute of [his] time was expended . . . [he must] list[ ] [the] hours and identify[ ] the general subject matter of [the] time expenditures." *Gucci Am., Inc. v. Pieta*, No. CV 04-9626 ABC (Mcx), 2006 WL 4725707, *2 (C.D. Cal. July 17, 2006) (quotation omitted).  Class counsel have provided time records in support of their request for attorneys' fees, which list the hours and general subject matter of their time expenditures.[180]  They state that they billed all time in increments of one-tenth of an hour.[181]

The court has reviewed the time records submitted and finds they reflect an excessive number of hours.  First, while it appears that higher-rate partners generally spent fewer hours on projects than lower-rate partners and associates, the total number of hours billed by all attorneys for various tasks was excessive.  The class certification motion is an example.  The time charts

_____

(Lodestar Chart showing 1,286.8 attorney hours and 565.2 paralegal hours).

[177]See Supp. Caddell Decl., ¶ 6.  Caddell states that the additional hours included time spent "preparing for and attending the final approval hearing and answering questions from Class members." (*Id.*)

[178]Motion at 20.

[179]*Id.*

[180]Caddell Decl., Exhs. A (Chart detailing categories of work and tasks performed within each category), B (Lodestar Chart); Mendelsohn Decl., Exhs. B (Chart detailing categories of work and tasks performed within each category), C (Lodestar Chart); Shahian Decl., ¶ 11 (Lodestar Chart), Exh. A (Chart detailing categories of work and tasks performed within each category); Starr Decl., Exh. A (Lodestar Chart and chart detailing categories of work and tasks performed within each category).

[181]Caddell Decl., ¶ 44.

submitted by counsel show that Chapman took lead responsibility for the class certification motion in her office, and billed 174.9 hours to the task. Caddell, whose hourly rate is higher, billed 67.4 hours for the motion. Mendelsohn took responsibility for the motion in his office, billing 154.4 hours, while the higher-rate Mazie Slater partners spent 13.3 and 15 hours on the project. Payam Shahian took responsibility for the motion in his office, billing 295.3 hours, while Yu recorded 72.2 hours and Ramtin Shahian 31.3 hours. Tabesh took responsibility for the motion at the Law Offices of Robert L. Starr, billing 105 hours, while Starr, whose billing rate is higher, recorded 15.8 hours, In many respects, the class certification motion was straightforward. While questions of predominance and superiority posed some challenge, and while the motion raised the issue of whether a class of individuals residing in different states could be certified, which necessitated a choice-of-law analysis, and the submission, at the court's request, of a 16-page supplemental brief reviewing the consumer protection laws of California, New York, Florida, and North Carolina, these issues at most required a small increase in the amount of time expended. The class certification motion was only 25 pages in length, and given counsel's reported class action experience, the legal issues simply could not have been so challenging that drafting the brief required 944.6 hours of work.[182] This is the equivalent of one attorney billing eight hours a day, five days a week for almost six months. It is also the equivalent of 23.04 hours and a $12,282.10 per page. Billing this number of hours, and fees of $503,952.07, for a single motion is unreasonable.[183]

---

[182]Motion for Class Certification, Docket No. 78 (Nov. 22, 2011).

[183]The time charts reveal that class counsel divided responsibility for the motion to dismiss and Honda's petition for interlocutory review in a similar fashion; by assigning primary responsibility for the motion to one attorney in each firm. Levy billed 125.6 hours on the motion to dismiss and Tabor billed 107.9 hours on the interlocutory appeal at Caddell & Chapman, while the higher-rate Caddell and Chapman billed 36.2 and 53 hours respectively on the motion to dismiss and 24.7 and 82 hours respectively on the interlocutory appeal. (Caddell Decl., Exh. B (Lodestar Chart).) At Mazie Slater, Mendelsohn billed 44.1 hours and 29.2 hours on the motion to dismiss and interlocutory appeal respectively, while higher-rate partners Mazie and Katz billed 9.9 and 9.4 hours on the motion to dismiss and 2.5 and 5.6 hours on the interlocutory appeal respectively. (Mendelsohn Decl., Exh. C (Lodestar Chart).) Payam Shahian billed 85.9 and

It appears that many of the unnecessary hours billed were a product of the fact that there were 21 attorneys and four law firms working on the case.  This staffing formula resulted in duplicative and excessive billing.  Class counsel contend that they divided responsibility among the firms to achieve efficiency and avoid duplication, with one firm assuming primary drafting responsibility for each pleading or portion of a pleading, and other team members "checking" each other's work.[184]  The court cannot agree.  In the case of the motion for class certification, opposition to the motion to dismiss, and opposition to the petition for interlocutory appeal, all four firms designated an attorney primarily responsible for the brief in their office.  Assuming this reflects the fact that the firms divided responsibility for sections of the briefs, it is simply not efficient – and inexorably leads to duplication – to have four co-authors of a pleading or legal document.  When, in addition, one or two other attorneys in each office were "checking" the work of the lawyer who was primarily responsible, the duplication and waste becomes obvious.  Although this was a nationwide class action involving a large class, the case was not so complex that it was necessary to have 21 attorneys at four different law firms working on it.  *Campon v. City of Blue Springs, Missouri*, 289 F.3d 546, 553 (8th Cir. 2002) ("In our view, it should not

122.7 hours on the motion to dismiss and interlocutory appeal respectively, while Yu and Shahian billed 72.2 and 31.3 hours respectively on the motion to dismiss and 60.5 and 15.4 hours on the interlocutory appeal respectively.  (Shahian Decl., ¶ 11 (Lodestar Chart).)  Finally, Tabesh billed 92 and 65 hours on the motion to dismiss and interlocutory appeal respectively, while Starr billed 12.8 and 4.9 hours on the motion to dismiss and interlocutory appeal respectively.  (Starr Decl., Exh. A (Lodestar Chart and chart detailing categories of work and tasks performed within each category).)  Once again, while generally more work was performed by lower-rate attorneys, the total hours expended on a project were unreasonable.  Counsel billed a total of 572.4 hours, or 22.9 hours per page, for preparation of their opposition to Honda's motion to dismiss.  They billed 520.4 hours to preparation of their opposition to the interlocutory appeal.  This amounts to $305,381.12 for the motion to dismiss, and $277,638.60 for the interlocutory appeal.  The court finds this number of hours unreasonable.  While it was necessary, in order to oppose  the motion to dismiss, to brief California, Florida, Idaho, and New York implied warranty and consumer fraud law, the motion was otherwise straightforward, and these aspects of plaintiffs' opposition comprised only two pages of their 25-page brief.  (Opposition to Motion to Dismiss, Docket No. 58 (Aug. 12, 2011), at 20-22.)  For these reasons, the court finds that it was excessive and unreasonable to bill more than 500 hours for preparation of plaintiffs' opposition to the motion.

[184]Motion at 21.

54

take four experienced, highly paid attorneys 480 hours to prepare one summary judgment motion and to prepare for and conduct a four-day trial when all pretrial discovery had been completed"). Duplicative billing is unreasonable, and duplicative fees cannot be recovered.  See *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("The court may reduce the number of hours awarded because the lawyer performed unnecessarily duplicative work").

Finally, the court notes that the general billing categories counsel identify, which are divided by the stage of proceedings or type of motion, encompass many discrete legal tasks.  This is a form of block billing, which makes it difficult for the court to determine how much time was actually spent on particular tasks.  Because, for example, counsel have block-billed all hours related to the motion for class certification, the court cannot determine how much time was spent researching, drafting, and reviewing "memoranda regarding class certification standards," how much was spent working with experts, and how much was spent drafting the motion and the supplemental brief.  It is within a court's discretion to reduce the number of requested hours where attorneys' block billing makes it difficult easily to identify the hours reasonably expended.  See *Neil v. Commissioner of Social Sec.*, 495 Fed. Appx. 845, 847 (9th Cir. Nov. 9, 2012) (Unpub. Disp.) (holding that it was not an abuse of discretion for the district court to reduce a fee request by ten percent to account for block billing, and citing *Hensley*, 461 U.S. at 437, and *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)).

At the hearing, class counsel argued that the court's analysis of the reasonableness of the requested fees only took into account the time they expended on motions, and did not consider other time-consuming work such as discovery and consultation with experts.  As an example, class counsel asserted that they had purchased three vehicles and had them driven for 12,000 miles to measure the effects of wear on the tires.  They also stated that they had hired experts and worked closely with them.  The block-billing methodology employed by class counsel, however, prevents close evaluation of these types of work or whether the time spent on them was reasonable.  The court cannot determine, for example, based on the time sheets submitted by counsel, how much time counsel spent "supply[ing] information and documents to experts; study[ing] expert reports; . . .[and] prepar[ing] for an attend[ing] expert depositions" versus myriad other types of activities

that fall within the general billing category "post-filing investigation and discovery."[185] For that reason, although the court is clearly aware that counsel spent significant time on discovery and expert consultation, it is unable to determine whether the amount of time recorded for such activities was reasonable.

### iii.    Calculation of the Lodestar Figure

For the reasons stated, the court concludes that the rates requested by class counsel are reasonable but that the total number of hours expended is not. Class counsel have reduced their calculated lodestar of $4,076,550.50 by 20% to alleviate any concerns the court may have concerning duplicative billing.[186] This brings the lodestar to $3,261,240.40. The court believes that the extent of excess and duplication, and the block billing in which counsel engaged, merit a larger reduction. It therefore reduces the lodestar by 30%, resulting in a fee award of $2,853,585.35.

### iv.    Whether the Court Should Adjust the Fee Award

Once the court has determined the lodestar, it is appropriate to consider the reasonableness of the sum, taking into account "'the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *In re Bluetooth*, 654 F.3d at 941-42 (quoting *Hanlon*, 150 F.3d at 1029). The court concludes, however, that the quality of the representation, the novelty of the issues presented, and the risk of nonpayment do not favor either an upward or downward departure from the lodestar figure. As the Ninth Circuit has made clear, the most important factor is the benefit obtained for the class. *Id.* at 942; see also *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir.2009) (the ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff"); see also *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d at 1046 ("The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award").

---

[185]See Caddell Decl., Exh. A (Chart Detailing General Categories and Tasks Performed)

[186]Caddell Decl., ¶ 51.

Class counsel assert that the settlement provides "an excellent result for the Class."[187]  The court agrees that the result is a positive one.  The free control arm replacements repair the alleged suspension defect; additionally, class members who paid for such a replacement themselves can seek reimbursement.  One of the primary forms of damage asserted by plaintiffs was the need to replace the tires on their class vehicles.  The settlement provides some compensation for these tire replacements.   Although class members will not receive monetary damages in addition to these types of relief, compromise is an inherent part of the settlement process, and this fact does not reflect a poor outcome.  Finally, it appears likely that many class members will benefit from the settlement, as Honda has already replaced 35,883 control arms and has received 14,340 claims for reimbursement in the four and one half months since Honda sent notice of the settlement to class members.

Moreover, class counsel filed a successful class certification motion and successfully opposed Honda's motion to dismiss and petition for interlocutory appeal.  See *In re Heritage Bond Litigation*, 02-ML-1475-DT (RCx), 2005 WL 1594389, *10 (C.D. Cal. June 10, 2005) (finding a fee representing 33% of the common fund appropriate in part because the case was "marked by extensive motion practice," including successful motions for class certification and partial summary judgment); compare *Lo v. Oxnard Euro. Motors, LLC*, No. 11CV1009 JLS (MDD), 2012 WL 1932283, *3 (S.D. Cal. May 29, 2012) (expressing concern "over awarding attorneys' fees in excess of twenty-five percent of the settlement fund given the short duration of the action and the fact that the complaint appears to be a boilerplate complaint that Plaintiff's counsel need only amend slightly in each case it files alleging a TCPA violation, of which there are many").  Given the factual and legal difficulties the class faced proving its claims – specifically the prospect of possible decertification of the class and certain of Honda's affirmative defenses – the court believes the settlement represents a significant recovery.  See *Vizcaino*, 290 F.3d at 1048 (a substantial risk that the class would not recover supported the district court's conclusion that the results achieved by class counsel were exceptional).  Because the settlement conferred a significant

---

[187]*Id*. at 11.

57

benefit on class members, the court declines to adjust the fee award downward.

### b.    The Percentage-of-the-Fund Crosscheck

As noted, because there is no cap on Honda's liability, the percentage-of-the-fund method is an imperfect method of calculating fees in this case. Nonetheless, the court finds it somewhat instructive to determine what percentage of the value of the class settlement the fees counsel seek represent. See *Grays Harbor Adventist Christian Sch.*, 2008 WL 1901988, *5 ("[A] court applying the lodestar method to determine attorney's fees may use the percentage-of-the-fund analysis as a cross-check," citing *Wing v. Asarco Inc.*, 114 F.3d 986, 988-90 (9th Cir. 1994)). As noted, the actual value of the settlement to class members as of November 19, 2013 is an estimated $11,876,009.36. Class counsel's requested fee of $2,865,413.47 represents 24.13% of this amount. This approximates, albeit is slightly lower, than the 25% benchmark set by the Ninth Circuit for awards calculated according to the percentage-of-the-fund method. See *Fischel v. Equitable Life Assurance Society of the United States*, 307 F.3d 997, 1006 (9th Cir. 2002); see also *Pincay Investments Co. v. Covad Communications Group*, 90 Fed. Appx. 510, 511-12 (9th Cir. Feb. 18, 2004) (Unpub. Disp.) ("This court has established twenty-five percent as a benchmark in percentage-of-the-fund cases that can be adjusted upward or downward to account for any unusual circumstances presented by a particular case"); *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that district courts should award in common fund cases"); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) ("The benchmark percentage should be adjusted, or replaced by a lodestar calculation, [however,] when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"). The court has concluded, however, that the award requested does not represent a reasonable fee because of the duplicative and excessive billing practices of counsel. The court therefore reduced fees by 30%. The resulting fee of $2,853,585.35 is 24.03% of the estimated current value of the settlement. Assuming that some additional claims are received before the end of the class period, this percentage will be reduced further. The percentage-of-the-fund cross-check, therefore, reveals that the determined fee is appropriate.

### c.      Conclusion Regarding Attorneys' Fees

For all the reasons stated, the court awards attorneys' fees of $2,853,585.35.

### 2.      Whether Counsel's Request for Litigation Expenses is Reasonable

The district court also has discretion to determine an appropriate award of costs and expenses. See FED.R.CIV.PROC. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement"); *Trans Container Services v. Security Forwarders, Inc.*, 752 F.2d 483, 488 (9th Cir. 1985). One court has noted that, in evaluating the reasonableness of costs, "the judge has to step in and play surrogate client." See *In re Continental Illinois Securities Litig.*, 962 F.2d at 572. In keeping with this role, the court must examine prevailing rates and practices in the legal marketplace to assess the reasonableness of the costs sought. *Jenkins*, 491 U.S. at 286-87. "Expenses such as reimbursement for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, documents scanning, and visual equipment are typically recoverable." *Rutti v. Lojack Corp., Inc.*, No. SACV 06–350 DOC (JCx), 2012 WL 3151077, *12 (C.D. Cal. July 31, 2012). "Requests for reimbursement for photocopying charges are regularly reimbursed, although courts are careful not to award [costs] for excessive copies, excessive costs per page, or copying of documents not reasonably related to the litigation." *In re Media Vision Technology Securities Litigation*, 913 F.Supp. 1362 1367-68 (N.D. Cal. 1996). Courts have discretion to reimburse consulting and expert witness fees. *Id*. at 1366-67.

Class counsel's motion originally sought $299,586.53 in expenses.[188] This number increased to $303,197.14 after class counsel submitted documentation and further explanation of their expenses, which the court requested at the hearing.[189] Class counsel explain that in addition

---

[188]Motion at 24.

[189]The new total appears to reflect a number of subtractions for accounting errors, as well as an additional $4,462.45 incurred by Caddell & Chapman between the date the motion for attorneys' fees was filed and the date counsel submitted supplemental declarations. (See, e.g., Supplemental Declaration of Payam Shahian in Support of Motion for Attorneys' Fees and

to expenses incurred by each law firm, Caddell & Chapman set up a common litigation IOLTA fund[190] to which all class counsel contributed.  This was used to pay for court reporters, experts, consultants, and document depository costs incurred to share documents with all class counsel.[191] Class counsel have each submitted proof that they contributed to this account; only Caddell & Chapman, however, seeks reimbursement for common fund expenses.[192]  Having reviewed the submissions, the court is satisfied that these expenses are not duplicative.

The total of unreimbursed expenses incurred in the common account is $198,028.23.[193] Class counsel used the funds in this account to retain four experts – two tire wear experts, including one who performed inspections of the named plaintiffs' vehicles, an automotive specialist, and an expert on "class issues."[194]   Additionally, class counsel retained RM Motorsports as a consultant; it purchased and test-drove three vehicles "to investigate the alleged defect and its effect on tire wear."[195]  These expenses were reimbursed, as were expenditures by RM Motorsports for tires, insurance, and storage of the vehicles.[196]  Approximately one-third of class counsel's costs request, or $105,054.87, represents monies that went to RM Motorsports for

---

Expenses ("Supp. Shahian Decl."), Docket No. 168-27 (Nov. 4, 2013), ¶ 4 n. 2; Supp. Caddell Decl., ¶ 4.

[190]IOLTA stands for the Interest on Lawyers Trust Accounts.

[191]Supp. Caddell Decl., ¶ 3.

[192]Supplemental Declaration of Matthew R. Mendelsohn in Support of Motion for Attorneys' Fees and Expenses ("Supp. Mendelsohn Decl."), Docket No. 168-15 (Nov. 4, 2013), ¶ 5, Exh. B (Letters and Checks Sent to Caddell & Chapman, Trustee); Supp. Shahian Decl., ¶¶ 2 n. 1, 11, Exh. 9 (Checks to Caddell & Chapman for Common Fund); Supplemental Declaration of Robert L. Starr in Support of Motion for Attorneys' Fees and Expenses ("Supp. Starr Decl."), Docket No. 168-28 (Nov. 4, 2013), ¶ 3.

[193]Supp. Caddell Decl., ¶ 3.

[194]*Id.*

[195]Caddell Decl., ¶ 28.

[196]Supp. Caddell Decl., ¶ 3.

these services.[197]  Although class counsel do not provide a great deal of information concerning the need for this work by RM Motorsports, the court notes that, based on the receipts submitted, it appears RM Motorsports was retained in approximately May 2012, after most of plaintiffs' claims had survived Honda's motion to dismiss and a motion for class certification had been filed. It therefore appears class counsel retained RM Motorsports in anticipation of the case going to trial.  Counsel's decision to retain RM Motorsports only after the case was certain to progress was reasonable; in a case involving allegedly defective vehicles, moreover, it is reasonable to purchase vehicles for investigative purposes, as it would be difficult to drive the named plaintiffs' vehicles, or other individuals' vehicles, many thousands of miles.

The court now turns to the expense requests submitted by each law firm.  Caddell & Chapman requests $44,147.90 in expenses prior to the date the motion for fees and expenses was filed, and an additional $4,462.45 for expenses incurred from September 7 to October 31, 2013.[198] Specifically, it seeks reimbursement for the services of a database management company, a tire expert different than the one retained through the common fund, court reporter services for depositions other than those paid for by the common fund, copies at $0.20 per page, faxes at $1.00 per page, telephone charges, research using Pacer and Westlaw, staff overtime, court costs, postage, deliveries, and attorney travel reimbursement.[199]  The firm has submitted copies of the receipts and/or checks paid for these expenses.[200]  It has also provided the curricula vitae of the

---

[197]*Id.*, Exh. A, Part 3 at 42 (Expert Invoices, Receipts, and Checks). Of this amount, $65,054.87 was on purchasing and servicing vehicles, paying insurance, title, and taxes, and purchasing new tires, alignment services, and fuel. Another $40,000 was reimbursement to RM Motorsports for testing.  (*Id.*)

[198]*Id.*, ¶ 4.

[199]*Id.*  There is an additional category called "write-off - travel expenses - $5,000," that has no support for that amount listed underneath it.  The court notes, however, that this amount is not included in the grand total.  (*Id.*)

[200]*Id.*, Exhs. A-B (Receipts, Checks, and Expert Curriculum Vitaes).

experts it retained.[201]

Mazie Slater requests $29,783.83 in expenses for electronic research, filing fees for Mendelsohn's admittance to the Ninth Circuit Court of Appeals, overnight delivery, photocopying at $0.25 per page, postage, service of process on Honda's parent company in Japan, transportation, meals, and lodging, website development and data collection related to more than 750 individuals, as well as document repository costs for a different period than those paid out of the common fund.[202]

Strategic Legal Practices requests $16,248.17 in unreimbursed costs for court reporters' deposition fees, court fees, Westlaw research, delivery and messenger fees, copying and printing at $0.20 per page, transportation, and website development.[203]  The requested amount includes a $4,500 check that Strategic Legal Practices wrote to Mazie Slater in connection with counsel's internet campaign.[204]  Mazie Slater inadvertently included this amount in its prior costs request, but has now eliminated it.[205]

Finally, the Starr Firm seeks $10,526.56 in costs for filing fees related to the filing of the

---

[201]See e.g., *id.*, Exh. A, Part 2, at 5-7, (Gary A. Derian Curriculum Vitae), 27-57 (Geoffrey P. Miller Curriculum Vitae).

[202]Supp. Mendelsohn Supp. Decl., ¶¶ 3, 6-11, 13-15, Exhs. B (Ninth Circuit Admittance of Matthew Ross Mendelsohn), C (Service of Process Bills, Receipts, and Checks), D-G (Travel Receipts), H (Screenshot of Website), I (Payments to LDA Interactive for Data Collection), J (Google Cost Summary Page), K (Invoice and Checks for Document Repository).

[203]Supp. Shahian Decl., ¶¶ 2-10.  Shahian requests reimbursement of $4,245.50, the cost of the original deposition transcript and original video for the November 1, 2011 deposition of Kurt Anderson and the November 2, 2011 deposition of Pamela Hernandez.  Caddell seeks $2,170.25 for a certified copy of the transcript and video for these same depositions.  These charges represent separate expenses and are therefore not duplicative.  (Compare Supp. Caddell Decl., ¶ 4, Exh. B, Part 1 with Supp. Shahian Decl., ¶ 4, Exh. 1.)

[204]Supp. Shahian Decl., ¶ 10, Exh. 8 ($4,500 Check from Strategic Partners to Mazie Slater).

[205]Supp. Mendelsohn Decl., ¶ 14 (noting that Mazie Slater originally sought $14,281.28 in expenses for the website but now seeks $9,781.28).

complaint, photocopying at $0.20 per page, transportation, meals, and lodging for trips to New York, California, Montana, North Carolina, Florida, and Texas, and court reporter fees for the transcript of plaintiff Eric Ellis's deposition.[206]

The court has reviewed all of the information provided by counsel and is satisfied that the costs incurred were reasonable.  The costs charged for photocopies, telephone expenses, faxes, postage, and couriers are within reasonable limits.  The costs charged for travel include reasonable amounts spent on air fare, rental cars, and per diem food expenses.  This is not a case in which class counsel seek reimbursement for "first class airplane tickets, luxury hotel accommodations, and gourmet dinner meetings" at the expense of a common fund recovery.  *In re Media Vision*, 913 F.Supp. at 1372.  Having reviewed counsel's receipts, the court is also satisfied that there is no duplication of expenses.  For these reasons, the court grants class counsels' expense request, and awards class counsel costs of $303,197.14.

### 3.    Incentive Awards

An individual who joins his claims with those of a class "disclaim[s] any right to a preferred position in the settlement [of those claims]."  *In re Oracle Securities Litigation*, No. C-90-0931-VRW, 1994 WL 502054, *1 (N.D. Cal. June 18, 1994) (quoting *Officers for Justice*, 688 F.2d at 632).  Nonetheless, it is well-established that the court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for time spent in litigation activities, including depositions.  See *In re Mego Financial Corp. Securities Litig.*, 213 F.3d at 463 (the district court did not abuse its discretion in awarding an incentive award to the class representatives); *Matter of Continental Illinois Securities Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (stating that an incentive award in such amount "as may be necessary to induce [the class representative] to participate in the suit" is appropriate).

The settlement agreement provides for a combined incentive payment to plaintiffs up to

---

[206]Starr Supp. Decl., ¶¶ 2, 5-8, Exhs. 1 (Itemized Spreadsheet of Expenses), 2 (Receipts and Invoices).

$35,000.[207]   Class counsel propose to divide this amount by awarding Keegan, Garcia, Ellis, Wright, Kolstad, and Hinkle $5,000 each, and awarding Phillips and Hall, who joined as plaintiffs later in the litigation and thus contributed less time to it, $1,000 each.   These proposed awards are consistent with the amount courts typically award as incentive payments.   See, e.g., *In re Mego Financial Corp.*, 213 F.3d at 463 (approving a $5,000 incentive award for each class representative); *Faigman v. AT & T Mobility LLC*, No. C06-04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving an incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.*, No. CV-10-3873-JST (RZx), 2011 WL 320998, *2 (C.D. Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 to two named plaintiffs); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646-47 (S.D. Cal. 2011) (approving an award of $4,000 for one named plaintiff and $2,000 for another); *Dennis v. Kellogg Co.*, No. 09-CV-1786-IEG (WMc), 2010 WL 4285011, *3 (S.D. Cal. Oct. 14, 2010) (preliminarily approving an incentive award of $5,000); *Aguayo v. Oldenkamp Trucking*, No. F04-6279 AWI LJO, 2006 WL 3020943, *10 (E.D. Cal. Oct. 17, 2006) (preliminarily approving a settlement agreement, which provided that class counsel would apply for an incentive award of no more than $5,000 for the named plaintiff).

Whether to authorize an incentive payment to a class representative is a matter within the court's discretion.   The criteria courts consider in determining whether to approve an incentive award include:

> "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation[;] and[ ] 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation."   *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995).

---

[207]Caddell Decl., Exh. D (Settlement Agreement, ¶ 4.4).

**a.      The Risk to the Class Representative in Commencing Suit**

When a class representative shoulders some degree of personal risk in joining the litigation, such as workplace retaliation or financial liability, an incentive award is especially important.  See *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (noting that fear of workplace retaliation is a relevant factor in evaluating the propriety of an incentive award).  The record contains some evidence that the plaintiffs bore some risk of financial liability, as each has stated that he or she experienced a disruption in his or her business as a result of having been a class representative.[208]  Plaintiffs' statements are too vague, however, for the court to conclude that they actually risked or suffered financial liability as a result of their participation in this case.  Accordingly, the court concludes that this factor is neutral.

**b.      The Notoriety and Personal Difficulties Encountered by the Class Representative**

There is no particular notoriety associated with this litigation, nor is there any indication that the named plaintiffs have been subjected to media attention as a result of their involvement in the case.  See, e.g., *Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2008 WL 3854963, *13 (C.D. Cal. Aug. 13, 2008) (finding that the media attention class representatives attracted supported incentive awards).  The fact that there was no media attention, however, does not preclude approval of an incentive payment.  See *Razilov v. Nationwide Mut. Ins. Co.*, No. 01-CV-1466-BR, 2006 WL 3312024, *4 (D. Or. Nov. 13, 2006) (approving an incentive award of $10,000 despite a lack of notoriety or demonstration of personal difficulties).  As no significant media attention or other difficulties have been identified, however, this factor weighs against authorizing a large incentive payment.

**c.      The Amount of Time and Effort Expended by the Class Representatives**

An incentive award is appropriate where, as here, the "class representatives remained fully

---

[208]Keegan Decl., ¶ 12; Garcia Decl. at 2; Ellis Decl., ¶ 12; Wright Decl., ¶ 10; Kolstad Decl., ¶ 12; Hinkle Decl., ¶ 12; Phillips Decl., ¶ 10; Hall Decl., ¶ 10.

involved and expended considerable time and energy during the course of the litigation." *Razilov*, 2006 WL 331204 at *4. Class counsel assert that the class representatives "have all spent significant amounts of time and effort on behalf of the class in this litigation, including submitting their vehicles for [multiple] inspection[s] and having their depositions taken."[209] Keegan states that he has "provided [his] attorneys with relevant and helpful information for this lawsuit regarding my experience with my vehicle, including my purchase of the vehicle; the malfunctions I experienced with the vehicle; my attempts to have the vehicle repaired at Honda dealerships; my discussions with Honda mechanics regarding my vehicle's malfunctions, defects and attempted repairs; and my damages resulting from the same."[210] He also states that he "ha[s] made [his] vehicle available for inspection on multiple occasions . . . at significant inconvenience to me," and has "assembled voluminous records evidencing the purchase, repairs, attempted repairs, malfunctions, and use of [his] vehicle." Finally, he notes that he has "been in regular email and phone contact with [his] attorneys and their staff throughout the prosecution of this case."[211] The other named plaintiffs have submitted declarations detailing a similar level of involvement.[212]

This factor, therefore, weighs in favor of granting an incentive award to plaintiffs. See *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, *17 (N.D. Cal. Apr. 22, 2010) (approving a $20,000 award where plaintiff "made herself available for deposition on two separate occasions, wherein she was subjected to questioning regarding her personal financial affairs and other sensitive subjects; met with Class Counsel on six separate occasions; attended the full-day Court-ordered appraisal hearing; spoke with Class Counsel and their staff on many occasions; reviewed all major pleadings; and repeatedly responded to interrogatories and document requests); *In re Heritage Bond Litigation*, 2005 WL 1594403 at *14

---

[209]Motion at 24.

[210]Keegan Decl., ¶ 5.

[211]*Id.*, ¶¶ 6-7.

[212]See Garcia Decl. at 2; Ellis Decl., ¶¶ 5-7, 9; Wright Decl., ¶¶ 5-7; Kolstad Decl., ¶¶ 5-7, 9; Hinkle Decl., ¶¶ 5-7, 9; Phillips Decl., ¶¶ 5-7, 11-12; Hall Decl., ¶¶ 5-7, 11-12.

(activities such as "responding to discovery, preparing for, traveling to and attending their depositions and maintaining contact with Plaintiffs' counsel to monitor the litigation" gave rise to an inference that class representatives were "actively involved in every aspect of . . . litigation").

### d.  The Duration of the Litigation

When a litigation has been protracted, an incentive award is especially appropriate.  See *Van Vranken*, 901 F.Supp. at 299 (finding that a class representative's participation through "years of litigation" supported an incentive award).  This case was filed on December 10, 2010,[213] and has been litigated for almost three years.  Given the length of the litigation and plaintiffs' involvement in it, the court concludes that this factor also favors an incentive award.

### e.  The Personal Benefit Enjoyed by the Class Representative as a Result of the Litigation

An incentive award may be appropriate when a class representative will not gain any benefit beyond that she would receive as an ordinary class member.  See *Razilov*, 2006 WL 331204 at *4 (approving the payment of an incentive award where the only benefit a class representative was going to receive from a settlement was the same statutory damages other class members would receive); *Van Vranken*, 901 F.Supp at 299 (where a class representative's claim made up "only a tiny fraction of the common fund," a substantial incentive award was appropriate).  The named plaintiffs in this action will receive no relief beyond that available to members of the class in general;[214] absent an incentive award, they will each be eligible for a control arm replacement and/or for reimbursement of costs associated with an earlier control arm or tire replacement.  This factor, therefore, also favors approval of an incentive award.

### f.  Weighing the Factors

Considering all relevant factors, the court concludes that an incentive award of $5,000 for each of Keegan, Garcia, Ellis, Wright, Kolstad, and Hinkle, and an incentive award of $1,000 for

---

[213]Complaint, Docket No. 1 (Dec. 10, 2010).

[214]Caddell Decl., Exh. D (Settlement Agreement, ¶ 4.4 ("The Representative Plaintiffs shall also be entitled to Control Arm Replacement and payments for Out-of-Pocket Expenses to the same extent that Settlement Class Members are eligible for such relief")).

each of Phillips and Hall is "just and reasonable under the circumstances." *Van Vranken*, 901 F.Supp at 299.

### III. CONCLUSION

For the reasons stated, the court grants the motion for final approval of the settlement, and the request for attorneys' fees, expenses, and incentive awards. It awards attorneys' fees of $2,853,585.35, expenses of $303,197.14, a $5,000 incentive award to Keegan, Garcia, Ellis, Wright, Kolstad, and Hinkle, and a $1,000 incentive award to Phillips and Hall.

DATED: January 21, 2014

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

68